## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| GARY DAVIS, JOE DAVIS, | : |
| JUSTIN HARRIS, | : |
| DEVAHN JEFFERSON, | : |
| KEITH MCCLINTON, | : |
| DONALD OUTLAW, E.J. RIVERS, and | : CASE NO. _____ |
| NAAMAN SMITH, individually and | : |
| on behalf of a class of similarly situated | : |
| individuals, | : COMPLAINT – CLASS ACTION |
| | : |
| Plaintiffs, | : JURY TRIAL DEMANDED |
| | : |
| v. | : |
| | : |
| GENERAL MILLS OPERATIONS, LLC, | : |
| | : |
| Defendant. | : |

## CLASS ACTION RACE DISCRIMINATION COMPLAINT

COME NOW the above-named Plaintiffs, individually and on behalf of a class of individuals similarly situated, and bring this action against Defendant General Mills Operations, LLC, due to a fraternal organization of male white supremacists operating in management and HR at the Covington location of General Mills which has systematically deprived Black employees the full and equal benefit of employment at General Mills in violation of the Civil Rights Act of 1866 and other federal and state statutory provisions for over thirty years.

## PARTIES

1.

Plaintiffs are current and former employees of Defendant who currently work, or previously worked within the last four years, at General Mills' manufacturing facility in Covington, Georgia.

2.

Plaintiffs are citizens of the United States and residents of the State of Georgia; they submit themselves to the jurisdiction of this Court.

3.

General Mills Operations, LLC ("Defendant" or "General Mills"), is a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota, and may be served by personal service of process upon its registered agent, National Registered Agents, Inc., 289 S. Culver Street, Lawrenceville, Georgia 30046.

4.

General Mills is an American multinational food manufacturer and marketer of branded processed consumer foods sold in retail stores.

5.

General Mills has an extensive portfolio of children's cereal brands, some of which are manufactured at the facility at issue in this case.

6.

General Mills purports to be an equal opportunity employer of more than 30,000 employees in the United States.

7.

General Mills presently has a market capitalization of over $38 billion, is a member of the World Economic Forum, and is one of the largest food manufacturers in the world.

8.

General Mills' website is replete with celebrating itself for its corporate focus to "Champion Belonging" as a core value at General Mills and to "ensure everyone has a seat at the table."[1]

9.

Defendant is subject to the jurisdiction of this Court.

---

[1] General Mills, *General Mills employee networks ensure everyone has a seat at the table*, available at: https://www.generalmills.com/news/stories/general-mills-employee-networks-ensure-everyone-has-a-seat-at-the-table

10.

Service and process are timely, valid, and appropriate in all respects.

## JURISDICTION AND VENUE

11.

Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights), and 28 U.S.C. § 1367 (supplemental jurisdiction).

12.

Plaintiffs assert claims under Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 et seq. ("§ 1981"), the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et set. ("Federal RICO Act"), Georgia Racketeer Influenced and Corrupt Organizations Act, O.C.G.A. § 16-14-1 et seq. ("Georgia RICO Act"), and state nuisance law.

13.

Pursuant to 28 U.S.C. § 1391(b) and N.D. Ga. L.R. 3.1, the Atlanta Division of this Court is the proper venue for Plaintiffs' claims because Defendant is subject to this Court's personal jurisdiction, 28 U.S.C. § 1391(c)(2), and a substantial part of the events or omissions giving rise to the claim occurred within the Atlanta Division of this Court.  *See also* N.D. Ga. L.R. 3.1(B)(1)(a) and 3.1(B)(3).

**SINCE IT OPENED, GENERAL MILLS' COVINGTON FACILITY HAS EMBRACED A RACIALLY HOSTILE WORK ENVIRONMENT PERPETUATED BY WHITE SUPREMACISTS WHO DENY BLACK EMPLOYEES SEATS AT THE TABLE**

14.

General Mills opened the West Plant of a food manufacturing facility in Covington, Georgia, in 1988.  It opened the East Plant in 1992.

15.

The Covington facility manufactures cereal and trail mix pieces.

16.

Jack Gilliam[2] and Greg Cantrell, both of whom are white men, previously worked together for a different employer and were early hires at the Covington location.

17.

Gilliam and Cantrell worked at, and quickly gained control over the management of, the East Plant.

18.

Gilliam and Cantrell are believed to harbor discriminatory beliefs towards people of color and women.  For instance, Cantrell, who called Black people

---

[2] Gilliam's last day at the company before retirement was May 29, 2024.

"colored" well beyond the 1990s, also once told a plaintiff to this lawsuit that "women should be at home having kids."

19.

Gilliam and Cantrell used their control and influence at the Covington facility to cause General Mills to take actions that aggrandized and enriched themselves and their white friends.

20.

Upon information and belief, the Covington facility generates more than one billion dollars in revenue per year.

21.

To maintain control and influence in a manner that allows them to use the Covington facility as their own enterprise, Gilliam and Cantrell only allow like-minded individuals who "toe the line" to be in management, HR, or other leadership positions.

22.

Gilliam and Cantrell, along with others, formed an organization of white employees in management and human resources called the "Good Ole Boys" who:

(a)   Do not uniformly require white employees to comply with policies, procedures, job descriptions, or advancement standards to the same extent or degree as that required of Black employees.

