## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| GARY DAVIS, JOE DAVIS, | : | |
| JUSTIN HARRIS, | : | |
| DEVAHN JEFFERSON, | : | |
| KEITH MCCLINTON, | : | |
| DONALD OUTLAW, E.J. RIVERS, | : | CASE NO. 1:24-CV-02409-MLB-JKL |
| NAAMAN SMITH, | : | |
| RICK CHILDS, MELVIN DREW, | : | FIRST AMENDED |
| DARRIUS EDGE, MARIO FLOYD, | : | COMPLAINT – CLASS ACTION |
| KEN HARRIS, RAKIA LEVESQUE, | : | |
| SAMUEL MAYHAN, and | : | JURY TRIAL DEMANDED |
| LAQUANDA TURNER, individually and | : | |
| on behalf of a class of similarly situated | : | |
| individuals, | : | |
| | : | |
|      Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| GENERAL MILLS OPERATIONS, LLC, | : | |
| | : | |
|      Defendant. | : | |

---

## FIRST AMENDED CLASS ACTION
## RACE DISCRIMINATION COMPLAINT

COMES NOW the above-named Plaintiffs and amend their June 2 class action complaint against General Mills (Doc. 1) to add eight named plaintiffs and insert the following paragraphs after paragraph 160 before Class Action

Allegations (Doc. 1 at 47) and to accordingly renumber paragraphs 161-193 in the initial complaint following the last paragraph below.

161.

When asked for comment about the June 2 class action complaint,

> a spokesperson for General Mills said the company does not comment on pending litigation, saying that the cereal manufacturer has a "long-standing and ongoing commitment to diversity, equity and inclusion."
>
> The spokesperson added the company does not "tolerate discrimination of any kind."[1]

162.

General Mills is aware that its Covington facility is controlled by white supremacists who create and maintain easy jobs for themselves and their white friends.

163.

The creator of the Confederate Mural (who is a long-time Good Ole Boys member with a track record of disparate treatment against Black employees) was just awarded a black hat role on August 12, 2024 – General Mills does not just tolerate discrimination; it rewards it.

---

[1] National Public Radio, *Black workers sue General Mills over alleged racial discrimination at a Georgia plant*, available at: https://www.npr.org/2024/06/07/nx-s1-4995429/black-workers-sue-general-mills-racial-discrimination.

164.

The only actions that General Mills has taken in response to lawsuits about the Good Ole Boys are self-protective, deflective, and related to optics and avoiding discrimination liability.

165.

Good Ole Boys members continue to be promoted over more qualified Black employees, and Black employees who speak out against or question discrimination continue to be retaliated against.

166.

Black employees are also retaliated against for participating in this class action litigation.

167.

One example is Plaintiff Rakia Levesque, who emailed the class action complaint and was terminated two days later. General Mills representatives could not give her a reason for her termination for six days.

168.

As detailed more below, General Mills' pattern and practice of tolerating race discrimination expands well beyond the facility in Covington, Georgia.

169.

The highest levels of leadership at General Mills are aware of the widespread race problem in the company.

170.

Jacqueline Williams-Roll, the Chief Human Resources Officer of General Mills, sold over $1.6 million worth of stock within a month of Conrad James' race discrimination complaint,[2] which was the first lawsuit that made allegations about the Good Ole Boys.

171.

Corporate has known about the Good Ole Boys for decades.

172.

General Mills has allowed and facilitated the control and self-enrichment of Covington white supremacists for business reasons, including defeating unionization[3] and mass production of Cinnamon Toast Crunch led by Greg Cantrell.

---

[2] *James v. General Mills Operations, LLC*, Case No. 1:23-cv-01560-SCJ-RDC, Doc. 1 (N.D. Ga. Apr. 11, 2023).

[3] Covington management, under the leadership of plant manager Joshua Anderson, was accused of "serious violations of the National Labor Relations Act" by the RWSDU, the only General Mills union which operates in just four of its fifty manufacturing facilities in the United States, Canada, Mexico, and Australia.

173.

Cantrell is allowed to run the plant how he has wished for over 30 years because, among other reasons, the Covington plant, under his leadership, underwent "one of the largest capital projects in General Mills history" to expand the production of Cinnamon Toast Crunch, "one of [General Mills'] most beloved brands as the No. 2 cereal in the United States, and growing."[4]

174.

Upon information and belief, Cantrell has delivered on vastly and recklessly expanded Cinnamon Toast Crunch production sufficient to justify his continued employment even though the Covington facility is mired in myriad complaints of racist employment decisions and a racially hostile work environment perpetuated by Good Ole Boys members looking out for each other at every level of HR and management.

175.

A substantial amount of Cinnamon Toast Crunch consumed in the United States is created in a racist scheme that has been illegal since the Civil Rights Act

---

[4] The Covington News, *General Mills expansion of cereal line to add 40 new jobs in Covington,* available at: https://www.covnews.com/news/general-mills-expansion-cereal-line-add-40-new-jobs-covington.

of 1866, which was passed the same year that "Cadwallader Washburn built his first mill in Minneapolis, Minnesota, which would become the foundation of General Mills."[5]

176.

Specifically, the Civil Rights Act of 1866 states:

> All persons within . . . the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens[.]"

42 U.S.C. § 1981(a).

177.

The Covington location of General Mills has been violating the Civil Rights Act of 1866 since it opened its doors: white employees are given one employment contract and reality that comes along with its own job duties and expectations, and Black employees – even those with the exact same job title – are given a different employment contract and reality with completely different, and much more onerous, job duties and expectations.

---

[5] General Mills, *Bringing good to the world since 1866*, available at: https://www.generalmills.com/about-us/our-history.

178.

Cantrell successfully created the cushy work environment for himself and his white friends by forcing Black employees to perform well beyond their fair share of the work.

179.

This model of two separate employment contracts and realities for white employees and Black employees has worked in making Covington extremely profitable and generating around $1 billion in revenue each year – it has also exploited Black employees for over 30 years.

180.

Cantrell and the Good Ole Boys force Black employees to do more work for less money and benefits, and create job stability for often less-qualified and lazy Good Ole Boys members and their friends,[6] by using this model:

(a)    First, with the intention to limit the advancement of Black employees who do not follow Good Ole Boys' instructions or engage in too much

---

[6] The Good Ole Boys do not see it this way; instead, they believe that Black people advancing in the company is "reverse discrimination" against white employees.

"back talk," Good Ole Boys refuse to train, safeguard information from, and intentionally incorrectly train Black employees;[7]

(b)     Second, even though the Good Ole Boys are responsible for training lower-level Black technicians, they nonetheless use write-ups, entries in the Coaching & Counseling Database, and delayed promotions to:

   i.     Punish Black employees for not being fully trained; and

   ii.    Intimidate them into performing more work than their white counterparts because even the technician positions are considered well-paying for the area.

(c)     Third, the Good Ole Boys make it very clear to Black employees that questioning or opposing racially discriminatory or hostile conduct are swiftly retaliated against – this happens via nitpicking and manufacturing evidence, which Chris Morrison, the head of local HR,

---

[7] Good Ole Boys allow advancement of Black employees who "toe the line" and follow Good Ole Boys' instructions. Black employees who question racially disparate application of policies are retaliated against. Roughly speaking, Black employees who have been employed less than ten years who cross the Good Ole Boys are terminated, nearly ubiquitously, via disparate policy application or manufacture of evidence, such as points. Black employees with close to or above ten years appear to be more likely to be denied advancement or harassed with write-ups as opposed to being terminated, although this is not a bright line rule as the recent termination of Rakia Levesque shows.

has personally taken part in, and that Megan Asturias in corporate

HR has personally taken part in covering up.

