IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| GARY DAVIS, JOE DAVIS, JUSTIN HARRIS, DEVAHN JEFFERSON, KEITH MCCLINTON, DONALD OUTLAW, E.J. RIVERS, NAAMAN SMITH, RICK CHILDS, MELVIN DREW, DARRIUS EDGE, MARIO FLOYD, KEN HARRIS, RAKIA LEVESQUE, SAMUEL MAYHAN, and LAQUANDA TURNER, *individually and on behalf of a class of similarly situated individuals*, <br><br> Plaintiffs, <br><br> v. <br><br> GENERAL MILLS OPERATIONS, LLC, <br><br> Defendant. | CIVIL ACTION FILE NO. <br><br> 1:24-cv-2409-MLB-JKL |

## NON-FINAL REPORT AND RECOMMENDATION

This is a putative class action employment case in which Plaintiffs allege that Defendant General Mills Operations, LLC ("General Mills") racially discriminated, harassed, and retaliated against Black employees who worked at its Covington, Georgia facility, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981. Plaintiffs contend that General Mills adopted and carried out a practice of race discrimination in virtually every aspect

of its operations at the facility and Plaintiffs' employment there.  Moreover, the named Plaintiffs seek to represent a wider class of:

> All black employees who, within the last four years before the initial class complaint was filed since June 2, 2020 to the present, worked at General Mills' Covington facility who have been, continue to be, or may in the future be, adversely affected by General Mills' racially discriminatory employment policies and practices . . . .

[Doc. 30 ¶ 432.]

General Mills moves to dismiss this action under Federal Rule of Civil Procedure 12(b)(6).  [Doc. 39.]  It contends that Plaintiffs have not plausibly alleged that any of them were subject to purposeful race discrimination, harassment, or retaliation, and that even if any of the Plaintiffs' individual claims survive, class adjudication is improper under Rule 23 because of the highly individualized nature of the asserted claims and General Mills's putative defenses.  [Doc. 39-1.]  Plaintiffs oppose the motion, arguing that they have pled facts that plausibly suggest General Mills maintained (and continues to maintain) a pattern and practice of discrimination and that any evaluation of whether class adjudication is proper is premature at this juncture.  [Doc. 43.]

For the reasons that follow, it is **RECOMMENDED** that the motion be **GRANTED IN PART**, that the Court **DISMISS** the second amended complaint

2

**WITHOUT PREJUDICE** as a shotgun complaint, and that Plaintiffs be **DIRECTED** to replead.

## I.    BACKGROUND

### A.    Facts

This action was filed on June 2, 2024, with eight named plaintiffs, and initially alleged violations of § 1981, the Federal RICO Act, and the Georgia RICO Act. [Doc. 1.] In August 2024, Plaintiffs filed their first amended complaint as a matter of course to add eight more named plaintiffs, as well as hundreds of paragraphs of factual content. [Doc. 11.] General Mills moved to dismiss the amended complaint [Doc. 17], and in response, Plaintiffs moved for leave to file a second amended complaint [Doc. 20]. The Court granted the motion for leave to amend, which rendered the motion to dismiss moot [*see* Doc. 29], and on January 6, 2025, the Clerk docketed Plaintiffs' proposed second amended complaint as the operative complaint in this action. [Doc. 30.]

The second amended complaint is a behemoth. There are 16 named plaintiffs and the allegations span 489 paragraphs (not including sub-parts) over 150 pages. The gist of Plaintiffs' allegations is that a group of supervisors—white men referred to as the "Good Ole Boys"—have used their positions at the Covington facility to engage in systemic racially discriminatory and retaliatory

actions against Black employees with impunity. [*See* Doc. 30 ¶¶ 2-4.] These acts have persisted for decades, Plaintiffs contend, because General Mills's corporate management (including its human resources ("HR") personnel) have turned a blind eye. [*See id.* ¶¶ 30, 48, 75.]

Despite its length, the second amended complaint omits a significant amount of crucial information. For one thing, the complaint does not specify when many of the alleged acts of discrimination or retaliation occurred. Thus, it is difficult to construct a timeline of events. The cast of characters is also lengthy and, for the most part, Plaintiffs have not explained who people are or what positions they held. The organizational structure of the Covington facility is also murky: Plaintiffs do not identify the associated job duties for particular positions or how various positions fit into the overall organizational structure of the Covington facility, leaving the Court to guess whether people served in supervisory roles or not (which, of course, can matter a great deal in an employment discrimination case). Indeed, many of the Plaintiffs do not identify to whom they reported or who made the employment decisions relevant to their claims. And in relation to Plaintiffs' retaliation claims, the amended complaint's

4

allegations about when particular Plaintiffs engaged in protected activity are also largely undeveloped.[1]

The second amended complaint is also replete with conclusory assertions and generalized allegations that are not supported by any specific factual content. The Court will not catalogue every example, but here are some:

- Plaintiffs regularly characterize white employees as racist members of the Good Ole Boys with little, if any, factual support. For example, Plaintiffs contend that the Good Ole Boys were co-founded by Greg Cantrell, who Plaintiffs allege "was implicated as a white supremacist in separate litigation over a year ago." [Doc. 30 ¶ 2.] Plaintiffs do not explain what they mean by this. Apart from this conclusory allegation, the only other concrete allegation that suggests he might harbor racial animus is Plaintiffs' allegation that in the 1990s Cantrell referred to Black individuals as "colored"; however, for as offensive as that might be, Plaintiffs provide no details whatsoever about when he used that term, the context in

---

[1] The Court has noted some of these gaps in the factual recitation that follows.

which he used it, or which of them (if any) heard him do so.  [*See id.* ¶ 23.]

- Plaintiffs allege in sweeping language that General Mills "[w]ith zero hesitation, . . . has retaliated against Black employees for participating in this class action litigation."  [Doc. 30 ¶ 58.]  But they also fail to identify any actual retaliation—Plaintiffs do not explain who was retaliated against, what form the retaliation took, or who took the retaliatory actions.

- Similarly, Plaintiffs allege that General Mills "without exception" has covered up complaints and retaliated against those who oppose the racist policies—again, without identifying the alleged retaliation. [Doc. 30 ¶ 52.]

- In hyperbolic terms, Plaintiffs allege that "General Mills has allowed and facilitated the control and self-enrichment of Covington white supremacists for business reasons, including defeating unionization, and mass production of Cinnamon Toast Crunch . . . ."  [Doc. 30 ¶ 63 (footnote omitted).]   In other words, Plaintiffs affirmatively contend that General Mills enables racism at the Covington facility so it can produce a popular cereal.

6

Though somewhat hamstrung by Plaintiffs' scattershot pleading method (the consequences of which will be discussed in more detail below), the Court summarizes the allegations as best it can.  The Court begins with an overview of the broad allegations of systemic racial discrimination that form the basis of Plaintiffs' putative class claims.  The Court then summarizes the individualized allegations for each of the 16 plaintiffs.  Finally, the Court summarizes the class allegations.  The Court provides this background for context in resolving the present motion to dismiss; it does not, however, make any factual findings.

> **1.  General Allegations About Systemic Racial Discrimination and Hostility at General Mills's Covington Facility**

General Mills is a manufacturer and marketer of processed consumer foods.  [Doc. 30 ¶ 12.]  It maintains a facility in Covington, Georgia, comprised of the "West Plant" and the "East Plant," where it manufactures cereal and trail mix components.  [*Id.* ¶¶ 19-20.]  The West Plant opened in 1988; the East Plant in 1992.  [*Id.* ¶ 19.]

Plaintiffs are current and former Black employees of General Mills who, at one time or another, worked at the Covington facility.  [Doc. 30 ¶ 9.]  They allege that the Covington facility has had a long-standing pattern and practice of racial discrimination perpetuated by a group Plaintiffs refer to as the "Good Ole Boys,"

a poorly defined[2] cadre consisting of white supervisors and HR personnel who engage in discriminatory practices against Black employees since the "the late 1980s or early 1990s."  [*Id.* ¶¶ 2, 30.]  According to Plaintiffs, the Good Ole Boys group has had de facto control over the Covington facility since its inception in the late 1980s, promoting a racially hostile work environment and denying Black employees equal opportunities for advancement.  [*See id.* ¶¶ 2-5 (summarizing, generally, the discriminatory and retaliatory actions alleged in this case).] Plaintiffs claim that the following men were members of the group:  Jack Gilliam, Greg Cantrell, Steve Jarva, Phil Thompson, Ken Preffer, Joe Powers, Ted Baker, Jim Alexander, and Shane Cox.  [*Id.* ¶ 2.]  The actual job titles that those individuals held, as well as their dates of employment and who they supervised, are not apparent from the amended complaint.

Plaintiffs identify a multitude of discriminatory practices that the Good Ole Boys allegedly meted out, including:  holding Black employees to higher standards than their white counterparts, providing false performance evaluations to justify adverse actions against Black employees, and promoting

---

[2] Plaintiffs name nine purported members of the group, but also allege that the list is non-exhaustive, as there are "additional white males in this organization, as well as token white females who are acceptable to the Good Ole Boys."  [Doc. 30 ¶ 2.]

8

less qualified white employees over more qualified Black employees. [Doc. 30 ¶ 3(a)-(f).] They also allege that Black employees were systematically set up for failure through inadequate training and were subjected to harsher disciplinary actions for minor infractions. [*Id.* ¶¶ 3(a)-(d), 88-90.] When Black employees complained about discrimination, they faced retaliation, including being written up, demoted, or terminated. [*Id.* ¶¶ 3(r)-(s), 48.] Black employees were also not given the same accommodations for Family and Medical Leave Act ("FMLA") leave, workplace injuries, and disability requests under the Americans with Disabilities Act ("ADA") as white employees. [*Id.* ¶ 5 (h)-(j).] Meanwhile, the Good Ole Boys allegedly used their influence to protect white employees who engaged in racist behavior, including targeting Black employees for "intimidat[ion]." [*Id.* ¶¶ 33-35.]

Plaintiffs allege that symbols of white supremacy were present at the Covington facility. [Doc. 30 ¶37.] A primary example is a cartoon mural showing General Mills cereal mascots—specifically, Sonny the Cuckoo Bird, Chef Wendell, and Buzz the Bee on horseback—within the carving on Stone Mountain in the place of confederacy leaders Jefferson Davis, Robert E. Lee, and Stonewall Jackson, which was painted at the Covington facility in 2005 and later removed in 2021:

9



[*Id.* ¶¶ 38-41.]  Another example were t-shirts that superimposed similar cartoon images on the face of Stone Mountain (without the controversial carving depicted), which unidentified Black employees were allegedly required to wear "at certain times and events" that are not described in the complaint.  [*See id.* ¶¶ 44-47.]  Significantly, no Plaintiff alleges that he or she was ever required to wear the t-shirts.  Nor do Plaintiffs allege who designed the t-shirts, when they were produced, when and to whom they were distributed, or whether only Black employees were required to wear them.

Plaintiffs also allege that in the 1990s and 2000s—that is, roughly two to three-and-a-half decades ago—white employees were openly racist:  first, that during the 1990s, white employees openly used the N-word and other racial slurs

and attempted to intimidate Black employees with racial hostility [Doc. 30 ¶ 28]; that in 1993, nooses were left on the desk of several Black employees, including Plaintiff E.J. Rivers [*id.* ¶¶ 184-85]; that in 1994, two unidentified employees told Rivers to "go back to Africa" [*id.* ¶ 186]; that in 2003 or 2004, someone wrote "coon" on Plaintiff Keith McClinton's "power audit forms" [*id.* ¶ 205] and "KM is a f****** [N-word]" on a restroom wall [*id.* ¶ 206]; and that in 2006, someone wrote "KKK" on McClinton's toolbox [*id.* ¶ 208]. More recently, in January 2024, a Black employee found an "okay hand gesture"—which the employee immediately perceived to be a hate symbol—drawn onto cling film in the production area of the East Plant. [*Id.* ¶¶ 49, 80; *see also id.* at 3.]

Plaintiffs allege that General Mills' corporate leadership was aware of the discriminatory practices at the Covington facility but failed to take corrective action. [Doc. 30 ¶¶ 60-62, 161-64.] Instead, General Mills has, according to Plaintiffs, "without exception" covered up complaints and retaliated against those who speak out. [*Id.* ¶ 52.] Plaintiffs also assert generally that the Good Ole Boys are "supported by the legal team of a multi-billion-dollar company," though they do not explain how General Mills legal department provides any material support. [*See id.* ¶ 30.]

11

In an effort to show that members of the Good Ole Boys harbor racial animus, the second amended complaint reproduces two images of white men, who are alleged to be members of the Good Ole Boys, making an "okay hand gesture," which in certain contexts can be a symbol of white supremacy. [Doc. 30 ¶¶ 72-75.] The first image is of John Henderson,[3] a site safety manager at the East and West Plants, sitting at what appears to be a restaurant table around Christmas. [*Id.* ¶ 71.] There are no allegations, however, about the year the photograph was taken, who took it, where it was taken, which employees saw the image (if any), when they saw it, or whether they reported it to anyone. Also, Henderson's dates of employment are not alleged and there is no allegation that Henderson had any direct involvement in any of the incidents alleged in the second amended complaint.

The other image is of B.J. Marks[4] flashing the okay hand gesture in what looks like the back yard of a residence. [Doc. 30 ¶ 74.] Plaintiffs allege that Marks retired in April 2024, but do not identify the positions he held or how long he

---

[3] Oddly, in paragraph 2 of the second amended complaint, which identifies members of the Good Ole Boys, Henderson's name is not mentioned. [*See* Doc. 30 ¶ 2.]

[4] Similar to Henderson, Marks is not identified in paragraph 2 of the second amended complaint as a member of the Good Ole Boys. [*See* Doc. 30 ¶ 2.]

worked at the Covington facility. Nor are there any allegations that Marks was directly involved in any incident of alleged discrimination, harassment, or retaliation. And although Plaintiffs allege that Marks was not terminated after "Corporate HR was notified" of the photograph, Plaintiffs do not elaborate on when the complaint was made, who made it, if any action short of termination was taken, or how "Corporate HR" responded (if at all).

Plaintiffs also allege that white supervisors "and their cohorts" at the Covington facility consolidated power by refusing to train Black employees and conspiring to deny them advancement opportunities. [Doc. 30 ¶¶ 87-106.] According to Plaintiffs, "C-5 Technicians" (also known as "Level 5 Technicians")[5] are responsible for training lower-level technicians. [*Id.* ¶ 87.] Level 5 Technicians who are members of the Good Ole Boys, however, "systematically deny training to Black employees and others disfavored by the group for racial reasons." [*Id.* ¶ 88.] Somewhat more specifically, Plaintiffs allege that General Mills has received complaints—from unidentified persons at unspecified times—that certain trainers, including Mark Pearson, Darren McDermott, Jeff Pierce,

---

[5] These terms are used interchangeably in the second amended complaint. For the sake of consistency, the Court will use the term "Level 5 Technicians" going forward.

13

Steve Hanson, and Jeff Nelson, refused to train Black employees, yet those trainers continued to work without punishment. [*Id.* ¶¶ 89, 91.] John Sams and Shane Cox allegedly went even further, intentionally training Black employees "incorrectly to set them up for failure," though, again, Plaintiffs do not identify any Black employees who were in fact set up for failure by Sams or Cox. [*Id.* ¶ 93.]