(b)   Construe and apply policies, procedures, job descriptions, and advancement standards in a more onerous and tedious way against Black employees than as to white employees.

(c)   Systematically hold Black employees to a higher standard of conduct by writing them up and taking adverse employment actions against them at a higher rate and for less-serious infractions than white employees.

(d)   Put Black employees in circumstances and environments that set them up for write-ups and other adverse actions under the auspices of "doing a favor" or "being a team player," such as:

   (i)   Pressuring Black employees to falsely sign off on inspection reports to allow production to begin quicker than appropriate, or

   (ii)   Having Black employees work in areas where they are not trained under the pretense of said employees doing a favor or being a team player –

7

then later taking adverse action against that employee related to that exact action for "violating policy."

(e)    Provide benefits for underperforming – and, often, racist – white employees by:

 (i) Giving them false performance evaluations with incorrect and inflated positive information and without correct information regarding negative behaviors or actions.

 (ii) Using false information to give promotions and bonuses to white employees.

 (iii) Using false information to select Black employees for demotion instead of underperforming white employees in so-called mass demotions.

 (iv) Removing negative information from white employees' personnel files.

 (v) Not holding white employees to the same performance standards as Black employees.

 (vi) Hiring or promoting white employees into positions for which they are not qualified to the detriment of more qualified Black employees.

(f)     Give false performance evaluations to Black employees to justify adverse employment actions.

(g)     Coordinate among each other to take adverse employment actions against Black employees based on false and manufactured evidence.

(h)     Receive information about complaints of race discrimination from local and corporate HR to then use as the basis to target Black employees with baseless adverse employment actions.

(i)     Maintain a quota[3] of Black employees who "toe the line" and do not complain about disparate treatment of Black employees to allow the Good Ole Boys to maintain control of the Covington facility and, to the furthest extent possible, avoid liability in discrimination lawsuits.

(j)     Give white employees answers to test questions required for advancement and not require them to complete the hands-on requirements.

(k)     Make up job positions and give less onerous job descriptions with fewer responsibilities to white employees.

---

[3] Upon information and belief, General Mills has argued that its employment decisions are not racist because there is "no statistical impact" on Black employees as a whole.

(l)  Reserve desirable positions, such as those in the maintenance department, for white employees other than a minimal quota of Black employees vastly disproportionate to the number of Black technician-level and temporary employees.

(m)  Hire and promote white applicants who are objectively less qualified than Black applicants.

(n)  Threaten Black employees with demotions and pay reductions.

(o)  Empower racist white employees to harass and mistreat Black employees, especially temporary employees and those with less than five years of seniority at the company.

(p)  Implement tools that will later be used in HR decisions and federal employment litigation to justify disparate treatment of Black employees, such as the Coaching and Counseling Database ("CC Database").

(q)  Give favorable treatment to at least one contractor who is a former member of the Good Ole Boys, which is consistent with Gilliam and Cantrell using the Covington facility as their own personal enterprise that enriches themselves and other white supremacists.

23.

In the 1990s, the Covington facility's proportion of Black employees was drastically less than the Covington area's population of citizens.

24.

In the 1990s, white employees, without fear of repercussions from management or HR, openly used the N-word and other racial slurs and attempted to intimidate Black employees with racial hostility.

25.

At different times throughout its history, including in the 1990s and early 2000s, the Covington facility has held meetings, trainings, and events that purport to promote diversity in response to racial hostility at the plant.  This façade of caring about the equal treatment of employees on the basis of race has permeated the entire history of the Covington facility.

26.

In reality, the Good Ole Boys have used members and friends in HR positions – supported by the legal team of a multi-billion-dollar company – to adopt policies and take actions that allow the Good Ole Boys to treat white employees more favorably than Black employees in a way that reduces the risk of

liability findings in discrimination cases and reduces the risk of paying unemployment benefits.

27.

Around 1999, Shane Cox was hired to work at the Covington facility.

28.

Cox is an entrenched and highly favored Good Ole Boys member.

29.

The Good Ole Boys has consistently ensured Cox is not held to the same standard as Black employees even though he has been accused of racially hostile behavior by multiple Black employees in dozens – if not hundreds – of incidents over 20 years.

30.

Defendant has removed negative information from Cox's personnel file and otherwise fabricated and manufactured documentation to protect Cox to the detriment of Black employees.

31.

To maintain the ability to keep Cox and other racist white employees in positions of power, the Good Ole Boys have used numerous methods to intimidate Black employees.

12

32.

The Good Ole Boys believes that Confederate imagery intimidates Black people, indicates white superiority, and subjugates Black employees.

33.

The Good Ole Boys believe that history and symbols that have been co-opted or misappropriated by the Ku Klux Klan and other white supremacist hate groups are useful to keep Black people "in their place" and discourage Black people from speaking or taking action against the disparate treatment of Black employees at the Covington facility.

34.

In 2005, the Good Ole Boys caused Defendant to commission a depiction of Stone Mountain from Good Ole Boys member James Spitzer with official General Mills characters portraying Confederate Generals:

(a)    Sonny the Cuckoo Bird (Cocoa Puffs) as Jefferson Davis;

(b)    Chef Wendell[4] (Cinnamon Toast Crunch) as Robert E. Lee; and

(c)    Buzz the Bee (Cheerios) as Stonewall Jackson.