**FOR DECADES, THE HIGHEST LEVELS OF LEADERSHIP AT
COVINGTON HAVE KNOWN AND ACKNOWLEDGED THERE ARE TWO
DIFFERENT EMPLOYMENT CONTRACTS AND REALITIES DEPENDING
ON WHETHER THE EMPLOYEE IS WHITE OR BLACK**

181.

On August 1, 1989, the Covington location's West Plant opened its doors.

That was also Ken Harris's first day of work for General Mills.

182.

Harris began his career as a West Plant Maintenance Technician.

183.

Harris worked on B-52 bombers in the United States Air Force.  He left the

service in 1988 to make a career with General Mills.

184.

In the late 1990s or early 2000s, the Covington facility opened a "reliability

maintenance department" ("reliability maintenance") that was intended to focus

on planned maintenance as opposed to ad hoc maintenance tasks of the "shift

maintenance department" ("shift maintenance").

185.

Reliability maintenance was a Monday-Friday 8am-5pm position unlike the shift maintenance position that was on a rotating shift schedule.

186.

When reliability maintenance began, white men were promoted into the first two reliability maintenance positions.

187.

Around 2009, four new reliability maintenance positions were advertised, and Harris applied.  All four positions were filled by white men.

188.

Harris was more qualified than the four white men selected for those reliability maintenance positions, and he had previously spearheaded a rebuild of an Aagard machine (an important packaging machine that puts cereal bags into boxes, seals the boxes, puts boxes into cases, and palletizes the cases).

189.

Orric Browning, who was Operations Manager at the time, expressed surprise when Harris informed him that he was passed over for all four positions because Harris had successfully led a rebuild of an Aagard machine.

190.

Starting around 2010, Harris developed a program where he instructed 15-20 technicians to dissemble and rebuild the four West Plant Aagard machines on a 36-month rebuild schedule.

191.

An additional three positions in the reliability maintenance department were created that were geared toward individual strength and desire to move from shift maintenance to the reliability team. All three additional positions were filled by white men.

192.

White male employees of the maintenance department received more favorable treatment than Harris even though he performed well above and beyond his normal duties to include managing the packaging department's major planned and preventative maintenance programs in addition to performing day-to-day shift duties.

193.

A fabrication position was created on the reliability maintenance team even though General Mills used a third-party contractor for fabrication. This is just one

example of the Covington facility creating roles for white employees that were not actually needed.

194.

When Harris started when the doors opened on August 1, 1989, three other Black men joined the company as shift maintenance employees. Over the years, those three Black employees left the company and were replaced with white men.

195.

Even though the turnover rate for shift maintenance was high, Harris remained the sole Black maintenance technician for years.

196.

To put in perspective, in the 33 years that Harris worked in the maintenance department, only one open maintenance position was filled by a person of color and **<u>NO</u>** PERSON OF COLOR received a promotion from shift maintenance into another role.

197.

Harris was nicknamed "the Colonel" for the way he ran the Aagard program, which served as a pipeline for technicians to be promoted to the maintenance department. Employees who applied for maintenance touted their participation in Harris's program as a qualification.

198.

Like Plaintiff Rivers, Harris trained white employees who were then promoted over him.

199.

In 2012, Harris was asked by the then-plant manager and Orric Browning (then-Operations Manager of the West Plant) to assist and provide guidance for large-scale rebuilds at the East Plant.   There, Harris was met with immediate resistance by three white employees – Jack Gilliam, John Pulliam, and Shane Cox.

200.

Gilliam and Pulliam stormed out of a meeting to plan for the rebuild.

201.

The day after storming out of the meeting, Harris spoke with Gilliam, who questioned whether he really created the Aagard rebuild program at West Plant.

202.

Cox was openly hostile to Harris and spoke to him condescendingly.

203.

Around 2012, the position of Maintenance Lead was created at the West Plant Packaging department.

204.

The maintenance lead position duties were identical to the work that Harris was doing in previous years; however, Harris was not informed about the position until after it was awarded to Kevin Sperry, a white maintenance technician with far less tenure than Harris.

205.

Later, around 2013, Julia Grib, then-maintenance manager, informed Harris that he needed to move to another team to back-fill for Jason Kato, another white employee who had *expressed interest* in the maintenance lead position that Sperry had recently vacated.

206.

Grib told Harris the decision had already been made without allowing him the opportunity to apply for it.

207.

When maintenance lead positions were posted a few years later, then-Operations Manager Trey Northern (a Good Ole Boys member) told Harris that those positions had a lower pay rate than Harris's rate at that time. For that reason, Harris did not apply for those open maintenance lead positions.

208.

Shortly after the new maintenance lead positions were filled, those positions' pay levels were raised.  In other words, Harris did not apply because of the reduced pay, but then the pay was increased shortly thereafter so Harris would not have actually taken a pay cut.

209.

By 2013-2014, Harris had been passed over and not given any consideration in joining the reliability maintenance team, two Puff maintenance lead positions, and one Flake maintenance lead position.

210.

Around this time, a chute that added raisins to Raisin Bran was backing up and spilling onto the floor.  Harris added a conveyor before the chute, which eliminated the problem.

211.

Harris had previously redesigned a packaging system that pre-dated the Aagard system to fix an issue with continuous jamming that was taking place.

212.

For his efforts inventing new processes, Harris was recognized and given awards by corporate headquarters in Minneapolis.

213.

Around 2019, it was announced that Jack Gilliam would be the new site maintenance manager.  At that time, Harris decided he wanted to retire from General Mills early because he was not given, and would never be given, the same opportunities to advance as Gilliam.[8]

214.

Around 2020, Harris requested and had a meeting with Orric Browning, Krys Duffus (then-HR manager), and Roxie Simon (then-plant manager) about his experience not being promoted from shift maintenance in the 30+ years he worked at the Covington facility.

215.

In that meeting, Harris explained how his career had been hampered by his race and how he had never been promoted even though he was given invention awards, and his Aagard rebuild program was touted by white employees to get promotions over him.

---

[8] After layoffs in the 1990s, a vote was held on who to bring back.  Jack Gilliam had been laid off and was not on the list of people voted to come back.  Dale Pusch, then-plant manager, brought Gilliam back anyway.

216.

After the meeting, Browning told Harris:

> You did an EXCELLENT job making your points, telling your story, and challenging us to do better.  We just debriefed.

> You inspired us to get this right Ken!

217.

Nothing changed – Harris retired in October 2022 without ever receiving a promotion from shift maintenance.

218.

As a maintenance technician, Harris took part in the hiring process for several new maintenance technicians.  In that role, he knew that Plaintiff Donald Outlaw had no hope of being accepted into the maintenance department.

219.

Elvis Alexander, a Black male employee, applied for a maintenance position more than once.  He had an engineering degree and previously worked on a dock building ships.  During his interview, Alexander vividly described the process of building a ship from beginning to end.  It was clear to Harris that Alexander was abundantly qualified – if not over-qualified – for the maintenance technician

position.  Harris, the only black person on the hiring committee, was the only person who wanted to give Alexander a chance in the maintenance department.

220.