As a result of the purported insufficient training, Black employees are alleged to have been frequently punished or denied promotions. [Doc. 30 ¶ 94.] Also, the complaint asserts that members of the Good Ole Boys "sabotage Black employees' systems and blame them for things that are beyond their control or not their job responsibility." [*Id.* ¶ 95.] An example is Jack Gilliam, a white employee, who "spent most of his time helping white employees pass tests and get promotions," while simultaneously neglecting Black employees. [*Id.* ¶ 98.] Another example is Will Coady, who allegedly helped white employees pass training tests while intentionally making it so that Black employees failed. [*Id.* ¶¶ 99-102.] Meanwhile, "numerous" Black employees have been denied or delayed promotions because they were given additional test questions not given to white employees. [*Id.* ¶ 103.] On one occasion (it is not alleged when)

14

unidentified white trainers refused to train a Black employee named Daniel,[6] saying that they would "not train that [N-word]," referring to Daniel. [*Id.* ¶ 104.]

Plaintiffs allege that white employees were permitted to advance while Black employees were held to higher standards and not allowed to advance. [Doc. 30 ¶¶ 107-30.] According to Plaintiffs, white employees Mike Walden and Jim Alexander were awarded promotions to "technical team lead" or "TTL" positions due to their loyalty to Cantrell (the alleged organizer of the Good Ole Boys), despite being unqualified. [*Id.* ¶ 107.] White employees were also permitted to engage in misconduct, such as sleeping or being intoxicated at work, while Black employees were held to higher standards. [*Id.* ¶ 105.] Along these lines, white employees were allowed to engage in misconduct without repercussions, while Black employees faced severe consequences for similar or lesser infractions. Examples identified by Plaintiffs include Douron Pierce, who was not terminated despite drunkenly driving through security gates, and Scott Rutledge, who coordinated the termination of Black employees under false pretenses. [*Id.* ¶¶ 109-11.] Additionally, Plaintiffs allege that it was "widely known" that Cox, one of the Good Ole Boys, called an unidentified Black woman

---

[6] Plaintiffs do not identify Daniel's last name.

a "Black bitch" but was not punished[7] and, since that time, was promoted numerous times over more qualified Black employees.  [*Id.* ¶ 122.]

White employees also left Black employees to run entire systems alone—which Plaintiffs allege is dangerous.  [Doc. 30 ¶¶ 112-13.]  No action was taken against the white employees, however, when Black employees complained.  [*Id.* ¶ 114.]  The second amended complaint does not provide any more specifics about those incidents, including who was involved and when they occurred.

At some point (Plaintiffs do not allege when) a white employee, Sabrina Taylor, was selected for promotion to a training role.  [Doc. 30 ¶ 115.]  According to Plaintiffs, the role was made specifically for her even though she was not qualified for it.  [*Id.*]  And more recently (again, Plaintiffs do not specify when) a Black technician with greater qualifications was passed over for a "black hat role" in favor of Taylor.  [*Id.* ¶ 116.]

Meanwhile, Danny Thompson, alleged to be a member of the Good Ole Boys, was fired as a TTL due to absences related to alcohol, and Joshua Sullivan, who is Black, was promoted into Thompson's position.  [*Id.* ¶¶ 124-25.]  When Thomspon demanded his job back, however, Sullivan "was targeted" and

---

[7] Plaintiffs do not explain the context of this epithet, who witnessed it, or whether it was reported to HR or management.  [*See* Doc. 30 ¶ 122.]

eventually fired for "coming in at the wrong time." [*Id.* ¶¶ 128-29.] Sullivan's firing did not follow the progressive discipline policy. [*Id.* ¶ 129.] A week after Sullivan was fired, Thompson returned to his old position.[8] [*Id.*]

Plaintiffs also allege that Black employees have been unfairly disciplined for missing barcode and metal audits, which are safety measures that ensure correct product packaging and prevent metal contamination. [Doc. 30 ¶¶ 131-33.] Those safety audits are governed by the "Quality & Regulatory Operations" policy, which specifies a progressive discipline policy for missed audits. [*Id.* ¶¶ 136-37.] According to Plaintiffs, as a general matter, Black employees have been punished and even terminated for missed audits, while white employees who commit similar infractions receive preferential treatment and are generally not punished. [*Id.* ¶¶ 139-41.]

Plaintiffs additionally contend that white HR employees at both the local and corporate levels supported discriminatory and intentionally adverse employment decisions against Black employees, as well as the actions of the

---

[8] Sullivan is not a named plaintiff. He has brought an individual suit against General Mills, *Joshua Sullivan v. General Mills Operations, LLC*, No. 1:24-cv-5979-MLB-JKL (N.D. Ga.), alleging race discrimination, racially hostile work environment, and retaliation in violation of § 1981. *See id.*, Doc. 12 (amended complaint).

white supervisors.  [Doc. 30 ¶¶ 142-64.]  More specifically, Plaintiffs allege that "[n]umerous" Black employees complained to corporate HR about Jim Alexander, one of the Good Ole Boys, but corporate HR has refused to take any action against him or to protect Black employees from his behavior.[9]  Black employees have attempted to move off Alexander's team but have not been allowed to do so, leading some to quit or take pay cuts to escape his supervision.  [*Id.* ¶ 144-46.]  Meanwhile, an unidentified Black female HR employee "bypassed Chris Morrison," the local head of HR, with a complaint about Alexander.  [*Id.* ¶ 148.]  She was later transferred to a different facility and replaced by Dan Lasota, who, according to Plaintiffs, supports the Good Ole Boys.  [*Id.* ¶¶ 148-49.]

Corporate HR has also received numerous complaints about Shane Cox, including from Plaintiff Turner, but according to Plaintiffs' pleading, these complaints have been ignored.  [Doc. 30 ¶ 151.]  Corporate HR has also hand-selected witnesses for investigations into Cox and often finds complaints unsubstantiated.  [*Id.* ¶ 152.]  After this action's complaint was filed, Jeff Pierce made a comment to an unidentified Black female employee suggesting she would get a job because of the lawsuit, but no action was taken against him, even

---

[9] It is unclear what behavior those employees complained about, when the complaints were made, or who made them.

though his comment violated General Mills's discrimination policy. [*Id.* ¶¶ 153-54.]

Plaintiffs allege that Corporate HR has engaged in similar conduct in other locations, including Murfreesboro, Tennessee. [Doc. 30 ¶ 155.] For instance, in Murfreesboro, a Black employee allegedly received racist images via text message. [*Id.* ¶¶ 156-59.] He complained to corporate HR in November 2023, but was terminated in March 2024 for not clocking in correctly, a commonly-used justification for firing Black employees. [*Id.* ¶ 160.] According to Plaintiffs, because its Chief Human Resources Officer sold over $2 million worth of shares shortly after a race discrimination lawsuit was filed, it shows that General Mills is aware of its potential liability for systemic race discrimination and maintaining racially hostile work environments across various locations. [*Id.* ¶¶ 161-62.] Even so, Plaintiffs also state there has been no concern from major investors during a quarterly meeting, despite media coverage of this lawsuit. [*Id.* ¶ 163.] Plaintiffs contend that General Mills's corporate office is aware of institutionalized segregation at its facilities but allows it to continue for business reasons, such as preventing unionization. [*Id.* ¶ 164.]

Plaintiffs also contend that General Mills's employee training, performance review, and coaching systems lacked controlling, objective criteria

or meaningful oversight, which permitted and promoted racial discrimination. [Doc. 30 ¶¶ 165-66.] The training systems for tasks such as machine maintenance and cleaning did not have uniformly enforced standardized instructions, allowing for subjective enforcement that could disadvantage Black employees. [*Id.* ¶ 167.] Supervisors and managers were allowed to give points or negative feedback affecting employment advancement, demotions, and terminations based on race rather than merit. [*Id.* ¶ 168.] Performance reviews were also based on subjective criteria, with no uniformly enforced written metrics guiding decisions about promotions, demotions, raises, and bonuses. [*Id.* ¶ 169.] According to Plaintiffs, the lack of standardized criteria for reviews allowed for post hoc changes that could be discriminatory or retaliatory. [*Id.* ¶¶ 170-72.]

General Mills's coaching system was also allegedly abused. General Mills uses a "Coaching & Counseling Database" to document incidents or conversations that were presumably meaningful, but not intended to warrant punishment. [Doc. 30 ¶¶ 173, 174.] But because platform leads have discretion when using the Coaching & Counseling Database, they have not used it neutrally, but rather to get technicians "in trouble." [*Id.* ¶¶ 174-76.] Moreover, given that there is no standard for coaching entries, the entries themselves are generally not shared with technicians. [*Id.* ¶¶ 176-77.] And despite the local

20

Covington HR staff's assurances that coaching entries are not used for employment decisions, managers and supervisors use the system to raise threats of negative employment actions or as a basis for negative performance reviews, which Plaintiffs allege allows for race-based decisions to be falsely documented as legitimate. [*Id.* ¶ 178.]

Without giving any examples, Plaintiffs generally allege that General Mills maintains an antiquated HR system that allows supervisors to alter, backdate, and manufacture performance reviews and other employment documents to cover up racist employment actions, making them appear to be based on objective, legitimate criteria. [Doc. 30 ¶ 180.] Plaintiffs contend that General Mills has not adopted a better system just so the Good Ole Boys can continue to enrich themselves and their white friends at the expense of Black employees. [*Id.* ¶ 182.]

### 2.    Allegations of the Individually-Named Plaintiffs

Each of the named Plaintiffs has also made allegations more specifically related to their own experiences and individual claims. The Court takes each in turn.

### a.    Rick Childs

Rick Childs's dates of employment and the positions he held are not alleged.  In any event, he alleges that at unspecified times, he experienced delayed promotions and advancements while his white counterparts did not. [Doc. 30 ¶ 274.]  At some point (again, Childs does not say when), James Dolan and Douron Pierce, both alleged to be white members of the Good Ole Boys group, targeted Childs for a "changeover and missed audit" in an effort to end his employment.  [*Id.* ¶ 275.]  Childs was cleared of wrongdoing after it was determined that the error was caused by a defective machine.  [*Id.*]  Fifteen to twenty other technicians, whose races Childs does not identify, missed the audit as well due to the broken metal detector, but for unexplained reasons, they were not "targeted."  [*Id.*]  Again, there are no allegations about when these incidents took place.

After the audit incident, someone told Childs to move to another team, which he did, transferring from the "A-Team," which he conclusorily asserts was known for its racist environment, to the "C-Team," derogatorily referred to as "the NBA Team" due to its younger employees of color.  [Doc. 30 ¶ 276.]  Childs does not allege when the transfer occurred or who directed him to move teams. Regardless, the move did not alleviate the reputational harm caused by the

alleged "targeting" (that is, being wrongly accused of missing an audit).  [*Id.* ¶ 277.]  Childs has since stopped applying for promotions, viewing application as futile.  [*Id.*]

In early 2024, presumably before he stopped applying for promotions, Childs applied for a "Blackhat Trainer role" but was denied the role in favor of James Spitzer, a less-qualified white male and member of the Good Ole Boys, who had painted the mural of the cereal characters on horseback.  [Doc. 30 ¶ 278.] The decision to select Spitzer over Childs was made by unidentified white decision-makers and, according to Childs, was "based on race."  [*Id.*]

On August 7, 2024, Childs filed a charge of discrimination with the EEOC, alleging race discrimination and hostile work environment.[10]  [Doc. 30 ¶ 445; Doc. 39-3 at 3-4.]

---

[10] Ten of the named Plaintiffs filed charges of discrimination with the EEOC, and Defendant attached the charges of discrimination to its motion to dismiss.  [*See* Doc. 39-3.]  Because the charges are central to the complaint and their authenticity is not challenged, the Court may properly consider them on a motion to dismiss without converting the motion to one for summary judgment. *See Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010); *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999) ("[A] document central to the complaint that the defense appends to its motion to dismiss is also properly considered, provided that its contents are not in dispute."); *Chesnut v. Ethan Allen Retail, Inc.*, 971 F. Supp. 2d 1223, 1228 (N.D. Ga. 2013) ("In discrimination cases, the EEOC charge is a

### b.    Gary Davis

Gary Davis worked at the Covington facility for approximately a year-and-a-half, from 2022 and 2023. [Doc. 30 ¶¶ 350, 357-58.] During the summer of 2023, he overheard a conversation among Daniel Korpi, a Good Ole Boys member, and other employees, in which they discussed manufacturing evidence to terminate Devahn Jefferson (another Plaintiff), who at that time was on FMLA leave. [*See id.* ¶ 351.] G. Davis [11] told Jefferson about the conversation, and Jefferson reported it to HR. [*Id.* ¶ 352.] HR interviewed G. Davis and assured him that his statement would remain confidential. [*Id.*] But shortly after his interview, Korpi confronted G. Davis about speaking with HR and "began harassing him." [*Id.* ¶ 353.] According to G. Davis, Korpi added additional questions to a test G. Davis had to take to advance to Technician Level 3, which caused him to fail the test. [*Id.* ¶ 354.] Similar questions were not required of white employees, G. Davis contends. [*Id.*] Also, when G. Davis requested training assistance, Korpi denied

---

document that courts routinely consider when ruling on motions to dismiss, even if it was not attached to a pleading.") (citations omitted).

[11] Two plaintiffs have the surname Davis, so the Court refers to Joe Davis as "J. Davis" and Gary Davis as "G. Davis."

it, whereas a white employee was given the opportunity to train with another technician.[12]  [*Id.* ¶ 355.]

John Dean, a white TTL who was favored by Korpi, often did not perform his duties, leaving G. Davis and Naaman Smith (another Plaintiff) responsible for Dean's work without additional pay.  [Doc. 30 ¶ 356.]  Despite doing more work, Davis and Smith were paid the same or less than Dean.  [*Id.*]

In October 2023, Korpi manufactured evidence that G. Davis and Smith had falsified documents showing that equipment was clean when it was not, and on October 13, G. Davis and Smith were discharged.  [Doc. 30 ¶¶ 357-58.]  Meanwhile, at least one white technician in the "Puff Department," Ashley Larrimore, was accused of document falsification but was not terminated.  [*Id.* ¶ 360.]

G. Davis filed a charge of discrimination on April 10, 2024, alleging discrimination on the basis of race and retaliation.  [Doc. 30 ¶ 445; Doc. 39-3 at 6.]

### c.    Joe Davis

Joe Davis began working for General Mills in 2004 and was promoted to TTL around 2020.  [Doc. 30 ¶¶ 230-31.]  J. Davis alleges that at some point before

---

[12] It is unclear whether this is the harassment that G. Davis alleges Korpi engaged in, or if this amounts to separate allegations of disparate treatment.

he received that promotion, he had been passed over for a separate promotion in favor of Chris Davenport, whom J. Davis describes as an alcoholic, less-qualified white male, who had "performance issues." [*Id.* ¶ 232.] J. Davis also alleges that Davenport got the promotion because of his relationship with Ken Preffer, who Plaintiffs contend was a member of the Good Ole Boys. [*Id.* ¶¶ 2, 232.]