---

[4] Chef Wendell is a former mascot of Cinnamon Toast Crunch.

35.

Some Black employees refer to the depiction of Stone Mountain as the "Confederate Mural."

36.

This is a picture of the Confederate Mural:



37.

The Confederate Mural was approximately twelve feet tall and more than twenty feet wide and was displayed from approximately 2005 until 2021 at the East Plant, just outside of a production area where Black employees were required to pass every day.

38.

The production area is just to the right of the orientation of the photograph in the above picture.

39.

Good Ole Boys member James Spitzer created several t-shirts depicting a boulder or rock with "Covington" written below it and, in at least one iteration, a General Mills flag on it.

40.

Upon information and belief, several of these t-shirts contain symbols intended to convey white supremacist ideas.

41.

This is one example of a t-shirt design:



42.

Another example includes Chef Wendell holding a chain connected to the

neck of a rabid Pitbull-lizard-looking animal with red eyes and a spade tail:



43.

Black employees have been required to wear these t-shirts at certain times and events.

44.

Egregious incidents of racism have gone ignored by local and corporate HR for over 20 years.  Further, HR routinely informs racist white supervisors about the content of complaints against them along with the identity of the Black employees who made the complaint.  This frequently results in retaliation against Black employees.  As a result, many Black employees will not make complaints of discrimination to HR or fill out "climate surveys" for fear of retaliation by the Good Ole Boys.

45.

In April 2023, Conrad James, a Technician Team Lead ("TTL") who was demoted effective January 1, 2022, as part of so-called mass demotions which are discussed in more detail below, filed suit in this Court, Case No. 1:23-CV-01560-SCJ-RDC.

46.

In his lawsuit, James alleged that the Good Ole Boys is a fraternity of white men operating in leadership positions at the Covington location.  *James v. General*

*Mills Operations, LLC*, Case No. 1:23-CV-01560-SCJ-RDC, Doc. 1 at ¶¶ 9-11 (N.D. Ga. Apr. 11, 2023).

47.

In his deposition in the *James* case, the current plant manager, Orric Browning, stated that he was working in Wisconsin when he was contacted about becoming plant manager at the Covington facility.

48.

Upon information and belief, the Covington plant manager position became available when the last plant manager, Roxie Simon, abruptly and uncharacteristically left the position after James' lawsuit was filed.

49.

Browning was on-site within 60 days of being contacted about the open position, which he described as "pretty fast." He left for Covington so quickly that he had to return to Wisconsin from Georgia to train his replacement.

50.

Browning also denied the use of official General Mills' characters on the Confederate Mural until he was confronted and impeached with the photograph in paragraph 36 above.

51.

In late January 2024, a Black employee found an okay hand gesture image drawn or transposed onto cling film or a similar material in a production area in the East Plant.  This symbol, which was immediately recognized as a hate symbol by the Black employee, was reported directly to the plant manager, Browning.

52.

Black employees were not warned that a hate symbol had been found in a production area, and Defendant took no specific action to address the symbol. Instead, Browning generally discussed civility in a regularly scheduled "respectful workplace" training session.

**ENTIRE CAREERS HAVE BEEN HAMPERED BY GOOD OLE BOYS, CAUSING BLACK EMPLOYEES AND THEIR FAMILIES TO SUFFER UNTOLD MILLIONS OF DOLLARS IN LOSSES AND IRREPERABLE HARM TO THEIR CAREER TRAJECTORIES**

Plaintiff E.J. Rivers:

53.

Rivers started working at the East Plant as a Technician in 1992.

54.

A noose – a racist symbol intended to intimidate Black people with the reminder of mob lynchings – was left on Rivers' desk in 1993.

55.

Rivers was told to "go back to Africa" in 1994.

56.

Rivers reported the noose and other racial incidents to HR.   Upon information and belief, no adverse employment actions were taken against anyone as a result.   Instead, General Mills had meetings where diversity was given lip service with no action to protect Black employees from potentially violent racists.

57.

On numerous occasions, Rivers was passed over for promotion in favor of less-qualified white men.   On numerous occasions, after he was passed over, he had to train less-qualified individuals who were selected over him.

58.

One example is in 2003 when Rivers applied for a position that required a bachelor's degree.   He had a bachelor's degree at that time but was nonetheless passed over in favor of a white employee who did not have a bachelor's degree.

59.

While working in Covington, Rivers' job description as a Quality Assurance Technician/Quality Assurance Analyst was longer and contained more responsibilities than white employees with the same title.

60.

Rivers was told that white employees considered him to be a problem because he insisted that all work strictly comply with policies and procedures. However, Rivers insisted on enforcing strict compliance with policies and procedures because Black employees – and not white employees – are expected to strictly comply with all policies and procedures or risk reprimand or termination.

61.

In 2016, Rivers left the Covington facility to work at a General Mills facility in Albuquerque, New Mexico.

62.

In 2021, when Rivers returned to Georgia for personal reasons, he worked at the Covington facility for one-and-a-half months "on loan" from the New Mexico facility.

63.

Rivers submitted applications for open positions but was not even given an interview.

64.

Because the Covington facility would not hire him, Rivers retired out of the New Mexico facility.

Plaintiff Keith McClinton:

65.

McClinton began working at the East Plant in December 2001.

66.