In its entire history since 1989, there has only been one other Black West Plant maintenance employee beyond the four initial hires in 1989 (which included Ken Harris).

221.

Harris is just one example of the systematic promotion of less qualified white employees over Black employees.

222.

And the West Plant[9] Maintenance Department is just one example of a department in Covington, Murfreesboro, and other locations, as well as pods of remote and field employees, where race trumps all other considerations as to whether a General Mills employee deserves a promotion.

---

[9] East Plant is generally considered harder, rougher, and "worse" than West Plant.

## CORPORATE HR SPECIFICALLY KNOWS THAT THE
## GOOD OLE BOYS ARE WHITE SUPREMACISTS

223.

John Henderson was the site safety manager with authority over East and West Plants.

224.

Here, Henderson is pictured displaying the "okay hand gesture," which was recognized by Black employees as a racist gesture designated a hate symbol by the Anti-Defamation League. Upon information and belief, Henderson was not terminated.



19

225.

The hand signal displayed in the above paragraph is intended to covey the letters W and P, which represent "White Power."

226.

Corporate HR was also notified of B.J. Marks displaying the okay hand gesture in this photograph.



227.

Henderson, Marks, and other Good Ole Boys in the highest levels of management and HR subscribe to white supremacist ideology and look out for other Good Ole Boys members who have **and demonstrate** the same beliefs.

228.

The Good Ole Boys' requirement of a white supremacist ideology ensures that current white employees and their families and friends have well-paying jobs with few requirements because the Good Ole Boys act in concert to enforce the scheme outlined in paragraph 180 above.

229.

Good Ole Boys members identify themselves to like-minded employees with symbols that have been misappropriated by the KKK and other hate groups, such as the okay hand gesture, the Gadsden flag, and "the Confederate flag."

230.

Good Ole Boys are routinely allowed to sleep on the job and are promoted even though they are not qualified – James "Jim" Alexander is a glaring example of this.

231.

B.J. Marks was not terminated and continued to work for General Mills until April 2024 when, upon information and belief, he retired.

232.

In late January 2024, the okay hand gesture symbol was found on production material hung up in a production area at the East Plant.

233.

In his deposition in the *James* case (*see* Doc. 1 at ¶ 46), the current Covington plant manager, Orric Browning, intimated General Mills was unaware of the racist and nefarious meaning of the okay hand gesture that was displayed in East Plant in January 2024.[10]  That is false.

_____

[10] General Mills received complaints about the Confederate mural misappropriating official General Mills brand characters for over a decade.  Still, General Mills refuses to acknowledge that the Confederate Mural was inappropriate or hurtful to the hundreds of Black employees who had to, every workday, walk past official General Mills-approved caricatures of men who believed Black people to be property equivalent to a wooden chair that could be broken with impunity.

234.

General Mills did not warn all Black Covington employees that –

(a)    White managers identified their membership in the Good Ole Boys using the okay hand gesture and other racist symbology recognized by the Anti-Defamation League as a hate symbol.

(b)    The Good Ole Boys is a group of white supremacists who create a favorable working environment for their friends to the detriment of Black employees.

(c)    The Good Ole Boys work together to enforce a different employment contract and reality for Black employees.

(d)    The okay hand gesture was found in a production area in Jan. 2024.

(e)    The Covington location has a long and robust history of threats of racial violence and racially hostile comments, such as –

(i)    Nooses.

(ii)    "KKK", the N-word, or "coon" written various places.

(iii)    Commenting about "banging" Black women or other sexual statements about Black women.

(iv)    Bragging about how white family members "used to own you [N-words]."

(v)    Bragging about getting Black employees fired.

235.

Upon information and belief, corporate and local HR did not even attempt to preserve available surveillance footage of the production area where the symbol was left in January 2024.

236.

Upon information and belief, corporate and local HR did not conduct a good faith investigation into the okay hand gesture found in production because they already knew it to be a symptom of the fact that white supremacists are in control of the facility.

237.

HR employees have previously admitted receiving complaints that white employees are systematically treated more favorably than Black employees.

238.

HR employees stated that the systematic unfair treatment of Black employees was "just the culture" and nothing could be done about it.

239.

Management and HR employees outside of Covington (such as Murfreesboro and divisions of field sales representatives and remote employees)

have made similar comments that the culture cannot be changed and Black employees who do not like it can leave.

## THE GOOD OLE BOYS CONSOLIDATE POWER BY REFUSING TO TRAIN BLACK EMPLOYEES AND CONSPIRING TO DENY ADVANCEMENT

240.

For decades, Level 5 (or C-5) Technicians have been responsible for training lower-level technicians.[11]

241.

C-5 Technicians who are members of the Good Ole Boys systematically deny training to Black employees and others who are disfavored by the Good Ole Boys for racial reasons – such as a white female employee who was disfavored and retaliated against for being married to a Black man.

---

[11] Many examples could be given of the Good Ole Boys' poor and harassing treatment of Black temporary employees.  Upon information and belief, General Mills uses multiple temporary staffing or contract labor companies and asserts such control over the temporary/contract employees that said employees are joint employees of General Mills and the temporary staffing/contract labor company under the law.  One such joint employer of temporary employees is EmployBridge, LLC, d/b/a ResourceMFG.  Shane Cox and Jim Alexander are two examples of General Mills supervisors who harass and mistreat temps and refuse to look at or talk to them.

242.

General Mills has received complaints that Mark Pearson, Darren McDermott, Jeff Pierce, Steve Henson, Jeff Nelson, and other white employees refuse to train Black employees.

243.

Corporate knows that Black employees are not offered the same degree and extent of training as that provided to white employees.

244.

Even with complaints about specific trainers, General Mills allows them to continue to train without punishment, and even allowed Pearson to return as a trainer on a contract basis after he retired.

245.

Former plant manager, Phil Thompson, corporate HR representative, Megan Asturias, and others have been specifically asked (and refused to answer) why Black employees do not get the same extent and degree of training as white employees.

246.

Good Ole Boys intentionally train Black employees incorrectly to set them up for failure. John Sams and Shane Cox have engaged in this behavior.

247.

Black employees are frequently punished or denied promotions because they do not have sufficient training even when it is not being made available to them.

248.

Plaintiff Laquanda Turner, who is frequently incessantly harassed by Shane Cox, was trained how to change out the ink on an Aagard machine incorrectly by Stan Holloway, a white trainer.  Turner was given an entry in the Coaching & Counseling Database for it, but Holloway was not.  This is another example of discriminatory behavior allowed or perpetrated by Steve Jarva.[12]

249.

Turner was recently informed of an additional coaching database entry she received for not completing changeover sheets.  She was told that everyone on her team received a coaching entry for that even though she did not actually fail to complete a changeover sheet.  Upon information and belief, not all of her team members were given a coaching for that.

---

[12] Jarva has bragged about the speed at which he has been promoted and the amount of his raises.

250.

Good Ole Boys members sabotage Black employees' systems and blame them for things that are beyond their control or not their job responsibility.

251.

White trainers frequently refuse to provide training to Black employees.

252.

Jim Alexander and other white TTLs routinely refuse to assign Black technicians trainers or mentors.

253.

Jack Gilliam, when not smoking cigarettes, spent most of his time helping white employees pass tests and get promotions.

254.

Part of the training and testing process is called "Hands-On Demonstration" ("HOD"), which is the hands-on portion of the test.

255.