Effective January 1, 2022, J. Davis was demoted from his TTL position. [Doc. 30 ¶ 233.] However, Sandy Beam, a less-qualified white male who had falsified documentation, and Cox, another white male, were not demoted. [*Id.* ¶¶ 234-35.] J. Davis contends he was selected for demotion instead of other less-qualified white males because he had made numerous complaints about racial discrimination to Phil Thompson and other decision-makers. [*Id.* ¶ 236.] J. Davis does not allege, however, when those complaints occurred, what he reported, or to whom he made the complaints. Thompson also accused J. Davis of being "unprofessional," "difficult," and a "complainer," based on his grievances. [*Id.*]

J. Davis appears to have filed a charge of discrimination with the EEOC in February 2024.[13] [Doc. 30 ¶ 237.] Afterward, Cox and Jake Hayslip, another Good Ole Boys member (though not one named in the initial group in the

---

[13] J. Davis does not allege when he filed his charge, but the charge General Mills has attached is dated February 12, 2024. [Doc. 39-3 at 8.]

complaint), conspired to act against him for not signing an innocuous form that he contends had no bearing on safety, compliance, or quality. [*Id.*] It appears he was given a "Level I violation," though he does not allege what that entailed or how it affected the terms and conditions of his employment, if at all. [*Id.*] In any event, J. Davis appealed the sanction, but the discipline committee, led by Mandy Calloway, a white female, upheld the sanction. [*Id.*] J. Davis asserts, in conclusory fashion, that "similarly situated white employees faced no repercussions for similar paperwork violations," though the complaint does not identify them. [*Id.* ¶ 239.]

J. Davis alleges that Davenport, the white employee who he suspected was an alcoholic, was promoted despite his issues, and that another unidentified white employee was not reprimanded for falsifying inspection paperwork, whereas Black employees faced severe consequences for similar or lesser infractions. [Doc. 30 ¶ 238(a)-(b).] Separately, J. Davis alleges, a Black employee was written up for being late for an overtime shift he volunteered to cover. [*Id.* ¶ 238(c).]

J. Davis contends that his complaints about racial discrimination went unanswered, and he observed a lack of proportional representation of Black employees in certain departments. [Doc. 30 ¶ 243.] He does not say, however,

which departments he was referring to or what he means by "proportional representation."

### d.    Melvin Drew

Melvin Drew, whose dates of employment and position are not alleged, asserts that supervisor Scott Rutledge frequently screamed and threw tantrums, and primarily directed his rage at Black employees, including Drew.  [Doc. 30 ¶¶ 283-85.]   Rutledge also nitpicked Drew and other Black technicians for not following his own personal proclivities, which did not follow official company policies.  [*Id.* ¶¶ 286-87.]   During one of Rutledge's tantrums, Drew asked Rutledge if he had woken up on the wrong side of the bed.  [*Id.* ¶ 291.]  Drew was written up for the comment.  [*Id.*]

Matt Hartley, a white employee, started at the same time as Drew and was quickly promoted to platform lead and then served as Drew's direct supervisor.  [Doc. 30 ¶¶ 288-89.]   After his promotion, Hartley refused to protect Drew or other Black employees from Rutledge.  [*Id.* ¶ 290.]

According to Drew's allegations, white technicians were allowed to sleep on-shift and were not held to the same work standards, and as a result, Drew and other Black employees had to compensate for the work left they left undone.  [Doc. 30 ¶ 293.] This, Drew contends, created a disparate pay system.  [*Id.*]  Drew

28

does not explain, however, what additional tasks he was saddled with, how much his workload increased, or when any of those events occurred. Nor does Drew allege what his compensation was at the time or how it compared to non-Black employees.

Ultimately, Drew was written up multiple times for what he contends were minor or fabricated infractions, in violation of standard HR principles. [Doc. 30 ¶ 294.] The write-ups included alleged safety violations, the comment made to Rutledge about waking up on the wrong side of the bed, and an incident (described in the complaint as a "hold in Bugles"[14]) where an entire team was written up, even though Drew had nothing to do with the situation. [*Id.*] Drew was terminated following the "hold in Bugles" incident, which he contends was false and pretext for discrimination. [*Id.* ¶ 295-96.] It is not clear when the alleged write-ups occurred or when he was terminated.

Drew did not file a charge of discrimination with the EEOC. [Doc. 30 ¶ 444.]

---

[14] Presumably this refers to a delay in the production of Bugles, a General Mills product. *See* https://www.generalmills.com/food-we-make/brands/bugles.

### e.    Darrius Edge

Darrius Edge was—and appears to still be—a "Level 2 Technician." [Doc. 30 ¶ 279.] Level 5 Technicians were responsible for training lower-level technicians [*id.* ¶ 87]; however, beginning in at least June 2, 2020, white Level 5 Technicians, including Jeff Pierce and Steve Henson,[15] "routinely refused to train Black employees," including Edge. [*Id.* ¶ 280.] As a result, Edge was forced to cover training other technicians, which resulted in Edge performing additional job duties without receiving the increased pay of a Level 5 Technician. [*Id.*] Edge does not allege when, in particular, he (or any other employee) was deprived of a training opportunity or when any specific instance occurred where he had to step in and train someone.

During a "quarterly meeting" on February 20, 2024, Edge told the group that training at General Mills was unfair. [Doc. 30 ¶ 281.] He highlighted that Black employees were not given the same training opportunities as white employees, that white Level 5 Technicians refused to train lower-level Black technicians, and that Black employees' promotions were delayed due to training or test-taking issues. [*Id.*] He also pointed out that lower-level technicians were

---

[15] Pierce and Henson are not alleged to be members of the Good Ole Boys. [*See, e.g.*, Doc. 30 ¶ 2.]

inappropriately required to train other employees because Level 5 Technicians refused to do so.  [*Id.*]  Two days later, Edge's employment was terminated.  [*Id.* ¶ 282.]  The stated reason for his termination was related to a clock-in practice that his direct supervisor had told him was in fact permitted.  [*Id.*]  According to Edge, the same clock-in practice was used by white employees who were not terminated.  [*Id.*]  Additionally, Edge's termination did not follow General Mills's progressive discipline procedures, which are typically used for disciplining white employees before termination.  [*Id.*]

Edge filed a charge of discrimination on August 8, 2024, alleging race discrimination and retaliation.  [Doc. 30 ¶ 445; Doc. 39-3 at 10-12.]

### f.    Mario Floyd

Mario Floyd's dates of employment and positions are not alleged in the complaint.  In any event, he alleges that in April 2020, Bob Brown, a "white Black hat,"[16] told him and other technicians, "We won't say that [N-word] word." [Doc. 30 ¶ 332.]  Floyd alleges that Brown's statement demonstrates that racial slurs were at some point acknowledged but never adequately addressed.

---

[16] Presumably, this is a reference to the "Blackhat Trainer role" though it is unclear what the duties of that position were.  [*See* Doc. 30 ¶ 278 (referring to "Blackhat Trainer role" that Childs unsuccessfully applied for in 2024).]

31

In April 2021, Floyd was denied equal overtime opportunities by Shane Cox, who cited Floyd's "back talk" as the reason. [Doc. 30 ¶ 333.] Floyd's supervisor, Steve Jarva, became aware of the denial, but did not intervene. [*Id.*] Meanwhile, white employees in Floyd's department were allowed to work overtime. [*Id.*]

Joe Powers became Floyd's supervisor in late 2021, after Jarva left. [Doc. 30 ¶ 334.] He told Floyd that there were fourteen entries for Floyd in the Coaching & Counseling Database, and threatened that a fifteenth entry would result in disciplinary action. [*Id.* ¶ 335.] Floyd was only allowed to see the fourteenth entry, which he claims was factually inaccurate.[17] [*Id.*] Floyd emailed Chris Morrison, the head of local HR, and Roxie Simon, a plant manager, complaining about what he perceived as unfair treatment and "harassment"; however, he did not attribute any of the conduct to his race (or any other protected classification). [*Id.* ¶ 337-39.] Within a week of complaining, General Mills terminated Floyd's employment, allegedly for violating an attendance policy. [*Id.* ¶ 340.] Floyd alleges that his attendance records were manipulated

_____

[17] There are no allegations about what the fourteenth entry said or why it was supposedly inaccurate.

and that he had not accumulated enough "points" to justify his termination. [*Id.* ¶ 341; *see also id.* ¶¶ 342-49.] Floyd does not identify his date of termination.

Floyd did not file a charge of discrimination. [Doc. 30 ¶ 445 (listing named Plaintiffs who filed charges of discrimination).]

### g.    Justin Harris

Justin Harris began working at the Covington facility around 2019. [Doc. 30 ¶ 325.] In 2022, he was fired because he allegedly accumulated 7.5 points due to absences. [*Id.* ¶ 326.] J. Harris[18] claims that he actually had less than five points, which would not have resulted in termination. [*Id.*] Meanwhile, white employees with similar (or more) points, including someone named "Kory," were not terminated. [*Id.*] J. Harris successfully challenged his termination after filing an unemployment benefits claim, which he won because General Mills failed to substantiate why it had assessed him 7.5 points. [*Id.* ¶ 327.]

J. Harris also alleges that he was informed by Steven Fellows, a white supervisor, that he could be re-hired. [Doc. 30 ¶ 328.] However, J. Harris was later told he was in fact not eligible for re-hire. [*Id.* ¶ 329.] Meanwhile, General

---

[18] The Court refers to Plaintiff Justin Harris as J. Harris and Plaintiff Ken Harris as K. Harris.

Mills re-hired white employees terminated for similar reasons, including "Kory" and Danny Thompson.[19]  [*Id.*]

J. Harris further alleges—in conclusory fashion—that all Black employees with whom he worked in the "Flake Department" were terminated and replaced with white employees.  [Doc. 30 ¶ 330.]  It is unclear who was terminated, who was hired, why they were allegedly terminated, or when the terminations occurred.

J. Harris did not file a charge of discrimination.  [Doc. 30 ¶ 445.]

### h.    Ken Harris

Ken Harris began working for General Mills on August 1, 1989, as a West Plant Maintenance Technician.  [Doc. 30 ¶¶ 385-86.]  Since 1989, he alleges, only one other Black employee was hired in the maintenance department in the West Plant.  [*Id.* ¶¶ 400, 424.]

In the late 1990s or early 2000s, when the Covington facility opened a "reliability maintenance department," white men were promoted into the first two positions, bypassing K. Harris.  [*Id.* ¶¶ 388, 390.]  However, K. Harris does

---

[19] J. Harris's allegations about how Kory was treated seem to be inconsistent because he alleges, on the one hand, that Kory was not terminated despite amassing more disciplinary points, but also that, on the other hand, Kory was rehired despite being terminated.  [*See* Doc. 30 ¶¶ 326, 329.]

not allege that he applied to the positions in the first two decades of their existence. In 2009, four new reliability maintenance positions were advertised, and although K. Harris applied, all were filled by white men who he alleges were less qualified than him. [*Id.* ¶¶ 391-92.]

K. Harris developed a program to train technicians on rebuilding "Aagard machines," [20] which became a pipeline for promotions to the maintenance department. [Doc. 30 ¶¶ 394, 401.] But K. Harris was still consistently overlooked for promotions, while white employees he trained received promotions. [*Id.* ¶ 402.] In 2012, K. Harris was asked to assist with large-scale rebuilds at the East Plant, where he faced resistance and hostility from white employees, including Jack Gilliam, John Pulliam, and Shane Cox.[21] [*Id.* ¶¶ 403-06.] Also in 2012, the Maintenance Lead position was created for the West Plant packaging department, but K. Harris was not informed about the position and it was awarded to a less-tenured white employee, Kevin Sperry. [*Id.* ¶ 408.] And when maintenance lead positions were later posted, K. Harris was discouraged

---

[20] An Aagard machine is a packaging machine that puts cereal bags into boxes, seals the boxes, puts boxes into cases, and palletizes the cases. [Doc. 30 ¶ 392.]

[21] Gilliam and Cox are alleged to be Good Ole Boys. [Doc. 30 ¶ 2.]

from applying due to misleading information about pay rates, which were then increased after the positions were filled.[22] [*Id.* ¶¶ 409-13.]

Between 2013 and 2014, K. Harris was once again overlooked for promotions [Doc. 30 ¶ 413] despite receiving recognitions and awards for his work [*id.* ¶ 416].

In June 2020, K. Harris attended a meeting with Orric Browning (who later became a Plant Manager), Krys Duffus (an HR manager), and Roxie Simon (a Plant Manager) about his inability to gain promotions during his tenure. [Doc. 30 ¶¶ 418-19.] He explained how he felt his race had hampered his ability to advance, while white employees were promoted over him. [*Id.* ¶ 420.] He asked Browning, Duffus, and Simon whether they believed he had been discriminated against, and they did not respond. [*Id.*] At the end of the meeting, K. Harris said he expected his daily duties not to change and, if they did, he would consider it retaliation; however, Simon responded that "she could not promise that nothing would change." [*Id.* ¶ 421.] Browning, meanwhile, thanked K. Harris for doing an excellent job making his points, "challenging us to do better," and "inspir[ing] us to get this right . . . ." [*Id.* ¶ 422.]

---

[22] It is unclear who discouraged Harris from applying or what they did to persuade him not to apply.

In the end, nothing changed [Doc. 30 ¶ 423], and K. Harris retired in October 2022 without ever receiving a promotion from shift maintenance.  [*Id.* ¶ 426.]  And despite his extensive experience and contributions to General Mills, K. Harris was not offered a post-retirement contract position, a benefit purportedly extended to less qualified white employees.[23]  [*Id.* ¶ 427-28.]

K. Harris did not file a charge of discrimination.  [*See* Doc. 30 ¶ 445.]

### i.    Devahn Jefferson

Devahn Jefferson began working for General Mills on January 10, 2022. [Doc. 30 ¶ 361.]  He initially applied to work at the Covington facility in 2016, but was interviewed by white male interviewers and not hired.  [*Id.* ¶ 361.]  Some six years later, after a "less intense and less hostile" interview with a Black interviewer, Jefferson was offered a position.  [*Id.* ¶ 362.]  After six months on the job, Jefferson was pressured to take a test to become a Level 2 Technician — presumably earlier than he would have liked — while a white male employee, J.J., was not required to take the test at the same time.[24]  [*Id.* ¶ 363.]  According to Jefferson, he was not provided the same amount of training as white employees,

---

[23] Harris does not allege that he applied for a contract position or that he was specifically overlooked in favor of a white former employee.

[24] It is unclear if "J.J." took the test before or after the six-month mark or how J.J. fared on the test.

and he was pressured to take his test quickly, unlike his white counterparts who were given more time. [*Id.* ¶ 365.] Jefferson does not allege whether he passed the test or not.

In July 2022, Jefferson was written up for a mistake made by his white trainer, Ashley Larrimore. [Doc. 30 ¶ 364.] But after he pointed out that he was in training, both he and Larrimore were written up. [*Id.*] The write-up prevented Jefferson from getting a raise for a year, while Larrimore did not face the same consequence. [*Id.*]

In June 2023, Jefferson took intermittent FMLA leave. [Doc. 30 ¶ 366.] He was informed by G. Davis that several supervisors (including Korpi, Huffman, Stephanie Ramos, and "Stephen") were discussing ways to get Jefferson fired. [*Id.* ¶ 367.]