McClinton's assigned mentor around the time he started at General Mills was a white man who had frequent outbursts of anger and yelled at McClinton daily.

67.

In 2003, McClinton and two white employees jointly made a mistake. McClinton openly apologized for the mistake, but the two white employees did not. Cantrell announced that McClinton "wasn't sincere enough," so three white employees approached and harassed him. The white employees who engaged in the same conduct were not harassed. McClinton reported this conduct to HR and is unaware of an investigation occurring. McClinton and Cantrell did not speak for years after that incident.

68.

Around 2003 or 2004, "coon" was written on McClinton's power audit forms, which are documents McClinton was required to complete as a job function, and "KM is a fucking [N-word]" was written on a restroom wall.

69.

Having witnessed Black employees being punished more harshly and for less serious infractions than white employees and knowing the Good Ole Boys' propensity to pepper Black employees' personnel files with false accusations about performance, McClinton has documented disparate treatment of Black employees in writing to HR for nearly 20 years – so much so that HR recently in 2024 told him to stop putting his complaints in writing.

70.

On or about November 9, 2005, McClinton complained in writing to HR that he had not received any follow-up regarding any investigation of racial comments left for him on the bathroom wall and his power audit forms.  In that complaint, he noted that the East Plant Manager told him that the company knew that he was a target of racist employees but did not warn him of the same throughout 2005. He also noted that he was denied advancement while being called an N-word on the bathroom wall and a "coon" on power audit forms.

71.

Around 2006, "KKK" was written on McClinton's personal lunchbox.

72.

In response to learning that "KKK" was written on McClinton's lunchbox, Defendant required McClinton to give a handwriting sample.

73.

As should go without saying, McClinton did not write "KKK" on his own lunchbox.

74.

Around 2020, McClinton learned that General Mills keeps confidential data on technicians in the CC Database when James inadvertently left it displayed on his computer screen as it was projected.

75.

James was reprimanded for inadvertently allowing McClinton to view entries in the CC Database.

76.

TTLs are required to add negative personnel information to the CC Database for Black employees because the same is used to justify adverse employment actions against Black employees.

77.

There are no objective criteria that govern the negative information put into the CC Database.

78.

In November 2021, a lock-out/tag-out incident took place that resulted in the disparate treatment of Black employees and one white employee involved –

(a)   Good Ole Boys member Steve Jarva took part in and/or was present for a training on certain manufacturing equipment.

(b)   When Jarva returned to / walked upon the training, he noticed that two non-Black managers and all the technicians involved had not "locked out/tagged out" the machine.

(c)   Jarva quietly told the non-Black managers to put their locks on the machine and, after they did, yelled at the technicians – all but one of whom was Black – for not putting their locks on the machine.

(d)   Jarva submitted write-ups for James, who was TTL at the time but was not present for the training, and all involved Black technicians but not the one involved white technician.

(e)   McClinton and other Black technicians complained to HR and sought to complain to corporate.

(f)     They were told that John Fryhoff was a corporate HR representative.

(g)     Instead, Fryhoff was head of local HR at General Mills' Murfreesboro, Tennessee, location.

(h)     Several weeks after this incident, Jarva announced that he was resigning and leaving the company.

(i)     After several months working for a different employer, Jarva returned to General Mills at the Murfreesboro location and, upon information and belief, continues to advance in the company.

79.

Over his tenure at General Mills, McClinton has complained about myriad instances of race discrimination, including –

(a)     The use of racial epithets and slurs in writing and verbally.

(b)     The Confederate Mural.

(c)     The disparate treatment of Black employees for write-ups and other adverse employment actions in the same circumstance or situation, including, among many other instances, the lock-out/tag-out incident in November 2021 and write-ups of Black employees for not attending a football game outside of regular working hours.

(d)     The disparate treatment of Black employees in promotion and hiring

decisions, including not imposing the same written or hands-on

testing requirements on white employees as are imposed on Black

employees.

80.

McClinton's supervisors include Cox and Jake Hayslip, who have colluded

to write-up McClinton, Joe Davis, and other Black employees.

81.

Cox and Hayslip were instructed by HR to only talk to McClinton when

absolutely necessary.

82.

The head of local HR, Chris Morrison, has criticized McClinton's emails

related to complaints of discrimination as being difficult to "decode."

83.

Corporate HR has denied McClinton's requests to be moved to a different

department than Cox, who frequently makes racist comments in the presence of

McClinton and other Black employees.   Instead, corporate HR in Minneapolis in

February 2024 asked McClinton to "reach out . . . if you experience or witness

incidents where Shane [Cox] is yelling or acting racist in any way."  Corporate HR

incredulously assured McClinton that, "we are working with him to improve his behavior."

84.

In April 2024, a local HR representative stated to McClinton in an email –

Going forward, instead of us trying to address via email which takes more time, please stop in and see either Jacob [Hayslip, Good Ole Boys member], Nate [Hood, Good Ole Boys member], or myself to discuss in person.

85.

In other words, local HR instructed McClinton to stop complaining about race discrimination in writing.

86.

The head of local HR is Chris Morrison, a Good Ole Boys member who helps the organization – from an HR and compliance perspective – maintain the racially hostile work environment at the Covington facility.

Plaintiff Joe Davis:

87.

In 2004, J. Davis began working for General Mills.

88.

J. Davis was promoted to TTL around 2020.

89.