Will Coady[13] and Chad Galloway took it upon themselves to train and test technicians even though that was not within the scope of their job responsibilities.

---

[13] Will Coady was selected for a position over Conrad James in 2022 – James was not even granted an interview.

256.

General Mills has a decades-long pattern and practice of inconsistent and under-documented testing.

257.

Coady helped white employees with HOD testing and intentionally made Black employees fail that portion of the test.

258.

Numerous Black employees have examples of promotions they were denied or delayed by Coady, Daniel Korpi, and others giving them additional test questions that were not given to white employees.

259.

White trainers once stated that they would not "train that [N-word]" referring to a Black employee named Daniel, who was later terminated.

260.

White employees, on the other hand, are permitted to sleep, be intoxicated, refuse to perform their work duties, chew tobacco in production areas, and disregard instructions from Black supervisors.

261.

After being promoted to TTL, Plaintiff Samuel Mayhan was given "does not meet expectations" by Joe Powers,[14] who shortly thereafter left the Covington facility.

262.

Cantrell then became Mayhan's direct supervisor.  At the time of his next performance evaluation, Cantrell simply copied and pasted the performance evaluation from Powers and gave it to Mayhan again.

263.

Mayhan told Cantrell that he had taken the last performance evaluation seriously and made changes that were not reflected in Cantrell's evaluation.  As a result, Cantrell changed the evaluation result to "meets expectations."

264.

Cantrell was unable to give substantive feedback to Mayhan about ways to improve, and he was unable to explain what failing or succeeding looked like.

---

[14] Powers nitpicked and harassed Plaintiff Mario Floyd until he complained directly to Chris Morrison and Roxie Simon then was terminated within a week for manufactured attendance points.  Powers was a highly favored Good Ole Boys member whose unqualified girlfriend was given a lab job.  Powers also harassed the Murfreesboro employee referenced in paragraph 399 below.  There are other examples of Good Ole Boys members who have harassed employees and engaged in misconduct at both the Covington and Murfreesboro facilities.

265.

Training and promotions at the Covington facility are a sham intended to benefit white employees to the detriment of Black employees in connection with the scheme outlined in paragraph 180 above.

## GOOD OLE BOYS ADVANCE WITHOUT REGARD TO QUALIFICATIONS AND ARE NOT HELD TO ANY SPECIFIC STANDARDS.  MEANWHILE, BLACK EMPLOYEES ARE NITPICKED.

266.

Mike Walden, Jim Alexander, and Chris Webb, among others, are not qualified to be TTLs,[15] but have been awarded those positions due to their fidelity to Cantrell.

267.

Once favored by the Good Ole Boys, white employees assert significant influence over terminating or punishing Black employees and get away with far more egregious conduct than is tolerated of Black employees.

268.

One example is Plaintiff Rick Childs, who had each of his promotions/level advancements delayed for circumstances that were not used to delay promotions of white counterparts.

---

[15] There are examples of unqualified platform leads as well.

269.

James Dolan and Douron Pierce, Good Ole Boys members who were close with Cantrell, targeted Childs for a changeover and missed audit. Dolan and Pierce were nearly successful in getting Childs terminated for a missed audit until it was proven that the metal detector at issue was broken so 15-20 other technicians (who were not being targeted by the Good Ole Boys) had missed the audit too.

270.

After avoiding termination that nearly occurred from Pierce and Dolan's targeting, Childs was told it would be in his best interest to move to another team. He was then moved from A-Team,[16] which was known to be racist, to C-Team, which had younger employees of color (and was derogatorily referred to as "the NBA Team").

271.

Douron Pierce is an example of a white employee whose egregious conduct was shamelessly defended by the Good Ole Boys. On one occasion, Pierce drunkenly drove his vehicle through security gates, parked on the sidewalk, exited his vehicle, and was yelling expletives at security. While Jim Alexander attempted to get Pierce – who was telling people to "go fuck" themselves – to move his

---

[16] This team would later become Mayhan's team.

vehicle, Chris Morrison (head of local HR) talked the police out of arresting Pierce, who was not terminated for this incident.

272.

Meanwhile, Childs has continued to work under the reputational harm caused by Pierce and Dolan that never recovered – he has not been promoted and has stopped applying for promotions because doing so is futile.

273.

Another example of an out-of-control Good Ole Boy is Scott Rutledge.

274.

Rutledge, a TTL before his retirement (which is believed to have been spurned by ongoing discrimination litigation), directly coordinated with other TTLs to create circumstances that led to the termination of Black employees under false and unfair pretenses.

275.

Plaintiff Melvin Drew had issues working alongside Rutledge as a fellow technician.

276.

While fighting against unionization at the Covington facility,[17] General Mills created dozens of TTL positions.  Rutledge was promoted to one of the new TTL positions.  As a result, he became Drew's direct supervisor.

277.

Rutledge frequently screamed and had tantrums, always taking his rage out on Black employees, including Drew.

278.

Rutledge nitpicked Black technicians that he had trained.

279.

Rutledge punished Black employees for not doing things his way, regardless of what the actual policy was.

280.

Matt Hartley started at the same time as Drew, but he is a Good Ole Boys member and was promoted quickly to platform lead.

---

[17] Upon information and belief, defeating unionization is a strong motivator for General Mills.  It appears that only four of over 50 General Mills facilities in the United States, Canada, Mexico, and Australia are unionized.

281.

Hartley was Rutledge's direct supervisor but was intimidated by Rutledge, Darren McDermott, and other Good Ole Boys.

282.

Hartley refused to protect Drew or other Black employees from Rutledge.

283.

On one occasion, Rutledge was having a tantrum, and Drew asked if he woke up on the wrong side of the bed – Drew was written up for that.

284.

While Rutledge nitpicked Black employees, he allowed a cushy work environment for white technicians, including Doug Rhodes and Doug Hayslip.

285.

Rutledge required Drew and other Black employees to pick up the slack caused by Rhodes and Hayslip not being required to complete their job duties, being allowed to sleep on-shift, and otherwise not being expected to work as much as Black employees.

286.

None of Drew's write-ups followed commonly accepted HR principles:

1.    The first two write-ups were for safety violations that allegedly took place in December 2022, but the write-ups were presented to Drew in March or April 2023.

2.    The third write-up was for asking Rutledge if he woke up on the wrong side of the bed when he was having a tantrum and screaming.

3.    The fourth write-up occurred when Jay Coleman (a white employee who broadcasts his racist beliefs on Facebook) caused a hold in Bugles and the entire team was written up even though Drew had nothing to do with the situation.

287.

Drew was terminated for the fourth write-up, and never achieved Level 5.

288.

Meanwhile, Hartley advanced beyond Level 5 Technician, to and beyond TTL, and to platform lead in the time it took Drew to get terminated without achieving Level 5.

289.

Mayhan was TTL under Hartley. Mayhan was the direct supervisor of Darren McDermott, a Good Ole Boy who refused to work one day, and Mayhan told him to go home.

290.

Chris Morrison previously told Mayhan and other TTLs in a TTL meeting that they would be supported as a TTL if they sent home a technician refusing to work.

291.

McDermott complained to Hartley, and Hartley told McDermott that he did not need to go home.[18] McDermott walked out of the meeting after adding that Hartley and Mayhan "ha[d] things to talk about."