On several unspecified occasions, Stephanie Ramos touched Jefferson, which made him uncomfortable. [Doc. 30 ¶ 368.] Ramos's position is not identified, and it is unclear whether she held a supervisory role over Jefferson. Regardless, Jefferson avoided Ramos. [*Id.*] Ramos, in an alleged effort to sabotage Jefferson's employment, told Jefferson's supervisor that Jefferson was not engaged and did not want to be at work. [*Id.*] Jefferson reported Ramos's touching and G. Davis's account of the conversation he had overheard to HR,

and stated that he was being targeted for taking intermittent FMLA leave based on his race because white employees were not similarly targeted. [*Id.* ¶ 369.] Afterward, the individuals involved (it is unclear who those individuals were) distanced themselves from Jefferson. [*Id.* ¶ 370.] Even so, Jefferson still faced frequent threats of write-ups from Huffman and Korpi for minor uniform or personal protective equipment issues, which he asserts were not enforced against white employees. [*Id.* ¶ 372.] Huffman and Korpi are also alleged to have made derogatory comments about Jefferson and other Black employees, including comments about their appearance and personal belongings, which were not directed at white employees. [*Id.* ¶¶ 376-78.]

On March 4, 2024, Jefferson's employment was terminated for allegedly falsifying a document and not cleaning a machine properly, despite never having been trained on the machine. [Doc. 30 ¶¶ 380-81, 383.] Meanwhile, Larrimore, his white trainer, engaged in the same misconduct and was not terminated. [*Id.* ¶ 383.] Separately, he generally alleges that he "was passed over for promotion in favor of less-qualified white employees at least twice since he began his employment" and that "[w]hite employees with little to no qualifications are routinely given positions over Black employees." [*Id.* ¶ 384.] He provides no specific facts to support those assertions, however.

On August 12, 2024, Jefferson filed a charge of discrimination with the EEOC, alleging discrimination on the basis of race and retaliation. [Doc. 30 ¶ 445; Doc. 39-3 at 14-15.]

Jefferson has also filed an individual suit against General Mills, *Devahn Jefferson v. General Mills Operations, LLC*, 1:24-cv-5977-MLB-JKL (N.D. Ga.), asserting claims for retaliation and interference under the FMLA based on essentially the same facts alleged in the class action complaint. *Jefferson*, Doc. 15 (second amended complaint).

### j.    Rakia Levesque

Rakia Levesque worked as a Processing Lead at the Covington facility until sometime in 2021. [Doc. 30 ¶¶ 265, 266.] During her tenure, which is unspecified, Levesque was subjected to inappropriate comments and touching from Phil Thompson, the East Plant Operations Manager and a Good Ole Boy, as well as from Greg Cantrell and Jack Gilliam, other Good Ole Boys who held supervisory roles. [*Id.*] She alleges that someone told her she was "filling out her thighs nicely," and questioned her about her ability to afford college or a house. [*Id.*] On one occasion, Gilliam allegedly touched her hair without consent, flipping her bangs and inquiring about her hair changes. [*Id.*] Levesque reported these

40

incidents to HR, though she does not allege when she made the reports or how she connected the conduct to her race.  [*Id.*]

In 2020, Levesque complained to Thompson that rumors were circulating that she was having a sexual relationship with a Black male temporary employee. [Doc. 30 ¶ 267.]  Thompson's dismissive response was, "well, are you?"  [*Id.*]  She reported this incident to HR and "other [unspecified] racist actions and comments."  [*Id.*]

In July 2020, Levesque applied for two Platform Lead roles, but despite her superior qualifications, the positions were awarded to purportedly less-qualified male candidates without college degrees. [Doc. 30 ¶ 268.]  The races of the individuals who were selected are not alleged.  Regardless, she expressed her distress to Roxie Simon, a white female Plant Manager, and Simon advised her to seek a transfer from the Covington facility.  [*Id.*]

At some point, Levesque moved to General Mills' Belvidere, Illinois facility and later to a remote corporate role, and consistently received positive performance reviews.  [Doc. 30 ¶ 269.]  She also joined a female mentoring group with other General Mills female employees and executives.  [*Id.*]  On June 2, 2024, she learned about this putative class action.  [*Id.* ¶ 270.]  She shared a copy of what she refers to as the "lawsuit" (presumably, the initial complaint) with some

members of the mentoring group, and said that she had personal stories about the Covington facility.[25]  [*Id.* ¶ 270.]  The next day, while on approved vacation, she was summoned to a video conference with Katie Holman, a General Mills corporate Vice President, and was informed that General Mills was going to terminate her employment.  [*Id.* ¶ 271.]  Holman offered her a severance package, which Levesque rejected.  [*Id.*]  Around six days later, Levesque was told her termination was due to "trust and integrity issues."  [*Id.*]

Levesque contends that her termination was racially motivated, because it was linked to her complaints about the racist behavior of her white supervisors at Covington (though it is not apparent that she has alleged factual content to support this assertion) and her potential to provide evidence supporting the class action lawsuit.  [Doc. 30 ¶ 273.]  In contrast, she asserts, unnamed white General Mills employees were allowed to discuss this lawsuit, share it among themselves, and taunt Black named plaintiffs without facing termination.  [*Id.*]  But like so many other allegations in the second amended complaint, this assertion is conclusory:  Levesque pleads no particular facts that permit an interference that any white employee discussed this action with impunity or taunted a colleague

---

[25] Levesque was not a named plaintiff in the initial complaint.

about it; instead, she simply asserts without detail that unspecified white employees did so.

On August 13, 2024, Levesque filed a charge of discrimination with the EEOC, alleging discrimination on the basis of race and retaliation. [Doc. 30 ¶ 445; Doc. 39-3 at 17.]

### k.    Samuel Mayhan

In 2022, Samuel Mayhan, who worked as a TTL, was rated "does not meet expectations" in an evaluation by his white Process Lead supervisor, Joe Powers, one of the Good Ole Boys. [Doc. 30 ¶ 298.] Greg Cantrell, another alleged Good Ole Boy, later replaced Powers as Mayhan's Process Lead. [*Id.* ¶ 299.] When it came time for Cantrell to conduct Mayhan's evaluation, he simply copied and pasted Powers' unfavorable evaluation without giving Mayhan guidance on how to improve. [*Id.*] When Mayhan questioned his rating, Cantrell changed the review to "meets" expectations, but still did not offer constructive feedback. [*Id.*]

The lack of support, Mayhan contends, generally hindered his ability to advance and he was blamed for situations beyond his control. [Doc. 30 ¶ 301.] For instance, in late 2023 or early 2024, Mayhan instructed a white technician, Darren McDermott, to go home for refusing to work. [*Id.*] McDermott complained to Matt Hartley, who had since taken over as Mayhan's Platform

43

Lead, but Hartley sided with McDermott.  [*Id.* ¶¶ 300-01.]  Then, on March 15, 2024, Mayhan was put on "Final Term" after a white colleague questioned him for entering the West Plant during a roof fire, when in fact, Mayhan had been told by his Project Manager to enter into the building.[26]  [*Id.* ¶ 302.]  Additionally, at some unidentified point, Mayhan was disciplined and ultimately terminated for allegedly lying about informing others of a missing metal audit puck (a device used to locate metal in food products), even though he had followed all proper procedures.  [*Id.* ¶¶ 303-06.]  Mayhan denies that he engaged in misconduct.  [*Id.* ¶ 307.]

Mayhan's insistence on following safety procedures and his vocal stance on the lack of support were, he contends, perceived negatively by his white supervisors, Cantrell and Hartley.  [Doc. 30 ¶ 308.]  According to Mayhan, this led to his termination in May 2024, which he contends generally was also due to his race and his opposition to the discriminatory practices at the facility.  [*Id.*]

On August 21, 2024, Mayhan filed a charge of discrimination with the EEOC, alleging race discrimination, retaliation, and hostile work environment. [Doc. 30 ¶ 445; Doc. 39-3 at 19-20.]

_____

[26] It is unclear who the Project Manager was.

44

### l.    Keith McClinton

Keith McClinton began working at the East Plant in December 2001. [Doc. 30 ¶ 202.] He contends that his assigned mentor, John Sams, who was white, yelled at him on a daily basis. [*Id.* ¶ 203.] According to McClinton, the "culture of white men yelling at Black employees has not stopped" and "Shane Cox[, one of his supervisors,] has done it for decades." [*Id.*]

McClinton alleges that in 2003, he was subjected to harsher punishments than white employees who engaged in similar infractions. [Doc. 30 ¶ 204.] McClinton does not say what those infractions were, how he was punished, or who received preferential treatment.

Then, in 2003 or 2004, he alleges someone wrote a racial slur written on one of McClinton's work documents and wrote "KM is a f****** [N-word]" on a restroom wall. [*Id.* ¶ 205.] McClinton reported these incidents to HR, but nothing was done to address them. [*Id.* ¶ 207.] In November 2005, McClinton complained to HR that he had not received a response to his complaint. [*Id.*] In 2006, someone wrote "KKK" on McClinton's toolbox. [*Id.* ¶¶ 208, 210.] McClinton complained again, and while it was investigated this time, McClinton himself was required

45

to give a handwriting sample to prove he did not write "KKK," which was done without McClinton "being informed of his rights.[27]" [*Id.* ¶ 209.]

In 2020, McClinton learned that General Mills maintained the Coaching & Counseling Database and that it contained "confidential data on technicians" after someone named "James"[28] inadvertently left it displayed on his computer screen. [Doc. 30 ¶ 211.] According to McClinton, TTLs—presumably employees who hold a supervisory role—are required to add negative personnel information to the database for Black employees so that General Mills can use it to justify adverse employment actions. [*Id.* ¶ 213.] McClinton does not explain how he came to understand that the database was being used to generate pretextual justifications for the discharge of Black employees. Regardless, McClinton alleges that in early 2020, he learned that Steve Jarva, one of the alleged Good Ole Boys, directed that a "false entry" about McClinton be added to the database.[29] [*Id.* ¶ 214.] Since 2021, McClinton has received more frequent

---

[27] It is unclear what "legal rights" McClinton believes that he was entitled to be advised of.

[28] Plaintiffs allege that "James" was reprimanded for inadvertently allowing McClinton to see the database. [Doc. 30 ¶ 211.]

[29] McClinton does not explain what the "false entry" said or when Jarva directed it to be entered into the Coaching & Counseling Database.

entries in the database "for circumstances that white employees received no punishment for." [*Id.* ¶ 219.] McClinton alleges no detail, however, about what those "circumstances" were or what, exactly, was allegedly recorded about him in the Coaching & Counseling Database.

During a training session on manufacturing equipment in November 2021, Jarva noticed that two non-Black managers and all the technicians—all but one of whom was Black—had not "locked out/tagged out" of a machine. [Doc. 30 ¶ 217(a), (b), (c).] Jarva quietly told the white managers to put their locks on the machine, and after they did, he yelled at the technicians for not putting their locks on the machine. [*Id.* ¶ 217(c).] Based on these purported infractions, Jarva "submitted write-ups" for a Black TTL who was not present at the training (he does not identify the employee by name) as well as the Black technicians, including McClinton, who were in attendance. [*Id.* ¶ 217(d).] Meanwhile, the sole white technician, Sabrina Taylor, was not written up. [*Id.* ¶ 217(e).] At some point, McClinton and others complained to HR about the incident. [*Id.* ¶ 217(f).] McClinton does not allege how HR responded, if at all.

In 2022 and 2023, McClinton made complaints about "racist treatment" (it is unclear to whom he complained), and in retaliation, his white supervisors, Cox and Jake Hayslip "doubled down and colluded to write-up" McClinton, Joe

Davis, and other unnamed Black employees, while not writing up white employees for "similar conduct."[30] [Doc. 30 ¶ 220.] Meanwhile, HR is alleged to have instructed Cox and Hayslip to speak to McClinton only when absolutely necessary. [*Id.* ¶ 221.] At an unspecified point in time, the local head of HR, Chris Morrison, criticized McClinton's emails complaining of discrimination as being difficult to "decode." [*Id.* ¶ 222]

According to McClinton, at some point, Cox made "racially charged comments or [took] racially charged actions in the presence of McClinton and other Black employees." [Doc. 30 ¶ 223.] It is entirely unclear what those comments were, whether they were directed at McClinton, what the "racially charged actions" were, and who those actions were direct against. In any event, McClinton alleges that he reported these incidents to HR in February 2024, and HR responded by indicating that they were working with Cox to improve his behavior. [*Id.*] McClinton also asked to be transferred, but his request was denied, even though other white employees had been granted similar requests. [*Id.*] McClinton provides no detail whatsoever about the white employees' transfer requests; nonetheless, he alleges in *ipse dixit* fashion that he was denied

---

[30] Again, it is unclear what McClinton or the others were written up for or what the similar conduct was.

a transfer because of his race and in retaliation for complaining about Cox's "racist behavior." [*Id.*]  Also, he contends, Cox retaliated against him by making his work-life "hostile, by reprimanding [McClinton] for things [he] did not do, were done by others, and/or that were within applicable policies and procedures, continuing to berate him, racially and otherwise, and refusing to give McClinton pass codes to the machinery that he was required to operate." [*Id.*] The actions of Cox and "other Good Ole Boys" made it difficult for McClinton to perform his job duties.  [*Id.*]

McClinton next alleges that white employees were "given time away from production and shift rotation to implement ideas," but that he was denied such an opportunity.  [Doc. 30 ¶ 225.]  At some point, McClinton and another unidentified Black coworker were disciplined for being late to work due to a traffic accident, while Jarva (his supervisor) was not disciplined for being late the following week for the same reason.  [*Id.* ¶ 226.]  At some other unidentified point, McClinton and a Black colleague were disciplined for not attending a football game they were told was optional, while a white employee who did not attend the game was not disciplined.[31]  [*Id.* ¶ 227.]

─────────────

[31] McClinton does not explain how he was disciplined, nor does he identify the white employee, the employee's position, or to whom the employee reported.

In 2024, McClinton was verbally reprimanded for falsifying a signature on a document even though he claims he did no such thing. [Doc. 30 ¶ 224.] McClinton complained to HR, but nothing was done about it. [*Id.*] In April 2024, HR instructed McClinton to stop putting his complaints in writing and instead discuss issues in person. [*Id.* ¶ 228.]

On November 15, 2023, McClinton filed a charge of discrimination with the EEOC, alleging race discrimination, hostile work environment, and retaliation. [Doc. 30 ¶ 445; Doc. 39-3 at 22.]

### m.    Donald Outlaw

Donald Outlaw began working for General Mills in 2005 as a technician. [Doc. 30 ¶ 244.] For over five years, he was involved in the electrical and instrumentation ("E&I") program whose purpose was to prepare employees for work in E&I. [*Id.* ¶ 245.] Outlaw was in the program for an extended period, but he was never given the opportunity to serve in an E&I position. [*Id.* ¶ 245.] He alleges that only one Black employee has ever served in an E&I role in the West Plant. [*Id.* ¶ 246.]