In 2021, General Mills decided to demote about half of the TTLs at the Covington facility.

90.

The mass demotions were overseen and executed by Good Ole Boys members, including Morrison.

91.

J. Davis was selected for demotion as part of the so-called mass demotions, and he was back in a technician role effective January 1, 2022.

92.

Cox was not demoted.

93.

After J. Davis filed a charge of discrimination with the EEOC alleging a hostile work environment, Good Ole Boys members Cox and Jake Hayslip

coordinated to take an adverse employment action against him because he did not sign a form that had nothing to do with safety, compliance, or quality. He appealed that adverse action in writing complaining of disparate treatment of employees to the discipline committee, which upheld a Level I violation. This violation is referred to herein as "Post-EEOC Adverse Action."

94.

J. Davis has witnessed white employees be treated more favorably than Black employees in the same situation. By way of example –

(a)     One white employee, Chris Davenport, who was suspected by Black employees to be an alcoholic, was hired by Good Ole Boys members. Davenport had gotten so drunk at work that management had to arrange for an Uber ride to take him home.

(b)     Another white employee falsely stated on required paperwork that an inspection was done correctly when, in fact, it had not been completed and different types of cereal that were not intended to be mixed was found days into running the system. The white employee was not reprimanded, but other plaintiffs in this lawsuit in the same or less egregious circumstances were reprimanded or terminated for "falsification of data."

(c)     A Black employee was written up for being late for an overtime shift that he volunteered to cover.

95.

Previously, the Good Ole Boys would be satisfied for an employee to show up for an overtime shift as referenced in subsection (c) of the above paragraph. For many years, the Good Ole Boys would allow Black employees to work at the Covington facility as long as they kept their heads down and did not complain.

96.

Under the Good Ole Boys more recently, Black employees are subjected to adverse employment actions for minor infractions that were previously not an issue for Black employees (and still are not an issue for white employees).

97.

J. Davis has complained to corporate HR about the Post-EEOC Adverse Action.

98.

J. Davis, like other plaintiffs herein, made numerous complaints about race discrimination or voiced concerns in "climate surveys" that have gone unanswered.  For instance, he previously mentioned in a climate survey that the

maintenance department does not have a proportionate number of Black employees considering the overall demographic of the Covington facility.

99.

The site maintenance manager until May 29, 2024, was Good Ole Boys founder Jack Gilliam, so the racial disparity is no surprise to Black employees.

Plaintiff Donald Outlaw:

100.

Outlaw began work for General Mills at the Covington facility in 2005 as a technician.

101.

Outlaw was in the electrical instrumentation ("E&I") program for over five years.

102.

Outlaw applied for a maintenance position at the West Plant several times and a white candidate was selected over him every time even though, each time, he was the only person in the E&I program.

103.

On one occasion, Defendant advertised five open maintenance positions at the same time, and white candidates were selected to fill each of those positions.

104.

Over the last 4-5 years, Gilliam, a co-founder of the Good Ole Boys, has been site maintenance manager.   In that role, Gilliam –

(a)     Hired a white employee, Chad Gilbert, over more qualified Black employees into a role where he worked with vendors and outside contractors, including IMMEC, a Good Ole Boys-affiliated vendor.

(b)     Promoted another white employee, Josh Hayslip, into an E&I role even though he had not completed any of the training or required processes necessary for that role.

105.

Upon information and belief, there have only been two Black employees in the E&I role and that number was recently reduced to one.

106.

Outlaw also applied for multiple maintenance positions and interviewed for a reliability maintenance position.   Each time, he was passed over for a less-qualified white employee.

107.

Outlaw worked in a technician role until he was promoted to a TTL position around 2020.

108.

Outlaw received the promotion to TTL because General Mills created over a dozen additional TTL roles.

109.

Around October 2021, Outlaw was told that he was selected for demotion effective January 1, 2022, even though –

(a)    All of his performance evaluations as TTL noted that he "Exceeded Expectations."

(b)    He received a bonus at each interval that he was eligible.

(c)    He performed more job duties than white employees.

110.

When he was notified that he would be selected for demotion anyway, he realized that Black people advance at the Covington plant only when the Good Ole Boys choose that for them.  The Good Ole Boys has complete control over whether a Black employee advances or is terminated without truthful justification. As a result, Outlaw quit after spending 16 years working for the company.

111.

Black employees, including those who worked for General Mills for over a decade, were and are disheartened and stopped interviewing for positions because the Good Ole Boys are open and obvious about choosing white candidates over more qualified Black candidates.

112.

Race and skin color are treated as an employment or advancement qualification that trumps all others.

113.

Outlaw was present when Cox called a Black employee a "Black bitch."  Cox was put on a final warning as a result but continued to advance in the company even while continuing to have race discrimination and other complaints lodged against him.

114.

Cox had received a final termination warning ("final term") for racial comments and inability to communicate effectively when he was given a promotion to a "black hat" role, which was a technical position for Project Roger, a special project that expanded the Covington's facility's production of Cinnamon Toast Crunch.  He was also on a final term when he was later promoted to TTL.

At the same time, a Black employee, Titus Reed, a processor in East Plant was also on "final term" for a product hold that his whole team (not just him) was responsible for.  As a result of Reed's "final term," he was not allowed to advance, but Cox and other less-qualified white employees continue to advance in the company.