---

[18] In yet another situation, Hartley was informed by Nathan Waters that other technicians were harassing him. Jay Coleman (*see above* ¶ 286(3)) was taking part in harassing Waters because his wife and children are Muslim, Asian, and of color. When Coleman and another harasser, Corey Smollen, stated they would not even sit in the same room with him, Hartley told Waters he "can't force anyone to eat lunch with you that doesn't want to." Hartley took part in the decision not to move Waters from the harassers. Waters was fired for allegedly threatening behavior, even though he had documented Coleman and Smollen's threatening and aggressive behavior against him to the plant manager (and *much* higher at corporate) months before he was terminated. General Mills has since lied about whether there was an open position that Water could be moved to.

292.

Black employees are often told – including by Chris Morrison directly – that they are responsible for running an entire system on their own; white employees are not expected to do this as it is dangerous.

293.

White employees leave Black employees alone operating the system to go on break without telling them.

294.

When Black employees complain about that practice, no action is taken against the white employees.

295.

Shane Cox helped coordinate the advancement of Sabrina Taylor in a training role.  Her selection for the role was pre-determined before interviews. Taylor was not qualified for the role, but it was made specifically for her.

296.

A more qualified Black technician was passed over for a black hat role that was recently awarded to Taylor for her fidelity to Cox.

297.

Taylor has been used to insulate Cox from ongoing and additional complaints of misconduct against him.

298.

McClinton and Cox have not spoken in three years.  HR instructed Cox to limit his interactions with McClinton.

299.

One day, Cox walked past McClinton and mumbled "the air is off" without stopping.  When McClinton took a break that same day, Cox and Taylor entered the SSG Machine.  After returning from his break, McClinton rechecked the machine and noticed that the drive belt had been loosened.  McClinton was then given a coaching for not speaking to Cox when he mumbled, "the air is off."

300.

McClinton was told that Cox did not have to speak to him, but he had to speak to Cox.

301.

Mandy Calloway and others in HR cover up for the many complaints against Cox.  For instance, Plaintiff Laquanda Turner reported Cox several months ago.  Calloway talked to Turner to "investigate" and, even though acknowledging

that what Cox did was wrong, attempted to get Turner to agree that he was perhaps having a bad day or just generally a rude person.

302.

It is widely known that Cox called a Black woman a "Black bitch" and was not punished – since that time, he has received numerous promotions over more qualified Black employees, including Conrad James.

303.

Just a sampling of policies and procedures that are subjective and not equally applied to white and Black employees –

(a)     Employees dating: white employees are allowed to date, Black employees dating is frowned upon, and white and Black employees dating or marrying each other is met with hostility and retaliation by the Good Ole Boys.

(b)     Family members working together:  white family members are allowed to work together, but Black family members are separated.

(c)     Sleeping:  white employees are allowed to sleep on-shift; Black employees are not.

(d)     Breaks:  white employees are allowed to take breaks in excess of one hour; Black employees' break times are nitpicked.

(e)    Time off:  Black employees are routinely denied time off requests made days in advance where white employees are routinely granted same-day time off requests.

(f)    Training:  white employees are given a mentor and/or trainer, many Black employees are not given either; white employees frequently refuse to train Black employees to safeguard knowledge.

(g)    Promotions:  white employees are given notice of what the promotion testing will include and are often given answers by Good Ole Boys in charge of testing (like Gilliam, Coady, and Korpi); Black employees are given surprise questions at the time of testing or are given voluminous additional topics to learn in a short time before testing, often resulting in delayed and denied promotions.

(h)    FMLA leave:  white employees are often given FMLA leave in excess of 12 weeks, and Black employees are routinely denied FMLA leave, chastised or retaliated against for taking FMLA leave, questioned about whether they are actually injured, and terminated to prevent their use of FMLA leave.

(i)    Workers' compensation light duty:  white employees are often allowed to work a light duty job (that involves using an iPad) so they

can continue to get their full wages, whereas at least some Black employees have not been offered similar positions. When Black employees are given light duty positions, white employees make comments about "milking" the injury or being "not that hurt."

(j)     ADA accommodation requests: white employees are often accommodated for longer periods of time than Black employees are accommodated for, if at all, and Black employees are often forced out of the company after mentioning pain of any sort – Black employees are believed by the Good Ole Boys to be "trying to get one over."

(k)     Overtime: Black employees are denied overtime opportunities that are routinely given to white employees.

(l)     Sexual harassment investigations: Black men accused of sexual harassment are generally terminated with minimal investigation. White men accused of sexual harassment (including Ted Baker and B.J. Marks) are generally not terminated – the women they harass are moved to another department and told nothing else can be done.

304.

General Mills tolerates white employees' racist, violent, and/or otherwise inappropriate behavior. Many of the examples of Good Ole Boys members herein

– including Shane Cox, Jim Alexander, and Matthew Ward – either have an accurate reporting of complaints against them in their personnel files (for which they should have been terminated), or the complaints are not in there because Good Ole Boys are protected at every level.

305.

In nearly every facet or circumstance, white employees are systematically treated more favorably than Black employees.

## THERE ARE MANY EXAMPLES OF BLACK EMPLOYEES BEING SWIFTLY RETALIATED AGAINST FOR QUESTIONING RACIALLY DISCRIMINATORY AND HOSTILE CIRCUMSTANCES

306.

Like many Black technicians at General Mills Covington, Plaintiff Darrius Edge got stuck on Level 2.[19]

307.

White C-5's routinely refuse to train Black employees.  As a result, Edge, even though he was a C-2, was responsible for training other technicians without any additional pay to do so.

---

[19] Technicians advance to Level 2 after taking a computer test following their six-month work anniversary.

308.

In a meeting on or about February 20, 2024, Edge stated that training at General Mills was unfair in that –

(a)    Black employees were not given the same training opportunities as white employees.

(b)    White Level 5 Technicians refused to train lower-level Black Technicians.

(c)    Black employees' promotions were delayed for reasons related to training or test-taking.

(d)    Lower-level Technicians were inappropriately being required to train other employees because Level 5 Technicians refused to do it.[20]

309.

Two days after making these comments in a meeting, Edge was terminated because of a clock-in practice that his direct supervisor told him was permitted.

310.

Joshua Sullivan, a former technician with an MBA and engineering background, was promoted to a TTL position that had previously been occupied by Danny Thompson, a Good Ole Boy.

---

[20] New employees training other new employees is rampant at the Covington facility.

311.

Upon information and belief, Thompson had been terminated from the TTL position due to issues related to alcohol.

312.

Thompson was rehired after being terminated.

313.

While Black employees are frequently told at the time of their termination that they can be rehired, they typically are not rehired after termination.[21]

314.

Sullivan was targeted because Thompson wanted his TTL position back.

315.

Sullivan was terminated for allegedly coming in at the wrong time. His termination did not follow the progressive discipline policy. A week after his termination, Thompson was back in his old TTL position.

---

[21] There are numerous examples of Black employees denied employment consideration after termination for reasons less egregious than Thompson and other Good Ole Boys who were rehired after termination.

316.

Chris Morrison, the head of local HR, has been behind numerous terminations of Black employees that were based on false information in retaliation for allegations of race discrimination.  One example is Plaintiff Mario Floyd.

317.

Floyd was denied equal overtime opportunities by Shane Cox because, according to Cox, Floyd gave him too much "back talk."  Floyd's supervisor, Steve Jarva, was aware that Cox denied Floyd overtime but did nothing to intervene.

318.