Outlaw also applied "several times" for a maintenance position at the West Plant, but each time, a white candidate was selected over him, despite Outlaw being the only person in the E&I program, which was supposed to facilitate

promotion to a maintenance position. [Doc. 30 ¶ 247.] On an unspecified occasion, five open maintenance positions were advertised, and all of them were filled by white candidates. [*Id.* ¶ 248.] Between June 2, 2020, and late December 2021, less-qualified white employees were also promoted over Outlaw, including Ben Matthews, Richard Mock, Joe Shellnut, David Green, Jeff Nelson, Chad Galloway, and Josh Hayslip.[32] [*Id.* ¶ 249.]

In 2020, Outlaw was promoted to a TTL position, but was demoted effective January 1, 2022, despite having performance evaluations that said he "Exceeded Expectations" and receiving bonuses at each eligible interval. [Doc. 30 ¶¶ 252-53.] When Outlaw inquired about the reason for his demotion, Mark Salerno, his white platform lead and alleged Good Ole Boy,[33] claimed that none of Outlaw's technicians liked him, which contradicted Outlaw's performance reviews and the feedback from his technicians. [*Id.* ¶ 254.] In contrast, Cox, who Outlaw contends was actually disliked by many, was not demoted despite

---

[32] It is unclear whether these promotions are the same "open maintenance positions" referred to in paragraph 248 of the second amended complaint, or some different role.

[33] Similar to others, Salerno is not identified in paragraph 2 of the second amended complaint as a member of the Good Ole Boys. [*See* Doc. 30 ¶ 2.]

having worse performance reviews.  [*Id.*]  Outlaw claims that he was demoted while other, less-qualified white males with records of racist behavior were not demoted, including Will Coady, Sandy Beam, Jim Alexander, Tracey Reagan, Jason Ellis, and Shane Cox.  [*Id.* ¶ 255.]  Ultimately, Outlaw resigned at some time in 2021, before the effective date of the demotion, and thus the demotion was never carried out.  [*Id.* ¶ 256.]  According to Outlaw, he realized that advancement for Black employees at the Covington plant was controlled by the "Good Ole Boys," who exercised "complete control over whether a Black employee" could advance or be terminated without justification.  [*Id.*]

Outlaw did not file a charge of discrimination.  [*See* Doc. 30 ¶ 445.]

### n.    E.J. Rivers

E.J. Rivers, whose dates of employment and positions held are not alleged in the complaint, asserts that a noose was left on his desk in 1993 and no investigation was conducted by General Mills.  [Doc. 30 ¶ 184.]  In 1994, Darren Williams[34] and Lee Collins[35] told Rivers to "go back to Africa," and even though Rivers complained to HR, no action was taken against them.  [*Id.* ¶¶ 186, 188.]  At some point, Collins wrote "KOLA" (which stood for "Kiss Ole Lee's Ass") on

---

[34] Rivers does not allege what position Williams held at this time.

[35] Rivers also does not allege what Collins's position was at this time.

"company property" but no action was taken against Collins for defacing the property.[36]  [*Id.* ¶ 187.]

In 2003 and either 2005 or 2006, despite having the necessary qualifications, Rivers was passed over for promotions in favor of less-qualified white employees and was required to train them.  [Doc. 30 ¶¶ 189-91.]  Meanwhile, his job description contained more responsibilities than those of white employees with the same title.  [*Id.* ¶ 193.]  Again, it is wholly unclear what position Rivers held, and he fails to explain what additional duties he was responsible for.

In 2012, Steve Surmick[37] noticed Rivers using a toolbox and said, "If that was my toolbox, I would kick your ass."  [Doc. 30 ¶ 194.]  Rivers retorted, "Bring it."  [*Id.*]  Rivers reported the incident to Orric Browning, and HR got involved.  [*Id.*]  HR chastised Rivers for saying, "Bring it," but no action was taken against Surmick.  [*Id.*]  Meanwhile, at some unidentified point in time, Surmick told a

---

[36] Rivers does not explain why he thought that this had been directed at him, nor does he identify what "property" Collins allegedly defaced.

[37] Surmick's position is not alleged and it is not clear if he held a supervisory position or was a member of the Good Ole Boys.

Black female vendor's employee that if she spilled his coffee, he would "kick her ass."[38]  [*Id.* ¶ 195.]

In 2016, Rivers transferred from the Covington facility to a facility in Albuquerque, New Mexico.  [Doc. 30 ¶ 196.]  He was the only Black person on support staff at the Albuquerque facility.  [*Id.* ¶ 197.]  In 2017 or 2018, a white technician was given a "Quality Engineer" position even though he did not have a degree.  [*Id.* ¶ 198.]  Rivers is not aware of any Black employee being given a similar waiver for such a position.[39]  [*Id.*]

In 2021, Rivers returned to the Covington facility, where he worked "on loan" from the New Mexico facility for around 45 days.  [Doc. 30 ¶ 199.]  He alleges that he "was told that white employees considered him to be a problem" because he required "strict compliance with policies and procedures."[40]  [*Id.* ¶ 200.]  Even so, he did not compromise, and insisted on strictly enforcing policies and procedures.  [*Id.*]  Also, after his return to Covington in 2021, Rivers applied

---

[38] Apart from the allegations that Rivers and the vendor are Black, there are no other facts alleged that plausibly suggest Surmick harbored racial animus toward Rivers (or anyone else).

[39] Rivers does not allege that he applied for a "Quality Engineer" position or even if he was qualified for it.

[40] Rivers does not allege who told him this.

for "open positions"—though he does not specify which ones he applied for, when he submitted the applications, or how many times he did so—but was not granted an interview. [*Id.* ¶ 201.] He gives one example—when he applied for the position of "Samples Coordinator," presumably in 2021, the hiring managers, Sean Longfellow, a white male, and "Maria," a Hispanic female, did not grant him an interview, and ultimately interviewed and awarded the position to a less-qualified white female, Candi Bailey.[41] [*Id.*]

Rivers did not file a charge of discrimination with the EEOC. [*See* Doc. 30 ¶ 445.]

### o.     Naaman Smith

Naaman Smith worked as a technician for General Mills for about seven years. [Doc. 30 ¶ 309.] Despite his qualifications, he was passed over for a promotion to TTL in favor of John Dean, a less-qualified white male who was suspected by multiple Black employees of being unable to read or write fluently. [*Id.* ¶ 310.] According to Smith, Dean's promotion process was a sham, with Dean being pre-selected by white decision-makers. [*Id.*]

---

[41] No allegations explain how Bailey was supposedly less-qualified.

At some other point, Smith's Platform Lead, Steven Fellows, an alleged Good Ole Boy,[42] encouraged him to apply for a TTL role, but simultaneously coached a white employee, Danny Thompson, on how to secure the position over Smith and other qualified Black applicants. [Doc. 30 ¶ 311.] Thompson, who had previously been terminated for absences, was re-hired and promoted over Smith, which Smith contends shows General Mills maintained a pre-selection process favoring white employees. [*Id.*]

Smith asked Fellows for training on the "cooker," but Fellows discouraged him; and John Dean later told him Fellows doubted Smith's capabilities. [Doc. 30 ¶ 312.] Fellows and another white supervisor, Daniel Korpi, also showed deference to Dean, allowing him to remove an insubordination write-up from his record, a privilege not extended to Black employees like Smith. [*Id.* ¶¶ 313, 315.]

Throughout Smith's tenure at the Covington facility, white employees made "stereotypical" comments about him, such as assumptions about his familiarity with jail, his need for a gun even though he lived in a relatively safe neighborhood, and remarks about his hair. [Doc. 30 ¶ 318.] It is not clear what was actually said to him, who said it, or when the comments were made.

---

[42] As with others, Fellows is not identified in paragraph 2 of the second amended complaint as a member of the Good Ole Boys. [*See* Doc. 30 ¶ 2.]

At some point in 2021, Korpi became Smith's Platform Lead.  [Doc. 30 ¶ 315.]  In September 2023, Smith complained to Korpi that he felt Korpi was targeting him, did not recognize his positive performance, and held him to higher standards than white employees like John Dean.  [*Id.* ¶ 316.]  In October 2023, Korpi accused Smith and G. Davis (a co-plaintiff in this case, whose allegations were discussed earlier), of falsifying documents, claiming they signed off on unclean equipment.  [*Id.* ¶ 321.]  Korpi allegedly manufactured evidence to support the accusation, leading to Smith's and G. Davis's terminations on October 13, 2023.  [*Id.* ¶¶ 321-23.]  Smith's termination did not follow General Mills's progressive discipline policy, while Ashley Larrimore a white employee who worked in the "Puff Department," was accused of similar conduct and was not terminated.  [*Id.* ¶¶ 324, 360.]

Smith filed a charge of discrimination with the EEOC on February 2, 2024, alleging discrimination on the basis of race and retaliation.  [Doc. 30 ¶ 445; Doc. 39-3 at 24.]

### p.    Laquanda Turner

Laquanda Turner worked as a manufacturing technician at the Covington facility from "late 2020 through 2021."  [Doc. 30 ¶ 258.]  She was supervised by Shane Cox.  [*Id.*]  Cox consistently targeted her for actions he deemed improper,

but did not reprimand white male technicians. [*Id.* ¶ 259.] Turner reported this behavior to Jarva, Cox's supervisor. [*Id.*] Jarva informed Cox of the complaint, which led to further mockery and harassment from Cox—though it is unclear what exactly Cox did to mock or harass her. [*Id.* ¶ 260.] At any rate, according to Turner, even after Cox was later promoted to Process Lead, he would badger her about her work but not white employees.[43] [*Id.*]

Turner alleges she also experienced disparate treatment in training and performance evaluations. Her white trainer, Stan Holloway, incorrectly trained her on changing ink on an Aagard machine, resulting in a negative entry in the Coaching & Counseling Database for Turner, but not for Holloway. [Doc. 30 ¶ 261.] Jarva allegedly allowed this incident to happen. [*Id.*] Turner was also informed of another coaching entry for not completing changeover sheets, which she denies. [*Id.* ¶ 262.] She believes that not all team members received similar entries, which she contends suggests selective enforcement. [*Id.*]

Turner alleges that in August 2024, someone played the "Dukes of Hazzard" theme song and that someone used the N-word over the radio, which Turner and other Black employees heard. [Doc. 30 ¶ 263.] Cox's actions also

---

[43] It is unclear what Cox allegedly badgered her about.

seemed aimed at forcing Turner to quit, as he allegedly bragged about his ability to get employees fired. [*Id.* ¶ 264.] Despite this, Turner has not quit and remains determined not to let Cox's actions force her out of her job. [*Id.*]

Turner also alleges that Conrad James (a Black TTL) complained about Cox's behavior to Jarva. [Doc. 30 ¶ 264.] After James complained, Cox, Jarva, and Phil Thompson (a white East Plant Operations Manager) accused James's team of infractions that she contends were contrived by Cox. [Doc. 30 ¶ 264; *see also id.* ¶ 266).] Every time James complained, Cox would deny the allegations and white management would consistently take Cox's side over James, so much so that ultimately James became so stressed that he developed a heart condition for which he was forced to take time off from work. [*Id.* ¶ 264.]

On August 7, 2024, Turner filed a charge of discrimination with the EEOC, alleging discrimination on the basis of race, sex, retaliation, and hostile work environment. [Doc. 30 ¶ 445; Doc. 39-3 at 26.] She has also filed an individual suit against General Mills, *Laquanda Turner v. General Mills Operations, LLC*, 1:24-cv-5969-MLB-JKL (N.D. Ga.), asserting claims for sex discrimination, retaliation, and a sexually hostile work environment based on essentially the same facts alleged in the class action complaint, *id.*, Doc. 15 (second amended complaint).

### 3.    Class Allegations

The named Plaintiffs have filed this action on behalf of themselves and a class of individuals under Federal Rules of Civil Procedure 23(a), 23(b)(2), and (b)(3).  [Doc. 30 ¶ 431.]  The proposed class includes all Black employees who worked at the Covington facility since June 2, 2020, and who have been, continue to be, or may in the future be adversely affected by the company's "racially discriminatory employment policies and practices."  [*Id.* ¶ 432.]  Plaintiffs allege that the proposed class likely has "hundreds of members," who each suffered an adverse employment action while working at the Covington facility.  [*Id.* ¶¶ 433, 435.]

### B.    Claims

Based on the allegations set out in the second amended complaint, Plaintiffs assert six claims:

- **Count One**:  disparate treatment on the basis of race under 42 U.S.C. § 1981, brought by all Plaintiffs [Doc. 30 ¶¶ 449-56];

- **Count Two**:  retaliation under § 1981 by Harris, McClinton, J. Davis, Turner, Levesque, Edge, Mayhan, Smith, Floyd, G. Davis, and Jefferson, as well as similarly situated putative class members [*id.* ¶¶ 457-60];

- **Count Three**:  racially hostile work environment under § 1981 by McClinton, J. Davis, Turner, Levesque, Edge, Drew, Mayhan, Smith, Floyd, G. Davis, and Jefferson, as well as similarly situated putative class members [*id.* ¶¶ 461-66];

- **Count Four**:  disparate treatment on the basis of race under Title VII by McClinton, J. Davis, Turner, Levesque, Childs, Edge, Mayhan, Smith, G. Davis, and Jefferson, as well as similarly situated putative class members [*id.* ¶¶ 467-75];

- **Count Five**:  retaliation under Title VII by McClinton, J. Davis, Turner, Levesque, Edge, Mayhan, Smith, G. Davis, and Jefferson, as well as similarly situated putative class members [*id.* ¶¶ 476-83]; and

- **Count Six**:  racially hostile work environment under Title VII by McClinton, J. Davis, Turner, Levesque, Edge, Mayhan, Smith, G. Davis, and Jefferson, as well as similarly situated putative class members [*id.* ¶¶ 484-89].

C.    **Procedural Posture**

On March 18, 2025, General Mills moved to dismiss the second amended complaint.  [Doc. 39.]  General Mills argues that no Plaintiff can state a claim under § 1981 or Title VII due to insufficient allegations and their failure to exhaust

administrative remedies. In particular, General Mills contends that Plaintiffs' disparate treatment claims fail because they do not plausibly allege purposeful race discrimination by decisionmakers, that the retaliation and hostile work environment claims fail to allege required elements, and that regardless, many alleged adverse actions are now time-barred. [Doc. 39-1 at 4-21.] General Mills also argues that the class allegations should be dismissed as Plaintiffs cannot satisfy Rule 23 requirements, including typicality and commonality. [*Id.* at 21-25.]