115.

Phil Thompson was Operations Manager of the East Plant.  He would not talk to Black employees in the same manner as he would talk to white employees. He kept conversations with Black employees very brief.  He would barely talk to Outlaw, look at him, or take him seriously.

116.

Upon information and belief, Defendant sought to address the power and control held by the Good Ole Boys by moving Cantrell to the Roger Department and moving Gilliam to West Plant.  They did this because Cantrell and Gilliam were more powerful than the Operations Manager.  Instead of weakening the Good Ole Boys, these moves have spread the Good Ole Boys' stronghold to West Plant and has increased the racial hostility at the Covington facility.

117.

General Mills had two Black female Operations Managers. They were never trusted by the Good Ole Boys to have the actual authority of an Operations Manager so were terminated quickly.

118.

Browning left Covington because he was not a good fit, was having performance issues, and was never a strong presence at the Covington facility.

119.

Many Black employees doubted the motivations of Defendant in putting Browning into the plant manager position as having dubious timing following the filing of the *James* lawsuit.

120.

Upon information and belief, the Good Ole Boys allowed a Black man to be made plant manager for the first time and has allowed other strategic hires and promotions of Black employees[5] in response to the *James* lawsuit.

---

[5] This is not to suggest that the Black employees who were hired or promoted for any position referenced in this complaint are necessarily not qualified. Many, if not all, of these individuals are indeed qualified for the positions they were hired or promoted into. However, the timing of these positive employment decisions is dubious and unprecedented prior to the filing of *James*. The problem with being promoted by the Good Ole Boys is that they decide how long the employee deserves that position.

<u>Plaintiff Naaman Smith</u>:

121.

Smith worked for General Mills as a technician for about 7 years.

122.

Smith worked on a team with Gary Davis and John Dean, under Good Ole Boys member Daniel Korpi.

123.

Smith, who has a bachelor's degree, was passed over for a promotion to TTL in favor of John Dean, who is suspected by multiple black employees to be unable to fluently read or write.

124.

On another occasion, Good Ole Boys member Steven Fellows, encouraged Smith to apply for a TTL role.  As Smith was completing his application for that role, Fellows coached a white employee, Danny Thompson, on what to do and say to get the TTL role over five other applicants, including Smith.  Thompson was previously fired then re-hired by Fellows before being promoted to TTL over Smith.

125.

Fellows has been dishonest with other Black employees as well.  For instance, Justin Harris, a Black man, was with the company for about one-and-a-half years before being terminated over points accumulated from personal circumstances.  When Harris was fired, Fellows told him that he would be re-hired in 6-12 months.  Later, Fellows took the position that Harris should not be rehired since he had been fired, although Thompson, referenced in the paragraph above, had the same circumstance and was re-hired by Fellows.

126.

Around September 2023, Smith reported to his direct supervisor, Korpi, that he believed he was being targeted.  Korpi assured Smith that there was no problem, and Smith should continue to do what he had been doing.

127.

In October 2023, Korpi took photographs that he claimed showed Smith and Davis signed off on paperwork stating that equipment was clean when it was not. One photograph was of a tote on a clean floor; Korpi claimed Smith and Davis had committed a policy violation, and Korpi had cleaned up the tote before taking the picture.  Korpi did not have any evidence of a policy violation.

128.

Nonetheless, Smith and Davis were terminated on October 13, 2023.

129.

Upon information and belief, Korpi manufactured evidence and gave a false statement for the purpose of having Smith and Davis terminated.

Plaintiff Justin Harris:

130.

Harris began work at the Covington facility around 2019.

131.

In 2022, Defendant terminated Harris for having 7.5 "points," when he actually had less than five points.

132.

In connection with an unemployment claim, Defendant falsely told the Georgia Department of Labor that Harris was terminated for accumulating 7.5 points due to absences.  Harris told the DOL he would agree he should not get unemployment benefits if Defendant could produce documentation showing he had 7.5 points.  Shortly thereafter, he was awarded unemployment benefits.

133.

When he was terminated, Fellows told him that he could be re-hired.

134.

Even though white employees who were terminated for accumulating points based on absences were later re-hired, Harris was told he was not eligible to be re-hired.

Plaintiff Gary Davis:

135.

G. Davis worked for the Covington facility for approximately 1.5 years.

136.

Around the summer of 2023, G. Davis overhead Korpi and several other employees discussing manufacturing evidence to terminate an employee on FMLA leave, Devahn Jefferson.

137.

G. Davis told Jefferson the conservation he overhead, Jefferson reported it to HR, and HR interviewed G. Davis, telling him his statement would be confidential.

138.

Shortly after speaking with HR about Jefferson in August 2023, Korpi began harassing G. Davis.

139.

Korpi added questions to the test G. Davis had to take to advance to a Technician III that were not required of white employees.  G. Davis failed the test on one occasion because of the additional questions.

140.

When G. Davis asked Korpi for training help, the request was denied. However, when a white employee asked for training, Korpi took him off his regular team and placed him with another technician to better learn the system. G. Davis asked for the same treatment, and that request was denied.

141.

John Dean, a white TTL, frequently sat and did not work.  However, Dean was favored by Korpi, so Korpi held Davis and Smith responsible for the work that Dean was not performing.  Davis and Smith's job duties took longer than they otherwise would because they also had to perform Dean's duties.