When Floyd joined Project Roger around April 2020, Bob Brown told two separate groups of Technicians, including Floyd's group, that, "We won't say that [N-word] word."

319.

When Jarva left the Covington facility in late 2021, Joe Powers became Floyd's supervisor and began harassing him.

320.

Powers told Floyd that he had 14 entries in the Coaching & Counseling Database and a 15th entry would result in being put "on a level."[22]   The 14th coaching was factually inaccurate; Powers would not allow Floyd to see the other 13 coaching entries.

321.

Floyd emailed Chris Morrison (head of local HR) and Roxie Simon (then-plant manager who was removed shortly after the *James* suit was filed). Screenshots of that email are included herein at paragraphs 322 and 323.

---

[22] General Mills frequently makes conflicting representations about whether entries in the Coaching & Counseling Database are considered for employment decisions.   Chris Morrison stated to Plaintiff McClinton in writing in January 2023 that entries in the Coaching & Counseling Database are not used to justify employment decisions.   It is believed, however, that General Mills has used Coaching & Counseling Database entries in connection with responding to charges of discrimination made with the Equal Employment Opportunity Commission ("EEOC").   General Mills has also used said Database entries to justify other negative consequences against Black employees.

322.



Hey Chris and Roxie, I need your help resolving a very important issue that I am having here in my system. I was told not to speak on this situation or matters will get worse for me by my platform lead but I can't keep this to myself. I apologize for the lengthy read but I am writing you because I feel this is the best way for me to communicate right now given how sensitive the matter is to me.

Last Friday I was called to a meeting with my platform lead and my TTL about an issue on the floor regarding the management of super sacks. Apparently there have been discrepancies during shift change with incoming technicians feeling they were unfairly left with work from the team before. This was news to me because I've promoted straight forwardness with my peers so we could tackle problems at the core.

My platform leads proceeds to show me trends where he's had other technicians pull for him showing him that I was present on a few instances when this happened. I let him know then that that's not something I'd ever do and what he's reading in the trends could be from a result of different actions.

This is when the platform leads leaves this topic and moves to the 2nd part of the meeting that wasn't part of the invitation he sent. He goes on to tell me that I have been coached 14 times in great detail by my TTL. This is again news to me because I have never been notified that I've been coached by anyone. He says he's not at liberty to read what's there, but he tells me that from what was written it sounds like I try to run away from work. He said if he had been my platform lead before, I would have been on step 1 a while ago. This super sack issue would be considered my 15th coaching and there wouldn't be a 16th.

I don't think it's fair I'm being held accountable for things I did not do. My TTL gets to

323.

I don't think it's fair I'm being held accountable for things I did not do.  My TTL gets to fabricate and exaggerate encounters with me and label it coaching.  I'm constantly being accused of things I did not do by this TTL on a daily basis and I don't know when he will get mad at me for a disagreement and coach me again without telling me.

I made my platform aware of this and he clearly supports this behavior so I asked if I could be moved and was denied.  He told me I need to work on changing my perception but didn't give any recommendations.  How can I change if I don't even know I'm being coached? How can I change if what I'm being coached for is a behavior that is unfamiliar to me?

I love working at General Mills, just could do without the harassment.  Please help me fix this

## Other Forms of Harassment

Other forms of harassment result from conduct that:

- is based on or motivated by characteristics protected by law or company policy such as race, color, religion, national origin, age, sexual orientation, gender identity or disability; and

- has the purpose or effect of unreasonably interfering with an employee's ability to do his

324.

Floyd complained of the same sort of systemic two-employment-realities circumstances outlined in this Amended Complaint to the head of local HR and the plant manager – the highest his complaint could be taken locally.

325.

Within a week – like Edge, Sullivan, and others – Floyd was terminated for a violation of the attendance policy, a favorite to be used against Black employees.

326.

To get to 7 points to justify termination, Workbrain was manipulated for absences in June 2021 where Floyd had used vacation, leave, or a personal holiday so no points should have been given. The system was manipulated so points would be generated.

327.

Black employees are aware that their attendance hours in Workbrain can be manipulated by TTLs and more senior supervisors to automatically generate points, and Good Ole Boys tell Black employees that points can only be removed by HR.

328.

This is but one example of "mistakes" that negatively affect Black employees that are never corrected because managers claim doing so is difficult and tedious.[23]

329.

In reality, points can be removed by TTLs; TTLs who are Good Ole Boys members are just often unwilling to do so for Black employees.

330.

Within a week of complaining of harassment to Morrison and Simon, Morrison manufactured a basis to terminate Floyd related to missed days in June 2021.

331.

Floyd's termination was orchestrated by the highest-ranking HR employee of General Mills on-site at the Covington location.

332.

That HR employee, Chris Morrison, has trained Dan Lasota to follow in his footsteps of directly participating in racially discriminatory or retaliatory terminations and other adverse employment actions.

---

[23] Jim Alexander routinely underpays Black technicians and pretends it was a mistake.

333.

In some instances, Morrison and Lasota manufacture evidence to support terminations and other adverse employment actions.

334.

Morrison personally made the decision to terminate Floyd knowing that his points were fabricated.[24]

## THE GOOD OLE BOYS GET WHAT THEY WANT BECAUSE CANTRELL DELIVERS ON PRODUCTION

335.

Multiple Plaintiffs and other Black employees have been disparately written up for missing barcode and metal audits.

336.

Barcode audits protect consumers from allergens by ensuring the correct product goes in the correct box.

337.

Metal audits protect consumers from metal in the product.

---

[24] Justin Harris and other Black employees have been terminated for 7 points when they did not, in fact, accumulate that many points.

338.

Metal flakes off of manufacturing equipment as a result of the ongoing use of said equipment. The rate of metal flaking off is influenced by how often the machine is being rebuilt, maintained, and cleaned.

339.

General Mills' decision to use cheaper and cheaper food ingredients has also contributed to a need for more rebuilds, maintenance, and cleaning that is not occurring at the appropriate rates.

340.

The audit policy is set by Quality & Regulatory Operations ("QRO").

341.

Quality Audit Documentation Guidelines specifies a progressive discipline policy for missed audits.

342.

Plaintiff McClinton has made numerous complaints about chronically missed audits on multiple packaging lines at East Plant.

343.

White employees who miss food safety audits, e-Logs, and centerline are given preferential treatment compared to Black employees.

344.

White employees who miss audits generally are not punished; Black employees are punished and have been terminated over the same.

345.

In other words, General Mills does not follow its own discipline policy regarding missed food safety audits.

346.

Will Coady involved himself in an investigation to figure out why a particular system had several incidents of missed audit pucks.

347.

An audit puck is a plastic circular hockey-puck-shaped disc with metal inside it which is put with the food product on the conveyor line.

348.

During a metal audit when a metal detector is functioning properly, it causes the detector to reject the puck and adulterated food product.

349.

If the metal detector audit is not done properly, the puck can go missing.

350.

Mayhan was questioned several times about missing pucks, which had been found (and not lost) by his team.

351.

West Plant has a TTL for every system – Puff, Flake, Snacks, and Roger.

352.

East Plant only has one TTL for processing and one TTL for packaging.

353.

Mayhan was questioned by his Platform Lead, HR, QRO, and FSA about the missing pucks, taking him away from his regular job duties even though his team was not responsible for the missing puck.

354.

When Mayhan was questioned, Jim Alexander was present, even though he was not regularly scheduled to work at that time.

355.