Plaintiffs oppose the motion. [Doc. 43.] Plaintiffs contend that General Mills focuses entirely on the sufficiency of the allegations as they relate to individual acts of discrimination and ignore that Plaintiffs are alleging a pattern-and-practice case, an entirely different theory of discrimination that is especially suitable for class action status. [*Id.* at 9-18.] Along these lines, Plaintiffs contend that they have alleged facts showing that illegal discrimination was General Mills's standard operating procedure — which is the principal showing a plaintiff must make in a pattern-and-practice case. [*Id.* at 9-12.] They also assert that there is no statute of limitations problem, as they contend the continuing violations doctrine should apply to render otherwise time-barred events are actionable. [*Id.* at 2-3, 15.] Plaintiffs further argue that they have pled sufficient facts to plausibly

suggest intentional discrimination against each Plaintiff through a convincing mosaic of circumstantial evidence. [*Id.* at 18-22.] Lastly, Plaintiffs contend that General Mills's argument that the complaint's class allegations should be dismissed is simply premature. [*Id.* at 22-25.]

On reply, and in response to Plaintiffs' arguments that they have shown a pattern or practice of discrimination, General Mills argues that Plaintiffs' second amended complaint is an impermissible shotgun complaint because each of the six causes of action incorporates "each and every allegation" preceding it by reference. [Doc. 44 at 2-4.] And because this is Plaintiffs' third bite at the apple, General Mills urges the Court to dismiss the complaint on this basis. [*Id.* at 4.]

Regarding Plaintiffs' pattern and practice theory, General Mills argues that it did not waive any arguments relating to purported pattern and practice allegations because the second amended complaint is drafted in such a manner that it did not put General Mills on notice that Plaintiffs were proceeding on that theory, and that it was only upon review of Plaintiffs' response to the motion to dismiss that the pattern and practice theory was clearly identified. [Doc. 44 at 2, 5-6, 6 n.4.] General Mills also argues that no Plaintiff has standing to prosecute a pattern and practice claim on behalf of similarly-situated employees because no

Plaintiff has alleged facts that plausibly suggest that he or she suffered discrimination, retaliation, or a racial hostile work environment.  [*Id.* at 6-7.]

General Mills also argues that Plaintiffs' alleged time-barred actions cannot be used to state a claim for relief.  [Doc. 44 at 8.]  Likewise, it contends, Plaintiffs cannot rely on purported "me too facts" because such evidence is admissible only when it involves employment decisions made by the same person who made the decision affecting the plaintiff, the other employee(s) held a position similar to the plaintiff, and they also suffered an adverse employment action similar to the plaintiff.  [*Id.* at 9.]  Along similar lines, General Mills contends that the continuing violations doctrine does not apply here, and that Plaintiffs do not even attempt to identify which time-barred actions are purportedly salvaged by the doctrine.  [*Id.* at 10-12.]

General Mills finally argues that the individualized nature of Plaintiffs' claims makes it impossible to certify a class, given that Plaintiffs have held a variety of roles, worked for General Mills at different times, and suffered disparate forms of alleged adverse employment actions.    [Doc. 44 at 12-15.] General Mills also underscores on reply that the Court may, at this juncture, strike or dismiss class allegations when a motion to dismiss demonstrates that

64

facial deficiencies in the complaint would make it impossible to certify the putative class. [*Id.* at 13-15.]

## II.    STANDARD OF REVIEW

In evaluating a Rule 12(b)(6) motion to dismiss, a court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint need not provide "detailed factual allegations," but it must provide factual allegations sufficient to set forth the plaintiff's entitlement to relief. *Twombly*, 550 U.S. at 555. Providing only "labels and conclusions" is insufficient, "and a formulaic recitation of the elements of a cause of action will not do." *Id.* In evaluating a complaint, courts should disregard any allegations that are mere legal conclusions. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (discussing *Iqbal* and *Twombly*). Further, if assuming the truth of the factual allegations of the amended complaint, there is a dispositive legal issue that precludes relief or if it is based on a meritless legal theory, dismissal is warranted. *Neitzke v. Williams*, 490 U.S. 319, 326 (1989); *see also Brown v. Crawford Cnty.*, 960 F.2d 1002, 1009-10 (11th Cir. 1992).

## III.  DISCUSSION

The Court organizes its analysis as follows:  first, it takes up the pleading sufficiency of Plaintiffs' operative complaint; then it turns to issues of class certification; and finally, it evaluates Plaintiffs' pattern and practice theory, which also relates to issues concerning class certification.

### A.    Shotgun Pleading

The Court first takes up General Mills's contention that the second amended complaint is an impermissible shotgun complaint.

"A shotgun pleading is a complaint that violates either Federal Rule of Civil Procedure 8(a)(2) or Rule 10(b), or both." *Barmapov v. Amuial*, 986 F.3d 1321, 1324 (11th Cir. 2021) (citing *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015)).  Under those rules, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," *see* Fed. R. Civ. P. 8(a)(2), and present the claims "in numbered paragraphs, each limited as far as practicable to a single set of circumstances," *see* Fed. R. Civ. P. 10(b). Rule 10(b) further provides that if clarity demands it, "each claim founded on a separate transaction or occurrence . . . must be stated in a separate count."  "The self-evident purpose of these rules is to require the pleader to present his claims discretely and succinctly, so that his adversary can discern what he is claiming

66

and frame a responsive pleading." *Barmapov*, 986 F.3d at 1324 (cleaned up; citation omitted). Those rules also exist "for the benefit of the court, which must be able to determine which facts support which claims, whether the plaintiff has stated any claims upon which relief can be granted, and whether evidence introduced at trial is relevant." *Id.* (cleaned up; citations omitted).

"Courts in the Eleventh Circuit have little tolerance for shotgun pleadings." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018); *see also Whitchurch v. Elarbee Thompson Wilson & Sapp, LLP*, No. 1:17-CV-5205-MLB, 2022 WL 22782304, at *1 (N.D. Ga. Jan. 24, 2022) (noting that the Court of Appeals "has reserved special ire" for shotgun complaints). Such pleadings are particularly odious because they "waste scarce judicial resources, inexorably broaden the scope of discovery, wreak havoc on appellate [and district] court dockets, and undermine the public's respect for the courts." *Id.*

The Eleventh Circuit has identified four categories of shotgun pleadings. *Barmapov*, 986 F.3d at 1324.

> The first is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint. The second is a complaint that is replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action. The third is a complaint that does not separate each cause of action or claim for relief into a different count. And the final type of shotgun pleading

> is a complaint that asserts multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.

*Id.* at 1324-25 (citations omitted)

Here, the operative complaint falls into the first and second categories. The first category's requirements are satisfied because at the beginning of each count, Plaintiffs indiscriminately "repeat and reallege" every preceding allegation—including the entirety of the factual allegations in the complaint [*see* Doc. 30 ¶ 449 (in the complaint's first count, "Plaintiffs repeat and reallege each and every allegation above as it set forth herein in full.")], as well as the allegations in each of the preceding counts [*see id.* ¶¶ 449, 457, 461, 467, 476, 484]—meaning every cause of action incorporates, by reference, every allegation in the complaint. Meanwhile, the counts themselves contain very few, if any, factual assertions to support each cause of action, leaving the Court to guess which facts pled earlier in the complaint—***over the course of 448 paragraphs and 147 pages***—underpin each claim.

The operative complaint also falls into the second category because, as the factual summary above makes evident, the complaint is rife with vague and conclusory allegations about dozens of incidents that allegedly occurred over three or more decades. Time and time again, the second amended complaint

68

omits crucial information about when events occurred, who made decisions, how those decisionmakers were related to Plaintiffs, what positions Plaintiffs held, what Plaintiffs themselves observed, what was complained about and to whom, and so on. Beyond that, the complaint also contains immaterial allegations without specific factual support about, among other things, General Mills's facility in Murfreesboro, Tennessee (complete with inflammatory images), that General Mills makes Cinnamon Toast Crunch so that it can perpetuate systemic racial discrimination at the Covington Facility and tamp down unionization efforts, and that General Mills's Chief HR Officer sold nearly $2 million in General Mills stock after another employee filed a lawsuit in April 2023, as if to suggest that this is somehow an indication that the corporate big-wigs knew the jig was up.[44] [*See* Doc. 30 ¶¶ 63, 66, 155-62.]

The allegations in this case bear remarkable resemblance to those in *Davis v. Coca-Cola Bottling Co. Consolidated*, where the Eleventh Circuit expressed its ire for shotgun pleadings filed in putative class actions. 516 F.3d 955 (11th Cir. 2008), *abrogated on other grounds as recognized in Est. of Bass v. Regions Bank, Inc.*, 947 F.3d

---

[44] And, as noted above, the complaint, seemingly in contradiction to this assertion, also states that investors had "no concern" about the lawsuit. [*See* Doc. 30 ¶ 163.]

1352, 1356 n.3 (11th Cir. 2020). In *Davis*, nine Black current and former employees of a Coca-Cola bottling facility alleged, on behalf of themselves and a putative class, that the company maintained a pattern and practice of discrimination against Black employees with respect to virtually every aspect of the employment relationship, including hiring, promotion, pay, a racially hostile work environment, and light work assignments. 516 F.3d at 961. Plaintiffs asserted disparate treatment claims under Title VII and § 1981, alleging that the defendant maintained a pattern or practice of race discrimination as to "pay, raises, benefits, ability to advance, and [the] right to be free of racial discrimination, harassment, and intimidation, and other terms and conditions of employment." *Id.* at 963-64. But the complaint contained "no count in which a plaintiff allege[d] that he was, or is, [the] victim of one or more specific features of the [alleged] pattern or practice of race discrimination." *Id.* at 964. Instead, the complaint implied—by virtue of the fact that the Title VII and § 1981 counts incorporated all preceding allegations—"that all nine plaintiffs, and all other black non-supervisory employees of [the defendant], have experienced, and are continuing to suffer from, all of the features of the alleged pattern or practice." *Id.*

By the time the case reached the Eleventh Circuit, the case had undergone a "convoluted history" that included two amended complaints, a motion for

judgment on the pleadings, and a motion for summary judgment, which resulted in a substantially narrowed scope on appeal. *Davis*, 516 F.3d at 961-62, n.2. In strong terms, the court expressed its disapproval about how the parties (and the district court) allowed the case to proceed in an unbridled fashion, only to be winnowed down later. *See id.* at 979-984 (noting that the framers of the Federal Rules of Civil Procedure "would roll over in their graves" if they could read the case's record). The court explained that the Rules of Civil Procedure require complaints to be:

> drafted as clearly and definitively as possible, so that the defendant [can] understand the cause(s) of action the plaintiff was asserting and frame a responsive pleading, and the district court, having a clear and definitive response before it, [can] recognize the parties' claims and defenses, identify the issues of fact to be litigated, and proceed to a just result.

*Id.* at 979. The complaint in *Davis*, the court stated, was "a model 'shotgun' pleading of the sort this court has been roundly, repeatedly, and consistently condemning for years, long before [the] lawsuit was filed." *Id.* The court chastised the plaintiffs for lumping together in a single count otherwise discrete claims that the plaintiffs had been discriminated against with respect to pay, raises, benefits, ability to advance, and that they had the right to be free from racial discrimination, harassment, and intimidation. *Id.* at 980. "This all-encompassing discrimination gave the . . . named plaintiffs (and the unnamed

members of their class) untold causes of action, all bunched together in one count contrary to the requirements of [Rule] 10(b)." *Id.* By not "explicitly . . . link[ing] a particular plaintiff to a particular cause of action," Plaintiffs made it impossible to tell which plaintiff possessed which cause of action. *Id.*

The appellate court also identified the many "unacceptable consequences of shotgun pleading," which are also applicable here. *Davis*, 516 F.3d at 981-983. While the court placed most of the blame on the parties' counsel, it expressed that the district court should have done more to corral the pleading problems in the case. The court decried that shotgun pleadings unnecessarily broaden the scope of discovery (to the benefit of no one) and that a case would inevitably devolve into an unmanageable mess "[u]nless ***the court*** has intervened and required the attorneys to replead the case, unless ***the court*** has definitively identified the parties' claims and defenses and has squeezed the case down to its bare essentials." *Id.* at 982 (emphasis added). Going on, the Circuit lamented that shogun pleadings "***if tolerated by the court***" tax the court's own scarce resources "to reach and dispose of the cases and litigants waiting to be heard." *Id.* (emphasis added).

The implication is obvious: trial courts that "tolerate" shotgun complaints are themselves complicit in the inefficiencies that such pleadings create. The

Circuit also wrote that shotgun pleadings make appellate review difficult, explaining that because of "the nebulous pleadings in [*Davis*] ***and the district court's failure to strip the case down and identify each claim and defense***, we had to undertake that task from scratch." *Id.* (emphasis added). The undersigned takes this admonition to heart. And of course, the upshot of all *Davis*'s warnings, then, is that a trial court must not sit idly by when a party has filed a shotgun complaint.

Ironically, Plaintiffs characterize General Mills's motion to dismiss as a "shotgun motion to dismiss brief" because it "does not analyze even one claim of any single Plaintiff," "only purports to analyze individual claims in charts," and provides "no cohesive analysis of any claim." [Doc. 43 at 4-5.] But that is a problem of Plaintiffs' own creation: they have pled their case in such a way that that it is nearly impossible to discern which facts support which claims, which claims are actually asserted, and even what each Plaintiff's individual theory of discrimination is.

The undersigned emphasizes that this critique does not question that the complaint alleges very troubling facts suggesting that discrimination occurred at the Covington facility, and it should not be taken to suggest that the individual Plaintiffs did not experience intentional racism. Rather, the locus of concern is

that the Court cannot determine which facts pled in the complaint plausibly suggest that General Mills engaged in a pattern or practice of discrimination that actually impacted each of the Plaintiffs, as well as the putative class.

The Eleventh Circuit instructs that "in a case in which a party, plaintiff or defendant, files a shotgun pleading, the district court should strike the pleading and instruct counsel to replead the case—if counsel could in good faith make the representations required by Fed. R. Civ. P. 11(b)." *Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1357 (11th Cir. 2018) (cleaned up); *see also U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1354 n.6 (11th Cir. 2006) ("When faced with a shotgun pleading, the trial court, whether or not requested to do so by the party's adversary, ought to require the party to file a repleader."). Thus, it is **RECOMMENDED** that the Court **DISMISS** the second amended complaint **WITHOUT PREJUDICE** and direct Plaintiffs to file an amended complaint that addresses the defects identified in this report and recommendation.[45]

---

[45] General Mills urges the Court to dismiss the complaint with prejudice because Plaintiffs have already filed three complaints. [Doc. 44 at 2-3.] The Court declines to make such a recommendation at this juncture because until now, the Court itself has not ordered repleader to cure a shotgun complaint. *See Vibe Micro, Inc.*, 878 F.3d at 1295-96 (explaining that district courts are required *to sua sponte* allow a litigant a chance to remedy shotgun pleading issues before dismissal on shotgun pleading grounds).

B.    **Plaintiffs' Class Allegations**

Because repleader, rather than dismissal, is recommended, the Court also addresses the parties' arguments about the sufficiency of Plaintiffs' class allegations.  As will be discussed presently, the Court struggles to see how this case could possibly satisfy the requirements of Rule 23.