142.

Davis was terminated for the same conduct that was deemed "falsification of data" that led to the termination of Smith.

143.

A white technician in the Puff Department engaged in the same conduct as Davis and Smith and was written up, not terminated.

Plaintiff Devahn Jefferson:

144.

On or about January 10, 2022, Jefferson began working for Defendant.

145.

Around June 2023, Jefferson took intermittent FMLA leave allowing him to miss three workdays per week.

146.

In August 2023, G. Davis told Jefferson about a conversation he overheard where supervisors were discussing ways to get Jefferson fired.  At the time, Jefferson's supervisors were Danny Thompson and Phil Fain.

147.

Jefferson reported the conversation that G. Davis overheard to HR.

148.

After Jefferson reported the conversation to HR, the individuals involved in the conversation overheard by G. Davis distanced themselves from Jefferson, which he initially welcomed.

149.

Around January 2024, however, Thompson passed away and Fain retired.

150.

After Thompson passed and Fain retired, Joe Huffman and Nicholas (last name unknown), both of whom were involved in the August conversation, became his supervisors.

151.

Joe Huffman made comments or asked questions about Jefferson's –

(a)     Smell.

(b)     Clothing.

(c)     Jewelry.

(d)     Vehicle.

152.

Huffman and other white employees asked various stereotypical questions, such as how Jefferson was financially able to obtain his vehicle and why he wore jewelry and certain clothing.

153.

Several months after his supervisors changed, Jefferson was told that he had falsified a document and slowed down production two weeks before the issue was brought to his attention.

154.

Jefferson's supervisor told him the machine was "80% clean" and it delayed production. Later, Jefferson was told by HR representative Mandy Calloway that he only cleaned 20% of the machine. Jefferson disputed that he did not fully clean the machine or that he falsified a document. Calloway stated that Georgia is an at-will state and he could be fired for any reason.

155.

Jefferson was not trained on cleaning the machine that he was terminated for not cleaning.

156.

Jefferson was terminated on Huffman's first day in a new post-promotion role as TTL.

157.

Defendant was aware that Jefferson was expecting a newborn child within about two months of his termination and was anticipating taking paternity leave.

158.

General Mills offers well-paying jobs with good benefits.  The Good Ole Boys, to the extent they are allowed, want to –

(a)     Reserve those jobs and benefits for other white employees; and

(b)     Prevent Black employees from having those jobs and benefits because the Good Ole Boys does not consider Black employees worthy.

159.

Jefferson was passed over for promotion in favor of less-qualified white employees at least twice.  White employees with little to no qualifications are routinely given positions over Black employees.

160.

One white employee quit and left the premises without following protocol. He called later that day to say he was joking; he was allowed to return to work. If a Black employee did that, they would not be allowed to return, and their unemployment claim would be denied.

## CLASS ACTION ALLEGATIONS

161.

Plaintiffs bring this action as a putative class action and propose one class.

162.

Plaintiffs propose the following class, while reserving the right to modify this definition:

> All black employees who, within the last four years, worked at General Mills' Covington facility and suffered an adverse employment action in any form, including a write-up or inclusion in the Coaching & Counseling Database.

163.

Plaintiffs propose certification on all issues, while reserving the right to seek, in the alternative, certification as to any specific issue, claim, or defense.

164.

This action has been brought and is properly maintained as a class action as it satisfies the numerosity, commonality, typicality, and adequacy-of-representation requirements of Fed. R. Civ. P. 23.

165.

Plaintiffs allege that hundreds of Black employees suffered an adverse employment action while working for General Mills' Covington facility within the last four years.

166.

The class members are so numerous that joinder is impracticable.

167.

Plaintiffs' claims are typical of the claims of the putative class. Because Plaintiffs were harmed by the same discriminatory scheme intended to hamper the advancement of Black employees to the benefit of white employees on the basis of race that has harmed the class, Plaintiffs were subject to the conduct that is typical of the rest of the class.

168.

Plaintiffs would adequately protect the class's interests. Plaintiffs have genuine interest in protecting the rights of the class and Plaintiffs' counsel is

experienced in handling complex class actions. Because Plaintiffs seek recourse related to a racially discriminatory scheme that harmed all class members, the interests of Plaintiffs and the class are aligned.

169.

Questions of law and fact common to the putative class exist that predominate over questions affecting only individual members including but not limited to whether Defendant maintained a racially hostile work environment that hampered and negatively affected the careers of Black employees on the basis of race.  A finding of liability in favor of Plaintiffs would establish Defendant's liability on behalf of all class members damaged by the systemic racist scheme.

170.

A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

171.

The prosecution of separate actions by or against individual members of the class would create a risk of "(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; [and] (B) adjudications

with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests[.]" Fed. R. Civ. P. 23(b)(1).

172.

In opposing the class, Defendant has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.  Fed. R. Civ. P. 23(b)(2).

## **COUNT ONE**

### Violations of the Civil Rights Act of 1866

173.

Pursuant to the Civil Rights Act of 1866 –

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like

punishment, pains, penalties, taxes, licenses, and exactions of

every kind, and to no other.

42 U.S.C. § 1981(a).  This provision applies to nongovernmental discrimination.  *Id.*

at § 1981(c).

174.