In addition to not being supported by his platform lead (*see above* ¶¶ 289-291), Mayhan had to deal with hostile behavior from the following individuals:

(a)   Will Coady, who was involved in a testing scandal where he provided answers to white technicians and made Black technicians fail.

(b)   Jim Alexander, who was subject of complaints by nearly everyone on his team and several Black employees quit or took pay cuts to get away from him.

(c)   Matthew Ward,[25] who like Rutledge, would have temper tantrums, scream, and throw things.  Hartley refused to intervene after Ward threw a tool that almost hit a Black female employee. Ward refused to train technicians, so Mayhan had to complete additional work duties as a result.

356.

Mayhan was terminated and told that he had lied about reporting the puck to Carrie Muldoon, who was not the person he was supposed to report it to, not who he actually reported it to, and not who he told anyone he reported it to.

---

[25] Ward's nickname is Skip, and his tantrums were nicknamed "Skippy Fits."

357.

Years back, a bottleneck was occurring on the B-System because it was being pushed beyond what could flow through the metal detector before the toaster.

358.

The B-System manufactures Cinnamon Toast Crunch.

359.

Because of the bottleneck, the metal detector before the toaster on B-System was removed.

360.

Several weeks before his termination, Mayhan started a shift and received notification of two metal findings, which are bags with metal shards that the system kicks out.

361.

When Mayhan was notified that B-System generated a third metal finding, he said over the radio to prepare to shut the system down. At that point, he went to packaging to verify the three metal findings because, per policy, the system needed to be shut down if there were indeed three metal findings.

362.

When he arrived at packaging, Coady was already there. Over the radio, Coady then said not to shut down but instead divert to the tote room. Coady may have been attempting to stall long enough to come up with a plan to isolate the problem in lieu of shutting down. However, the tote room then called about metal findings as well. This additional pressure regarding the metal findings forced Coady to stop production beyond the three metal findings that, per protocol, should have stopped production earlier.

363.

Allowing the system to continue to run, especially while it is missing one of the metal detectors responsible for catching metal findings before it makes it to packaging, made it harder to pinpoint where the metal was coming from. To Mayhan's knowledge, the source of the metal was never identified.

364.

Cantrell, who oversees the Cinnamon Toast Crunch production at the Covington facility, had been pushing the system beyond its intended capacity for months (or longer).

365.

Just a few days before his termination, Mayhan discovered that Cantrell was responsible for the removal of the metal detector from B-System.[26]

366.

Coady questioned another Black employee about a missing puck similar to a missing puck that Mayhan was ultimately terminated for.  That employee pointed out to Coady that the puck was sitting out in plain sight.

367.

Cantrell is focused on maximum production, not the requirements of federal employment law, OSHA, or the USDA.

368.

The Good Ole Boys are willing to do what is necessary to defeat unionization and carry out Cantrell's directives – all while covering up OSHA, USDA, and other violations that come along with pushing the system too hard, *and while forcing Black employees to do most of the work in lesser positions, for less pay.*

---

[26] A-System has one metal detector; B-System had two but now has one because Cantrell removed one; C-System has three and also has more chronic metal detector issues than the other systems.

369.

The culture at the Covington facility has caused white employees to be more lackadaisical about rules and Black employees to take them much more seriously.

370.

Black employees taking the rules seriously has resulted in Plaintiff Rivers being "a problem."  (*See* Doc. 1 at ¶ 60.)

371.

The military taught Mayhan structure regarding paperwork and business communication.

372.

Taking rules seriously, however, was something that did not compute with Cantrell – he did not see the problem with cutting and pasting Mayhan's last performance review from Powers because Cantrell knows that the performance reviews are shams.

373.

Taking rules seriously caused friction between Mayhan and Hartley, who refused to hold Good Ole Boys members like McDermott to the same standard that Black employees are held to.

374.

Taking rules seriously caused friction between Mayhan and Coady, who understands that Cantrell's system is built on forcing Black employees to do most of the work and decisions that impact production – like stopping production after three metal findings – is the most likely thing to draw the ire of corporate.

375.

In the months before his termination, Mayhan told Cantrell and Hartley that he would not tolerate them speaking to him condescendingly.

376.

It became abundantly clear to the Good Ole Boys that Mayhan was a problem, so he was terminated for a false, vague, and inconsequential reason that did not comply with the company's progressive discipline policy.

377.

The same Black employees who take performance evaluations seriously are the same employees ensuring work safety (OSHA) and food safety (USDA) regulations are enforced.

378.

Once Black employees' concerns about performance and safety conflict with the Good Ole Boys' ideology or Cantrell's mandate to mass produce Cinnamon Toast Crunch *at all costs*, the Black employees are a problem and are terminated.

379.

Terminating competent employees because they cross the Good Ole Boys has caused a dire need for competent employees to ensure Covington is safe from metal, microbial, and other dangers.

## THE COMMON THREAD IS CORPORATE

380.

Megan Asturias was frequently assigned by corporate HR to investigate complaints emanating from the Covington facility.[27]

381.

Numerous Black employees have complained to corporate HR about Jim Alexander.

---

[27] Upon information and belief, Asturias is no longer being assigned to Covington investigations as a result of ongoing discrimination litigation.

382.

Black employees have attempted to move off of Alexander's team and have not been allowed to do so.

383.

Levi Sanders quit to get away from Alexander as his TTL.

384.

At least one other employee took a pay cut to get off of Alexander's team.

385.

There is at least one Black employee working under Alexander right now who seriously questions how much longer he can cope with Alexander's abuse.

386.

Upon information and belief, a Black female employee in HR went around Chris Morrison with a complaint about Alexander. She transferred to a different facility shortly after that, and she was replaced with Dan Lasota.

387.

Lasota uses Morrison's tactics to support the Good Ole Boys.

388.

Corporate HR has refused to take any action against, or protect Black employees from, Alexander.

389.

Corporate HR has also received copious complaints about Shane Cox, including numerous complaints from Plaintiff Turner with multiple witnesses, all of whom corporate HR ignores.

390.

Corporate HR will hand-select witnesses for investigations into Shane Cox, then find that the complaint could not be substantiated.

391.

After the class action complaint was filed, Jeff Pierce stated to a Black female employee that she should apply for a maintenance position because "with the lawsuit going on" she would get the job because she is Black.

392.

Asturias informed the Black female employee that Pierce was found to have violated the discrimination policy – nonetheless, General Mills appears to not have taken any action against him.

393.

Plaintiff Rakia Levesque worked at the Covington facility until 2021. She left Covington due to her interactions with Phil Thompson.

394.

After Levesque left Covington, she began receiving promotions at a much higher frequency than she was receiving at Covington.

395.

Mostly recently, Levesque has been working remotely. On June 2, 2024, she emailed a copy of the Class Action Complaint. Two days later, she was terminated. During her termination interview, General Mills representatives were unable to articulate why she was being terminated.

396.

Levesque was terminated in retaliation for sharing the Class Action Complaint (Doc. 1).

397.

Corporate HR's disturbing track record of allowing and supporting a racially hostile work environment is not confined to Covington – corporate HR is the common denominator supporting racist managers and HR personnel at General Mills' Murfreesboro, Tennessee location.

398.

A Black employee at the Murfreesboro, Tennessee, location was harassed in a group chat. Cropped and/or redacted versions of the photographs are in paragraphs 399 through 401.

399.