1.    **The Parties' Contentions**

General Mills argues that the face of the second amended complaint demonstrates that it would be impossible to certify a class under Rule 23 because the sixteen Plaintiffs' claims are highly individualized, dealing with a wide variety of alleged discrimination, retaliation, and harassment over three decades from a multitude of co-workers, supervisors, and management.  [Doc. 39-1 at 22-23.] General Mills also directs the Court to the fact that fifteen putative class members have filed their own individual suits, which shows that Plaintiffs' claims are not typical of the proposed class.  [*Id.*]  General Mills further argues that the "single-filing rule"—which would allow putative plaintiffs who did not file charges of discrimination with the EEOC to piggyback their claims on a filing-plaintiff's charge—forecloses class treatment because it would involve highly

75

specific, case-by-case inquiries.[46]  [*Id.* at 23.]   According to General Mills, the Court would have to (1) determine the validity of each of the EEOC charges; (2) ascertain the scope of each charge; (3) identify each alleged action suffered by each non-filing plaintiff or putative class member; and (4) assess each alleged action against the scope of any EEOC charges that are valid to determine if the filing plaintiff or putative class member's actions arise from similar discriminatory treatment that also occurred within the same time frame.  [*Id.* at 23-24.]

General Mills also argues that Plaintiffs have not alleged facts that plausibly satisfy any of the subparts of Rule 23(b).  [Doc. 39-1 at 24.]  Specifically, it argues that certification under Rule 23(b)(1) is improper because Plaintiffs seek both compensatory and injunctive relief.  [*Id.*]  General Mills also argues that Plaintiffs' allegations primarily request monetary damages, foreclosing a Rule

---

[46] Generally, an employee who wishes to sue his employer for race discrimination under Title VII must first file a charge of discrimination with the EEOC.  *See* 42 U.S.C. § 2000e–5.  Under the "single-filing rule" (also known as the "piggybacking rule"), a putative plaintiff who has not filed his own EEOC charge may "piggyback" his claim onto the claim of a plaintiff who has filed a timely charge where "(1) the relied upon charge is not invalid, and (2) the individual claims of the filing and non-filing plaintiff arise out of similar discriminatory treatment in the same time frame."  *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 450 (11th Cir. 1993).

23(b)(2) class based upon class-wide injunctive or declaratory relief.  [*Id.*]  Finally, General Mills argues that a Rule 23(b)(3) class—where common questions of law or fact predominate—cannot be certified because the second amended complaint confirms that the allegations and claims involve different decisionmakers, various types of employment decisions, and decisions that are spread out over decades—meaning each Plaintiff's claims will require an individualized assessment.  [*Id.*]

Plaintiffs respond that General Mills's request to dismiss the complaint's class allegations is procedurally improper.  [Doc. 43 at 22-23.]  Plaintiffs contend that Rule 12(b) is inapplicable to class allegations, and that the proper vehicle for attacking the validity of class allegations at this juncture is a motion to strike under Rule 12(f), which General Mills has not filed.  [*Id.*]  Plaintiffs further argue that it is premature to assess the validity of class allegations because the deadline to move to certify the putative class has not passed.  [*Id.* at 23.]  Plaintiffs contend that discovery, including statistical evidence on how Black employees were treated vis-à-vis white employees, is needed so they can "flesh out" their class allegations.  [*Id.* at 24.]  Plaintiffs also suggest that such discovery "may" offer "a more definitive basis for the certification of the class in this case."  [*Id.*]

On reply, General Mills reiterates that the Court is authorized to strike or dismiss class allegations and that it is appropriate to do so here, since the individualized nature of Plaintiffs' claims makes it impossible to certify a class. It also emphasizes that Plaintiffs have held a variety of job titles, worked for General Mills at different times, and allegedly suffered myriad forms of adverse employment actions. [Doc. 44 at 12-15.]

### 2. Analysis

To maintain a class action, the named plaintiffs must show: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

In addition to meeting the requirements found in Rule 23(a), a plaintiff must establish that the proposed class satisfies at least one of three requirements listed in Rule 23(b). Rule 23(b) provides

A class action may be maintained if Rule 23(a) is satisfied and if:

(1) prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b). In the second amended complaint, Plaintiffs expressly allege that they qualify as class representatives pursuant to Rule 23(b)(1) and (b)(2). [*See* Doc. 30 ¶¶ 441-42.]

Generally speaking, courts do not inquire about the sufficiency of class allegations before the plaintiff has moved for class certification. *See, e.g., Carrier v. Ravi Zacharias Int'l Ministries, Inc.*, No. 1:21-cv-2161-TWT, 2023 WL 2355891, at *2 (N.D. Ga. Mar. 3, 3023). This is because "the parties' pleadings alone are often not sufficient to establish whether class certification is proper, and the district court will need to go beyond the pleadings and permit some discovery and/or an evidentiary hearing to determine whether a class may be certified." *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1309 (11th Cir. 2008). But courts have stricken class allegations where it is clear *from the face of the complaint* that the proposed class cannot satisfy the requirements of Rule 23. *See Bush v. Honda Dev. & Manuf. of Am. LLC*, No. 1:25-cv-893-RDP, 2025 WL 1830702, at *3-4 (N.D. Ala. July 2, 2025) (quoting *Bearden v. Honeywell Int'l, Inc.*, 720 F. Supp. 2d 932, 942 (M.D. Tenn. 2010)) (discussing numerous defects in putative class action complaint and ordering repleader because it was a shotgun complaint); *see also Lumpkin v. E.I. Du Pont de Nemours & Co.*, 161 F.R.D. 480, 482 (M.D. Ga. 1995) (granting motion to strike class allegations after some limited discovery). Such early challenges to

80

class claims are properly asserted under Rule 12(f)—via a motion to strike—rather than Rule 12(b)(6). *Mathews v. Home Depot USA, Inc.*, No. 1:22-CV-02605-ELR, 2023 WL 2731721, at *7 (N.D. Ga. Feb. 22, 2023) (declining to consider motion to dismiss class allegations under Rule 12(b)(6) as premature).[47]

Striking class proceedings at the pleading stage "is an extreme remedy appropriate only where a defendant demonstrates from the face of the complaint that it will be impossible to certify the classes alleged by the plaintiff regardless of the facts the plaintiff may be able to prove." *Lawson v. Life of the S. Ins. Co.*, 286 F.R.D. 689, 695 (M.D. Ga. 2012) (cleaned up). Even so, under some circumstances, early disposition of class claims can be appropriate, as class discovery is notoriously expensive, and a district court "has some responsibility to ensure there are valid class allegations presented before requiring the parties to embark on time-consuming and expensive Rule 23 discovery and motion practice." *Bush*, 2025 WL 1830702, at *3. Thus, "if a court is convinced that there are no circumstances in which Plaintiff's allegations could succeed in class action form"

_____

[47] Plaintiffs contend that the Court can ignore General Mills's arguments about the class allegations because General Mills did not style its motion as a motion to strike. [Doc. 43 at 22-24.] The Court declines to put form over substance. Regardless of which rule General Mills invoked, the point is that Plaintiffs' class claims have serious defects, and Plaintiffs must address those in a repleaded complaint.

striking the class allegations is appropriate. *Id.* (citing *Twombly* as an example of a class action that was dismissed before discovery due to the failure to state a claim).

Here, the Court has serious concerns as to whether Plaintiffs can maintain a class action. The Court starts with commonality. "Under the Rule 23(a)(2) commonality requirement, a class action must involve issues that are susceptible to class-wide proof." *Vega v. T-Mobile USA*, Inc., 564 F.3d 1256, 1270 (11th Cir. 2009). "Commonality is a relatively low threshold and should not be confused with the predominance inquiry—all that is required by Rule 23(a)(2) is that there be 'at least one issue whose resolution will affect all or a significant number of the putative class members.'" *Jones v. Depuy Synthes Prods., Inc.*, 330 F.R.D. 298, 306 (N.D. Ala. 2018) (quoting *Williams v. Mohawk Indus.*, 568 F.3d 1350, 1355 (11th Cir. 2009)). In other words, the class members must have all suffered the same sort of injury, such that the resolution of "central" factual or legal issues "is capable of classwide resolution." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011).

But "[t]his does not mean merely that they have all suffered a violation of the same provision of law." *Dukes*, 564 U.S. 350. Anti-discrimination statutes like Title VII and § 1981 "can be violated in many ways—by intentional

discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company." *Id.* Thus,

> the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once. Their claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

*Id.*

Here, Plaintiffs' class-wide pattern and practice claims are based on the entire spectrum of possible employment actions—everything from "write-ups" (that do not seem to have any material impact on the terms and conditions of employment) to termination from employment (*i.e.*, the ultimate adverse employment action) over at least a four-year period. Plaintiffs also worked (and continue to work) in a variety of positions and reported to different supervisors.[48] And some of them even attribute their adverse employment actions to reasons

---

[48] The Court again points out the paucity of allegations about positions the named Plaintiffs held, to whom they reported, and who made the challenged employment decisions.

other than race, such as Plaintiff Turner, who contends that she was subjected to discrimination because of her sex. [*See* Doc. 39-3 at 26.] Indeed, Turner has filed her own individual lawsuit in which she alleges that the exact same employment actions that form the basis of her race discrimination claims also support sex discrimination claims. *See Turner*, No. 1:24-cv-5969-MLB-JKL, Doc. 15. Likewise, Jefferson has filed an individual case in which he alleges General Mills unlawfully interfered and retaliated against him in violation of the FMLA. *See Devahn Jefferson v. General Mills Operations, LLC*, No. 1:24-cv-5977-MLB-JKL, Doc. 15. Another example of the lack of commonality is Plaintiff Levesque. The second amended complaint alleges that when she was terminated, she did not even work in the Covington facility, and it does not appear that she reported to any of the purported Good Ole Boys. [*See* Doc. 30 ¶¶ 269-73.] And these are but a few of the limited examples the undersigned has found in the complaint that would undermine commonality. In the end, the Court fails to see how it is possible for Plaintiffs to establish requisite commonality because they have presented numerous and diverse theories, each supported by "broadly different factual scenarios." *Bush*, 2025 WL 1830702, at *2.

The Court also fails to see how Plaintiffs could possibly establish typicality. "A class representative must possess the same interest and suffer the same injury

as the class members in order to be typical under Rule 23(a)(3)." *Vega*, 564 F.3d at 1275. "Typicality and commonality have much in common, but whereas, 'commonality refers to the group characteristics of the class as a whole,' typicality 'refers to the individual characteristics of the named plaintiff in relation to the class.'" *Jones*, 330 F.R.D. at 307 (quoting *Vega*, 564 F.3d at 1275). In other words, "[t]he claims must arise out of the same event, practice, or course of conduct and the claims must be based on the same legal theories." *Lumpkin*, 161 F.R.D. at 482. Here, Plaintiffs argue that their unifying theme is that General Mills has allowed a group of supervisors—that is, the Good Ole Boys—to act on their racial and anti-retaliatory biases. Yet a problem remains—how those biases affected each employee is highly individualized, seeing as each Plaintiff is alleged to have suffered distinct wrongs perpetrated at various occasions by different supervisors.

In addition to these concerns, the Court questions whether Plaintiffs can adequately represent the interests of other class members because several putative class members have filed their own individual actions in this District.[49]

---

[49] *Tommy Sanders v. General Mills Operations, LLC*, No. 1:24-cv-5972-MLB-JKL (N.D. Ga.); *Yussef Ibrahim v. General Mills Operations, LLC*, No. 1:24-cv-5973-MLB-JKL (N.D. Ga.); *Keisha Reed v. General Mills Operations, LLC*, No. 1:24-cv-5976-MLB-JKL (N.D. Ga.); *Gary East v. General Mills Operations, LLC*, No. 1:24-cv-5978-MLB-JKL (N.D. Ga.); *Joshua Sullivan v. General Mills Operations, LLC*, No.

"These other suits . . . call into question Plaintiffs' ability to adequately represent the interests of other class members . . . ." *Lumpkin*, 161 F.R.D. at 482. "The right and desire of other potential plaintiffs to control their own litigation and pursue independent actions are important considerations which defeat the propriety of class certification." *Id.*

And while the inability to establish each of the Rule 23(a) requirements dooms Plaintiffs' class claims, it also seems highly unlikely that Plaintiffs could meet the requirements of either Rule 23(b)(1) or 23(b)(2).[50] Starting with 23(b)(1), a plaintiff must show that the prosecution of separate actions by or against individual members of the class would create a risk of

> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; [and] (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not

---

1:24-cv-5979-MLB-JKL (N.D. Ga.); *Tamaris Goss v. General Mills Operations, LLC*, No. 1:24-cv-5980-MLB-JKL (N.D. Ga.); *Titus Reid v. General Mills Operations, LLC*, No. 1:24-cv-5981-MLB-JKL (N.D. Ga.); *Letonya Hunter v. General Mills Operations, LLC*, No. 1:25-cv-861-MLB-JKL (N.D. Ga.); *Brandon Hogan v. General Mills Operations, LLC*, No. 1:25-cv-862-MLB-JKL (N.D. Ga.); *Kelvin Phillips, II v. General Mills Operations, LLC*, No. 1:25-cv-864-MLB-JKL (N.D. Ga.); *Donald Brooks v. General Mills Operations, LLC*, No. 1:25-cv-865-MLB-JKL (N.D. Ga.); *Nathan Waters v. General Mills Operations, LLC*, No. 1:25-cv-866-MLB-JKL (N.D. Ga.); *Jimmie Granville v. General Mills Operations, LLC*, No. 1:25-cv-867-MLB-JKL (N.D. Ga.).

[50] Again, Plaintiffs do not allege that a class is appropriate under Rule 23(b)(3)—just Rule 23(b)(1) and (b)(2). [*See* Doc. 30 ¶ 441-42.]

parties to the individual adjudications or would substantially impair or impede their ability to protect their interests[.]

Fed. R. Civ. P. 23(b)(1). "Because the risk that judicial action will create incompatible standards of conduct is low when a party seeks compensatory damages, only actions seeking declaratory or injunctive relief can be certified under Rule 23(b)(1)(A)." *Babineau v. Fed. Exp. Corp.*, 576 F.3d 1183, 1195 (11th Cir. 2009). This same concern applies to Rule (b)(2). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Dukes*, 564 U.S. at 360 (2011). "[I]t does not authorize class certification when each class member would be entitled to" an individualized award of monetary damages. *Id.* at 360-61; *see Bush*, 2025 WL 18390702, at *4 ("*Dukes* acknowledged 'serious doubt about whether claims for monetary relief may be certified under [Rule 23(b)(2)]' and held that the only potential exception was where monetary relief was 'incidental to the injunctive or declaratory relief.'" (quoting *Dukes*, 564 U.S. at 360)).