General Mills has knowingly allowed the Good Ole Boys to operate the

Covington facility in a manner that systematically deprives Black employees the

equal benefits of employment enjoyed by white employees on the basis of race and

the color of their skin.

175.

The Good Ole Boys' actions and omissions that amount to the systematic

deprivation of the full rights of employment to Black employees have created a

racially hostile work environment that have altered the terms, conditions, or

privileges of employment because of race.

176.

Due to the discriminatory practices of Defendant, Black employees'

attempts to advance in the company are futile if they in any way oppose racially

discriminatory acts or omissions by management or HR at the Covington facility.

177.

The actions by General Mills described in this Count amount to an ongoing and continuous violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

178.

Plaintiffs are entitled to an award of damages against Defendant in an amount equal to all monetary and non-monetary losses they suffered.

## COUNT TWO

### Violations of the Federal RICO Act

179.

The Good Ole Boys has operated the Covington facility in a racially discriminatory manner since its construction and initial operation in the late 1980s.

180.

Over the last four years, each adverse employment action taken by the Covington facility was communicated to corporate HR in Minnesota via interstate wire.

181.

Each communication of adverse employment actions against black employees at the Covington facility has been inherently false and irredeemably tainted by the racially discriminatory scheme of the Good Ole Boys due to the

systematic unequal application of policies and procedures against black employees.

182.

The Good Ole Boys in management and HR at the Covington facility devised a scheme of creating false personnel data and transmitting the same for the purpose of obtaining money or property by means of false or fraudulent pretenses and representations by means of wire communication in interstate commerce.  This scheme is a violation of 28 U.S.C. § 1343.

183.

Defendant has received income derived, directly or indirectly, from a pattern of racketeering activity described above.

184.

Plaintiffs have been injured by the racketeering activity described above in this Count.  As such, Plaintiffs are entitled to recover threefold the damages they sustained plus the cost of this lawsuit, including a reasonable attorney's fee.

## COUNT THREE

### Violations of the Georgia RICO Act

185.

The allegations supporting Count Two are hereby incorporated as if fully restated herein.

186.

Serial violations of 18 U.S.C. § 1343 constitute racketeering activity under the Georgia RICO Act.  *See* O.C.G.A. § 16-14-3(5)(C).

187.

The violations of the Federal RICO Act at issue in this case necessarily constitute violations of the Georgia RICO Act, O.C.G.A. § 16-4-4, in that, in all regards relevant here, the Georgia RICO Act is more broadly applicable than its federal counterpart.

188.

Plaintiffs have been injured by the racketeering activity described above in this Count.  As such, Plaintiffs are entitled to recover three times the actual damages they sustained plus punitive damages.  O.C.G.A. § 16-14-6(c).

## COUNT FOUR

### Maintaining a Nuisance

189.

Defendant has allowed the Good Ole Boys to maintain a racially hostile work environment at the Covington facility that systematically hampers and negatively affects the careers of Black employees to the benefit of white employees on the basis of race.

190.

The Covington facility has been operated consistently since its inception by white supremacists in a manner that violates the Civil Rights Act of 1866.

191.

The operation of the Covington facility in the manner described within this Count causes and/or caused hurt, inconvenience, and damage to Plaintiffs.

192.

The damage caused by the referenced nuisance was reasonably foreseeable and, therefore, the proximate cause of the financial and other harms foisted upon Plaintiffs.

193.

Plaintiffs are entitled to all nuisance damages against Defendant as allowed by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand a TRIAL BY JURY and the following relief:

(a)     Declaratory judgment that the systemic pattern and practice of racially hostile and discriminatory employment practices that, over 30 years, made advancement at the Covington facility futile and caused catastrophic harm to the careers of Black employees violates Plaintiffs' § 1981 rights, constitutes racketeering activity under Federal and Georgia RICO statutes, and constitutes a nuisance;

(b)     Temporary and permanent injunctive relief, along with this Court's oversight for a reasonable duration, disbanding the Good Ole Boys, holding racist decisionmakers accountable, and implementing lawful employment practices that give Black employees the full benefit of employment at General Mills;

(c)     Full amount of financial losses caused to Plaintiffs as a result of the racist employment practices at the Covington facility;

(d)     Compensatory damages in an amount to be determined by the enlightened conscience of the jury for Plaintiffs' emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, and special damages;

(e)     Award of costs and expenses of this action, together with reasonable attorney and expert fees;

(f)     Punitive damages in an amount to be determined by the enlightened conscience of the jury sufficient to punish Defendant for its conduct toward Plaintiffs and deter Defendant from similar conduct in the future;

(g)     Judgment against Defendants for damages incurred by Plaintiffs;

(h)     Judgment against Defendant in an amount to fully and adequately compensate Plaintiffs;

(i)     An award of pre-judgment and post-judgment interest;

(j)     A trial by jury on all issues triable to a jury; and

(k)     Other and further relief as the Court deems just and proper.

Respectfully submitted this 2nd day of June 2024.


By:   /s/ Douglas H. Dean
      Georgia Bar No. 130988
      Attorney for Plaintiffs
      Dean Thaxton, LLC
      601 E. 14th Avenue (31015)
      Post Office Box 5005
      Cordele, Georgia 31010
      T:  (229) 271-9323
      F: (229) 271-9324
      E: *doug@deanthaxton.law*