[Cropped version of original image, redaction supplied]

400.



[Cropped version of original image]

401.



[Cropped version of original image, redaction supplied]

402.

Similar to Black employees' experiences at the Covington facility, this employee at the Murfreesboro location complained about discrimination, harassment, and targeting to corporate HR around November 2023.[28]   He was

---

[28] Also similar to some of the Plaintiffs from the Covington facility, this employee was harassed by Joe Powers.

terminated in March 2024 for an iteration of a popular justification for terminating Black employees – stealing time, not clocking in/out correctly, or falsifying time data. This particular employee was terminated for breaks, which he took to the same or lesser degree than non-Black employees.

403.

General Mills is acutely aware of its vast potential liability for systemic race discrimination and maintaining racially hostile work environments in Covington, Murfreesboro, other plants, and other pods of remote and field workers.

404.

As noted above at ¶ 170, General Mills' Chief Human Resources Officer sold over $2 million worth of shares that she had received as part of her compensation within a month of the filing of James' race discrimination lawsuit in April 2023.

405.

Many of General Mills' largest investors are large banking institutions. During the last quarterly investors' meeting, there was no concern noted about the class action lawsuit that had been filed and reported by media for over a week beforehand.

406.

General Mills' corporate office is aware of institutionalized segregation at its manufacturing facilities but, for business reasons, allows, encourages, and rewards it.  At a minimum, racial hostility creates divisions among employees that makes unionization nearly impossible.

**BECAUSE MORRISON IS NOT QUALIFIED TO BE THE HEAD OF LOCAL HR BUT IS QUALIFIED TO SUPPORT AND COVER UP FOR THE GOOD OLE BOYS, GENERAL MILLS WILL HAVE SERIOUS DIFFICULTY PROVING THE VERACITY OF PERSONNEL DOCUMENTS**

407.

General Mills develops and oversees employee training, performance review, and coaching systems.

408.

General Mills' managers and supervisors implement these systems without any controlling, objective criteria or any meaningful oversight.  These subjective employment systems permit and promote discrimination on the basis of race.

409.

As to General Mills' training systems for perfunctory tasks such as machine maintenance, cleaning, and product controls, there are not uniformly enforced standardized, written instructions – this means that a white employee can meet

one supervisor's instructions but a Black employee can fail to meet the same supervisor's instructions for the same task performed in the same manner.

410.

Without uniformly enforced written or objective controls or guidance, supervisors and managers are allowed to dole out points or negative feedback that affect employment advancement, demotions, and terminations allowing for such decisions to be based on race, not merit.

411.

As for performance reviews, subjective criteria are used to determine the ratings that General Mills' supervisors and managers then use in connection with decisions about promotions, demotions, raises, bonuses, etc.

412.

With no uniformly enforced written metrics guiding these decisions, these managers and supervisors are allowed to subjectively determine whether an employee meets, exceeds, or does not meet expectations.

413.

To make matters worse, General Mills does not uniformly enforce any written criteria for how reviews are to be provided to employees, written metrics

on how to allow for improvement by the employees, or whether a period of improvement will even be provided.

414.

Further, there are not uniformly enforced standardized, objective metrics for how reviews are saved, signed by employees and supervisors, and/or preserved to prevent post hoc changes that are discriminatory or retaliatory.

415.

The coaching system was also developed by General Mills with no uniformly enforced objective criteria on how and when coachings are to be provided, whether positive or negative coachings are to be in writing, whether and when coachings are to be conveyed to employees, and how coachings are to be used, if at all, in performance reviews or employment decisions by General Mills' supervisors and managers.

416.

As an example of how the Coaching & Counseling Database is used, as TTL, Mayhan entered technicians in the Database for neutral reasons that did not deserve punishment.  Then-plant manager Phil Thompson questioned Mayhan about complaints that he was making too many entries in the Database, and Mayhan explained that HR stated TTLs were supposed to document conversations

73

in the Database and not all coaching entries were negative or punitive. Technicians, however, generally do not view the Database as neutral, and the Database is not actually used neutrally.

417.

Platform leads have the subjective discretion to undermine TTLs' entries in the Coaching & Counseling Database.

418.

There is generally no standard enforced for entries in the Coaching & Counseling Database. When a Database standard is enforced, the purpose is to get the technician in trouble.

419.

Entries in the Coaching & Counseling Database are secret and generally not shared with technicians.

420.

While the local Covington Human Resources staff tell General Mills' employees that coachings are not used to make employment decisions, the managers and supervisors regularly use the coaching system for ad hoc threats of negative employment actions or as a basis for negative performance reviews so

that decisions based on race can be falsely documented in the coaching system as legitimate, non-race-based performance metrics.

421.

Upon information and belief, supervisors alter, backdate, and manufacture performance reviews and other employment documents to cover up their racist employment actions so they appear to be based on objective, legitimate, and non-discriminatory criteria.

422.

Supervisors are permitted to do this because General Mills' human resources systems allow supervisors to change employment documents that are not signed, saved as PDFs, locked, or otherwise safeguarded from post hoc manipulation.

423.

Upon information and belief, in large part, performance evaluations are not signed by employees or supervisors, and are merely saved in Word format allowing post hoc manipulation.

424.

For a company as large and profitable as General Mills, there is only one reason why it would have such archaic systems that do not comply with current

industry standards or HR best practices – without the normal controls in place, the Good Ole Boys continue to enrich themselves and their white friends to the detriment of Black employees.

Paragraphs 161-193 in the Class Action Complaint (Doc. 1) shall be renumbered accordingly to follow paragraph 424 above. The PRAYER FOR RELIEF section (Doc. 1 at 56) shall remain the same.

*Signatures continued on following page.*

Respectfully submitted this 21st day of August 2024.

By:    /s/ Douglas H. Dean
       Georgia Bar No. 130988
       Attorney for Plaintiffs
       Dean Thaxton, LLC
       601 E. 14th Avenue (31015)
       Post Office Box 5005
       Cordele, Georgia 31010
       T: (229) 271-9323
       F: (229) 271-9324
       E: *doug@deanthaxton.law*

By:    /s/ Linda G. Carpenter
       Georgia Bar No. 111285
       Sharon L. Neal, Esq.
       Georgia Bar No. 536060
       Attorneys for Plaintiffs
       The Brosnahan Law Firm
       31 Lenox Pointe, NE
       Atlanta, GA 30324
       T: (404) 853-8964
       F: (678) 904-6391
       E: *lgc@brosnahan-law.com*
       E: *sharon@brosnahan-law.com*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date I served a true and correct copy of the foregoing First Amended Class Action Race Discrimination Complaint on the following attorneys of record by filing the same using the Court's CM/ECF system:

Allegra J. Lawrence
Katherine Kendricks
Lovita T. Tandy
LAWRENCE & BUNDY, LLC
1180 West Peachtree Street, Ste. 1650
Atlanta, Georgia 30309
*allegra.lawrence-hardy@lawrencebundy.com*
*katherine.kendricks@lawrencebundy.com*
*lovita.tandy@lawrencebundy.com*

This 21st day of August 2024.

By:    /s/ Douglas H. Dean
Georgia Bar No. 130988
Attorney for Plaintiffs
Dean Thaxton, LLC
601 E. 14th Avenue (31015)
Post Office Box 5005
Cordele, Georgia 31010
T:  (229) 271-9323
F:  (229) 271-9324
E:  *doug@deanthaxton.law*