Here, the Court is not persuaded that monetary relief would only be incidental to the declaratory relief that Plaintiffs seek. To be sure, Plaintiffs seek a declaration that General Mills has violated the law, as well as injunctive relief, "along with this Court's oversight for a reasonable duration, disbanding the Good Ole Boys, holding racist decisionmakers accountable, and implementing

87

lawful employment practices that give Black employees the full benefit of employment at General Mills." [Doc. 30 at 157-58.] But Plaintiffs also seek the "[f]ull amount of financial losses caused to Plaintiffs as a result of the racists employment practices at the Covington facility," as well as other compensatory (such as emotional distress) and punitive damages. [*Id.* at 158.] These damages do not appear to be "incidental" to Plaintiffs' requests for injunctive or declaratory relief, but central to their claims, which, of course, would require a determination on an individualized basis. *See Bush*, 2025 WL 1830702, at *4.[51]

In sum, this case appears to be one where it is appropriate to evaluate the sufficiency of Plaintiffs' class allegations at an early stage. As discussed above, the Court has a difficult time seeing how Plaintiffs could maintain a class action. The more efficient approach, it appears, would be for Plaintiffs to pursue their cases individually. So while the Court is not striking the class allegations at this time, and is instead ordering repleader, the Court gives the same warning as the court did in *Bush*:

---

[51] Given the highly individualized nature of each Plaintiff's circumstances, the Court also fails to see how individual discrimination suits brought by one or more class members "would as a practical matter be dispositive of the interests of the other members . . . or would substantially impair or impede their ability to protect their interests." Fed. R. Civ. P. 23(b)(1)(B).

this opportunity to replead does not mean that the court believes
that a class action is an appropriate vehicle for Plaintiff's legal
theories. That question is still to be determined. The amended
complaint should only include class action allegations that Plaintiff
has a good faith basis for believing are supported by Supreme Court
and Eleventh Circuit case law.

*Bush*, 2025 WL 1830702, at *4.

### C.    Plaintiffs' Pattern and Practice Theory

Finally, the Court addresses Plaintiffs' allegations that General Mills

engages in a pattern and practice of discrimination.  *See Dukes*, 564 U.S. at 352.

### 1.    The Parties' Contentions

Plaintiffs assert that all six of their claims—which allege various forms of

disparate treatment, retaliation, and hostile work environment under Title VII

and § 1981—survive dismissal because they have sufficiently alleged a pattern

and practice of intentional discrimination.  Plaintiffs contend that General Mills's

motion ignores that they are proceeding on this "pattern and practice" theory of

liability, which they contend "focuses on a pattern and practice of intentionally

racially discriminatory decisionmaking via wholly different pleading and proof

standards ultimately establishing, at a later phase, that illegal discrimination was

a company's standard operating procedure."  [Doc. 43 at 2.]  Plaintiffs argue that,

given the "myriad specific examples of historical and ongoing intentional

discriminatory and retaliatory acts by General Mills at its Covington Plant," they

89

have plausibly alleged that race discrimination was General Mills's standard operating procedure. [*Id.* at 7.] These same examples, Plaintiffs maintain, provide a "mosaic of circumstantial evidence" that "is sufficient to show a plausible claim of illegal discrimination under Title VII and § 1981." *Id.*

Along these lines, Plaintiffs also stress that in a pattern and practice case, individual class members do not each have to prove the individual elements of discrimination; rather, once an illegal pattern and practice is shown, the burden shifts to General Mills to show that any particular class member was not discriminated against. [Doc. 43 at 7-8, 12 (citing *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546 (11th Cir. 1986)).] Plaintiffs argue that they have stated, at a minimum, viable claims for hostile work environment under a pattern and practice theory. [*Id.* at 16-17.]

In response, General Mills argues that Plaintiffs have failed to identify which claims fall within this theory. [Doc. 44 at 5.] Citing *E.E.O.C. v. J&R Baker Farms, LLC*, No. 7:14-cv-136-HL, 2015 WL 4753812 (M.D. Ga. Aug. 11, 2015), General Mills contends that a pattern and practice claim is a variation of the disparate treatment theory, and does not encompass retaliation or hostile work environment claims. [*Id.* at 5 n.3.] General Mills also argues that Plaintiffs must show that they have standing to prosecute a pattern and practice claim on behalf

90

of similarly-situated employees.  [*Id.* at 6.]  But here, General Mills maintains, no Plaintiff has alleged facts that plausibly suggest that they suffered discrimination, retaliation, or a racial hostile work environment.  [*Id.* at 7.]

### 2.    Analysis

To state a pattern and practice claim, a plaintiff must allege factual content that plausibly establishes that "discrimination was the company's standard operating procedure," that is, "the regular rather than the unusual practice."  *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977); *see also Henley v. Turner Broad. Sys., Inc.*, 267 F. Supp. 3d 1341, 1356 (N.D. Ga. 2017) (discussing pleading requirements for pattern and practice claims under Title VII and § 1981).  The plaintiff must allege facts that permit the court to draw a reasonable inference that the defendant engaged in "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts."  *Int'l Bhd. of Teamsters*, 431 U.S. at 336.  "A plaintiff may establish a pattern or practice claim through a combination of strong statistical evidence of disparate impact coupled with anecdotal evidence of the employer's intent to treat the protected class unequally."  *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1287 (11th Cir. 2000) (citation omitted).  If a pattern and practice of discrimination is established, a rebuttable presumption arises that the plaintiff was discriminated against. *Id.* at 1287 n.22.  The burden

91

then shifts to the employer to show by clear and convincing evidence that job decisions made when the discriminatory policy was in force were not made under that policy. *Id.*

As Plaintiffs explain in their response, their principal theory of liability in this case is that virtually every employment action involving a Black employee at the Covington facility should be presumed to be the result of discrimination. But here's the rub. Pattern and practice claims may be brought by either the EEOC or by a class of private plaintiffs. *Joe's Stone Crab*, 220 F.3d at 1286. And as explained in the previous section, the Court has serious reservations about whether Plaintiffs can maintain a class action. If Plaintiffs are unable to do so—and thus must prosecute their cases individually—then none of them can use the pattern and practice theory of liability to establish a presumption of discrimination. Instead, each Plaintiff would need to present evidence to create a reasonable inference that they were discriminated or retaliated against.

Moreover, the second amended complaint's effort to allege a plausible pattern or practice claim has some serious problems. Plaintiffs rely almost exclusively on anecdotal evidence to support their pattern and practice theory, foreswearing any reliance on statistics. The issue is thus whether these anecdotal

allegations are sufficient to plausibly allege that General Mills discriminated against Plaintiffs *as part of its standard operating procedure*.

There is not much case law explicating what a plaintiff must allege to bring a plausible claim for pattern and practice discrimination. *See Frazier v. Morgan Stanley*, No. 16 Civ. 804 (RJS), 2018 WL 11585450, at *11 (S.D.N.Y. Nov. 29, 2018) (observing that "[f]ew courts have addressed what a complaint must allege in order to state a pattern or practice claim"). But in *Henley v. Turner Broadcasting System, Inc.*, this Court was faced with a similar dilemma on a motion to dismiss a putative class complaint. 267 F. Supp. 3d 1341 (Duffey, J.). In that case, two plaintiffs brought a putative class action alleging that the defendants (various affiliated corporate entities) engaged in a pattern and practice of racial discrimination in performance evaluations, compensation, promotions, and terminations, all in violation of § 1981 and Title VII. *Id.* at 1346-49. The Court held that even assuming that the plaintiffs had standing to assert § 1981 claims on behalf of the putative class, they failed to allege that the defendants engaged in a pattern and practice of race discrimination against them and the class. *Id.* at 1357. The Court found that the plaintiffs' allegations that defendants exercised "undue discretion" in compensation, promotions, and performance evaluations was insufficient because they did not sufficiently allege facts describing how

93

those alleged discriminatory processes worked. *Id.* at 1357-58. The Court also identified several conclusory allegations as insufficient to support an alleged pattern and practice of intentional race discrimination, including allegations (1) that defendants "frequently fail[ed]" to evaluate managers based on their equal employment opportunity performance; (2) that Black employees "have had to endure racial slurs and prejudicial biases from their superiors such as, 'it's hard to manage black people' and 'who would be worth more: black slaves from times past, or new slaves,'" (particularly when the timing of those statements, who made them, or the circumstances under which they were made were not alleged); (3) that defendants denied Black employees equal training, mentoring, and work assignments; (4) that some "administrative processes" reflected condescending or stereotypical attitudes toward Black people; (5) that white employees often skip one or two position levels when promoted, while Black employees are simply promoted to the next lowest level; and (6) that Black employees are often required to assume, with no additional compensation, job responsibilities of more senior positions. *Id.* at 1358. The Court found that those allegations were conclusory, generalized, and not supported by specific factual allegations, and therefore, the plaintiffs' discrimination claim was not plausibly alleged.

The Court also found that the plaintiffs' allegations that unidentified white employees received bonuses while a Black employee did not and that the Black employee was later passed over for a promotion in favor of a white colleague were insufficient. *Henley*, 267 F. Supp. 3d at 1359. The Court explained:

> These broad, conclusory allegations—based on a single project about which no details are alleged, including the number of employees who worked on it—do not plausibly allege intentional race discrimination because there is insufficient information alleged to determine whether the employees identified as receiving a bonus or promotion qualify as similarly situated comparators. Plaintiffs do not provide meaningful information about the African–American employee who allegedly experienced discrimination, the other Caucasians who received a bonus, or the Caucasian counterpart who was promoted. Plaintiffs also fail to describe the individuals' contributions to the project, the type of project, the number of people who worked on it, or the number of bonuses given and for what reason.

*Id.* (cleaned up). The Court reached the same conclusion with respect to allegations that the defendants had selected a white candidate for promotion over a more highly-qualified Black candidate. *Id.* The Court noted that there were no allegations about how the Black candidate had performed during the interview, why he was better qualified, or even what positions the candidates held when their applied. *Id.* The undersigned has similar concerns here.

The Eleventh Circuit's opinion in *Hipp v. Liberty Nat'l Life Ins. Co.* is also instructive. In that case, the Eleventh Circuit held that plaintiffs in an ADEA class

95

action who alleged that they had been constructively discharged because of their age did not present sufficient evidence to prove that the "standard operating procedure" of the employer was age discrimination. 252 F.3d 1208, 1228-29 (11th Cir. 2001). The court found that the plaintiffs had simply alleged an "amorphous policy" under which the employer's "top executives employed a standardized set of harassing tactics and techniques." *Id.* at 1228. The court noted, too, that "the pattern and practice framework is inherently ill-suited to cases in which plaintiffs allege constructive discharge." *Id.* at 1229 n.29. In typical pattern and practice cases, the court explained, "plaintiffs challenge the employer's failure to hire or promote employees of a certain class," and the individual employees usually present very similar claims and often point to a written policy or strong statistical evidence that supports their position. *Id.* Constructive discharge cases (as well as hostile work environment cases), by contrast, depend on individualized actions taken against each employee. *Id.* While the court left open the possibility that "it might in some other case be appropriate to conclude an employer engaged in a 'pattern and practice' of forcing out employees of a certain class," it was not appropriate in that case because each plaintiff "relie[d] heavily on individualized and personalized 'harassment'" to support his or her claim of constructive discharge. *Id.*

Here, the complaint alleges a host of incidents, and frequently, courts look to the number of instances of alleged discrimination to determine whether a pattern and practice of discrimination has been adequately pled.  *See, e.g., Frazier*, 2018 WL 11585450, at \*4 (citing *United States v. E. River Hous. Corp.*, 90 F. Supp. 3d 118, 159 (S.D.N.Y. 2015)).  But the problem is that many of the incidents alleged in the complaint are so lacking in detail, it is impossible to determine whether they are connected to discriminatory animus.[52]  Compounding this problem is that Plaintiffs do not identify any particular policy that is supposedly discriminatory.  Rather, as best the Court can tell, they claim that in the Covington facility, a poorly defined group of white supervisors engaged in an across-the-board pattern of discriminating against Black people.  But to state a patten and practice claim, a plaintiff must demonstrate that discrimination was the *company's* standard operating procedure.  *See Int'l Bhd. of Teamsters*, 431 U.S.

---

[52] As to retaliation, the crux of Plaintiffs' theory seems to be that General Mills regularly retaliates against Black employees who complain about race discrimination.  [*See, e.g.*, Doc. 30 ¶¶ 3(r)-(s), 4(c), 48, 57, 58, 220, 282.]  As best the Court can tell, Plaintiffs are not alleging that General Mills maintains a "standard operating procedure" of retaliating against employees who engage in protected activity, but a "standard operating procedure" of retaliating against *Black* employees who complain about race discrimination.  Of course, any such act of retaliation would violate the anti-retaliation provision of Title VII, but these allegations do not fit neatly into a pattern and practice theory.  Instead, they seem to simply support allegations of race discrimination.

at 336.  Of course, the "company" here is General Mills, which, as Plaintiffs allege, is one of the largest food manufacturers in the world, employing over 30,000 employees in the United States, with 50 facilities in the United States, Mexico, Canada, and Australia.  [Doc. 30 ¶¶ 14, 15, 284 n.22.]  Whatever invidious acts of discrimination may have been perpetrated at the Covington facility, Plaintiffs have not plausibly alleged that General Mills, as a company, has a standard and usual practice of discriminating against Black individuals.[53]  Instead, it appears to the Court that Plaintiffs' claims stem from sum-total of discriminatory acts of a discrete number of individuals (many of whom are unidentified) who work in the Covington facility.

And even if a pattern and practice claim could be based on employment practices at the local level, the problem remains that Plaintiffs have not defined the "standard operating procedure" with any degree of clarity.  To be sure, "a *formal* or *express* policy of discrimination" is not required.  *Joe's Stone Crab*, 220

---

[53] Adding to the confusion is that some of the company-wide policies that Plaintiffs identify are facially neutral—such as the manner in which the Coaching & Counseling Database is maintained or General Mills's use of an antiquated document management system that allows for nefarious manipulation.  *See Frazier*, 2018 WL 11585450, at *11 (concluding that plaintiffs did not allege a discriminatory policy where they alleged that the defendant's policies allowed discrimination to occur).

F.3d at 1285.  But as the Eleventh Circuit observed in *Hipp*, a pattern and practice claim usually focuses on a practice involving a discrete employment decision—like hiring, promotion, and so on.  Thus, the pattern-and-practice theory is particularly ill-suited for highly individualized situations like hostile workplace harassment that are based on the experience of each individual plaintiff.  But here, Plaintiffs do not focus on a specific type of discrete action; they contend that there was a policy to discriminate (and retaliate) against Black individuals at every possible opportunity.  That is a far cry from the sorts of policies and procedures at issue in other cases.  And, as a further complication, Plaintiffs try to include allegations of harassment or retaliatory hostile work environment—again, typically highly individualized forms of discrimination—into their pattern and practice theory.

In sum, Plaintiffs' second amended complaint paints a troubling picture of how Black employees at the Covington facility were treated.  But, similar to the complaint's class allegations, the Court has serious concerns about whether Plaintiffs can avail themselves of a pattern and practice theory when it appears their claims are much better suited for individualized treatment.

### D.    Sufficiency of Individual Claims

Because repleader is warranted given the operative complaint's more general pleading problems (including in its class and pattern and practice allegations), the undersigned declines to wade into the merits of the individual claims, including the extent to which they are time-barred.  Indeed, given the murky way in which Plaintiffs have pled their claims, the Court has had considerable difficulty determining what adverse employment actions each Plaintiff even alleges.  As a result, the Court defers this analysis until later.

## IV.    CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the Court **DISMISS** the second amended complaint **WITHOUT PREJUDICE** and direct Plaintiffs to file an amended complaint that addresses the defects identified in this report and recommendation.

IT IS SO RECOMMENDED this 8th day of October, 2025.

_____

JOHN K. LARKINS III
United States Magistrate Judge

100